## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| **BRIAN AND LISA WRIGHT,** | § | |
| **Individually and as Representatives** | § | |
| **of the Estate of CADE WRIGHT,** | § | |
| **Deceased,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO.:  1:04-CV-11(MAC)** |
| | § | |
| | § | **JUDGE CRONE** |
| **FORD MOTOR COMPANY** | § | |
| | § | **(JURY TRIAL)** |
| *Defendant.* | § | |

## FORD MOTOR COMPANY'S MOTION TO EXCLUDE THE TESTIMONY OF LILA LAUX IN ITS ENTIRETY AND MEMORANDUM IN SUPPORT OF SAME

**BROWN MCCARROLL, L.L.P.**

Evan N. Kramer
Texas Bar No.: 11704650
William R. Moye
Texas Bar No.:  24027553
1111 Bagby, 47th Floor
Houston, Texas 77002
Tel:  (713) 529-3110
Fax:  (713) 525-6295

## TABLE OF CONTENTS

I.  BACKGROUND FACTS ........................................................................ 1

    A.  Nature of the Proceeding ..................................................................1

    B.  Relief Sought and Summary of the Argument ...................................1

    C.  Statement of Facts.............................................................................1

    D.  Plaintiffs' Allegations.......................................................................2

    E.  Plaintiffs' Human Factors/Warnings Expert ....................................3

    F.  Qualifications of Lila Laux ...............................................................3

    G.  Opinions of Lila Laux.......................................................................5

    H.  Methodology Employed by Lila Laux................................................6

III.  ARGUMENT AND AUTHORITIES........................................................ 7

    A.  Laux Lacks the Requisite Qualifications to Render Opinions Regarding Vehicle Design ..................................................................8

    B.  The Methodology Employed by Laux Fails to Satisfy the Evidentiary Gates of *Daubert*. Laux's Testimony is Unreliable and Should be Excluded.............................................................................................9
        1.  Laux's Human Factors Testimony Should be Excluded ........................10
        2.  Laux's Product Defect and Warnings Testimony should be Excluded ..................10

    C.  Laux's Methodology Is Not Adequately Linked to the Facts of this Case............12

IV.  CONCLUSION ...................................................................................... 14

# TABLE OF AUTHORITIES

## CASES

Black v. Food Lion, 171 F.3d 308 (5th Cir. 1999) ........................................................7, 12

Cavallo v. Star Enterprises, 892 F. Supp. 756 (E.D. Va. 1995).......................................13

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579; 113 S. Ct. 2786; 125 L.
    Ed. 2d 469 (1993) ...........................................................3, 6, 7, 8, 9, 10, 11, 12, 14

General Electric v. Joiner, 522 U.S. 136; 139 L. Ed. 508 (1997)....................................12

Kumho Tire v. Carmichael, 526 U.S. 137; 119 S. Ct. 1167; 143 L. Ed. 2d 238
    (1999)……....................................................................................................3, 8, 9

Mid-State Fertilizer Co. v. Exchange National Bank, 877 F.2d 1333 (7th Cir. 1989)
    ..................................................................................................................13

Moore v. Ashland Pharmaceuticals, 151 F.3d 269 (5th Cir.1998) ....................................8

Tanner v. Westbrook, 174 F.3d 542 (5th Cir. 1999).......................................................9

Watkins v. Telsmith, 121 F.3d 984 (5th Cir. 1997).....................................................11

Wilson v. Woods, 163 F.3d 935 (5th Cir. 1998)..........................................................9

## STATUTES

Fed. R. Evid. 702, 104(a).........................................................................................7, 8, 9

# APPENDIX

**EXHIBIT "A"** – Groves Police Department Accident Report

**EXHIBIT "B"** – Deposition of Medical Examiner Tommy Brown

**EXHIBIT "C"** – Deposition of Darren McCutcheon

**EXHIBIT "D"** – Deposition of Lisa Wright

**EXHIBIT "E"** – Ford 2001 Expedition Owner's Guide

**EXHIBIT "F"** – Lila Laux's *Curriculum Vitae*

**EXHIBIT "G"** – Expert Report of Lila Laux

**EXHIBIT "H"** – Deposition of Lila Laux

# I. BACKGROUND

### A.      Nature of the Proceeding

The matter at bar is an automotive products liability action which arises from a vehicle-pedestrian accident. *See* Plaintiffs' Original Complaint.

### B.      Relief Sought and Summary of the Argument

Ford moves to exclude the testimony of Plaintiffs' human factors/warnings expert, Lila Laux. Laux's testimony is not based on reliable scientific principles or methodology and should, therefore, be excluded.

### C.      Statement of Facts[1]

1.  The accident occurred on July 30, 2003, in a parking lot adjacent to a popular sno-cone refreshment stand located at 5041 Twin City Highway in Groves, Texas. *See* Groves Police Department Accident Report attached hereto as Exhibit "A".

2.  Cade Wright, the three (3) year old child of Plaintiffs Brian and Lisa Wright, was struck in the parking lot by a 2001 Ford Expedition operated by Robin McCutcheon. *See id.*

3.  Cade Wright died instantly as a result of the injuries he sustained in the collision. *See* Deposition of Medical Examiner attached hereto as Exhibit "B".

4.  At the time of the accident, the front of the sno-cone parking lot was not equipped with dedicated parking stalls. *See* Groves Police Department Accident Report.

5.  Consequently, all visitors who frequented the sno-cone stand where required to park their vehicles in a haphazard manner. *See* Groves Police Department Accident Report.

6.  One such visitor, Darren McCutcheon, the owner of the subject 2001 Ford Expedition, described the sno-cone stand and parking lot as a "madhouse" immediately prior to the incident. *See* Deposition of Darren McCutcheon attached hereto as Exhibit "C" at p. 60.

---

[1] Undisputed facts are designated in separate numbered sentences 1-8 pursuant to Local Rule.

7. In consideration for a release of liability in this matter, Plaintiffs have entered into confidential settlement agreements with both Robin McCutcheon and Crossroad Partners, Inc., the owner/operator of the sno-cone parking lot. *See* Deposition of Lisa Wright attached hereto as Exhibit "D" at pp. 48-49.

8. A thorough police investigation revealed that no persons at the scene actually witnessed the collision between the vehicle and Cade Wright. *See* Groves Police Department Accident Report.

All that is known, according to the Plaintiffs, the police investigators, and other witnesses at the scene, is that Brian and Lisa Wright carelessly allowed their three (3) year old son to walk unattended through the busy parking lot before the child was struck by the McCutcheon's vehicle. There is no evidence in this case which establishes how Cade Wright became located behind the McCutcheon's vehicle after the child left the sno-cone stand. In that vein, there is no evidence which would confirm that Cade Wright was located behind the vehicle before, or at the exact point when, Robin McCutcheon placed her vehicle in reverse in order to back out of the parking lot. Any testimony by Plaintiffs' experts to the contrary is mired in conjecture.

## D.   **Plaintiffs' Allegations**

Plaintiffs' Complaint sounds in strict products liability and negligence.   Specifically, Plaintiffs allege that Ford Motor Company was strictly liable and/or negligent for failing to equip the McCutcheon's 2001 Expedition with an ultrasonic rear parking aid device as standard equipment. As a result, Plaintiffs maintain that the 2001 Expedition was defective in its design, marketing and manufacture. The rear parking aid device is a convenience feature that sounds a tone to warn the driver of fixed obstacles near the rear bumper when a vehicle is placed in reverse gear. *See* Ford 2001 Expedition Owner's Guide ("Owner's Guide") attached hereto as

Exhibit "E". The Court should be aware, however, that the rear parking aid was offered on the 2001 Expedition as a vehicle option. Darren McCutcheon was aware that the equipment was available, but he, nevertheless, declined to purchase the rear parking aid. *See* Deposition of D. McCutcheon at p.61.

### E.     Plaintiffs' Human Factors/Warnings Expert

As part of their Rule 26 disclosures, Plaintiffs have designated Lila Laux, Ph.D. ("Laux") as a human factors/warnings expert in this case. Laux's chief conclusion is that the 2001 Expedition was defectively designed and/or marketed because the vehicle was not equipped with a rear parking aid device. As set forth herein, Laux lacks the requisite qualifications to render such opinions regarding the design and/or marketing of the 2001 Expedition. Moreover, Laux's opinions lack the necessary indicia of reliability as mandated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579; 113 S. Ct. 2786; 125 L. Ed. 2d 469 (1993) and *Kumho Tire v. Carmichael*, 526 U.S. 137; 119 S. Ct. 1167; 143 L. Ed. 2d 238 (1999). Ford moves to exclude Laux's testimony in its entirety.

### F.     Qualifications of Lila Laux

Laux holds a doctorate degree in Industrial Psychology and Human Factors Engineering. *See curriculum vitae* attached hereto as Exhibit "F". She is currently employed as a senior engineer at a private consulting firm, Micro Analysis & Design, which provides human factors consulting services to the United States Military. *See id.* Laux also is the sole principal in Human Factors Consulting, a private legal consulting firm. *See id.* Laux's *curriculum vitae* produced in this case reveals that she has been a human factors practitioner since 1987. *See id.* Laux defines a human factors consultant as an individual that explores the relationship between environments and product designs and human behavior. *See* Expert Report of L. Laux attached

hereto as Exhibit "G" at p. 1. Laux was retained in this matter "to perform a human factors analysis of the design of the 2001 Ford Expedition owned by the McCutcheon's with regard to the safety of the effective field of view when backing the vehicle." *See id.*

The matter at bar is the first professional consultation regarding either vehicle reverse parking aids and automotive vision characteristics undertaken by Laux. *See* Deposition of L. Laux attached hereto as Exhibit "H" at p. 10. Laux has not published in the area of vehicle parking aids. *See id.* at p. 24. Laux has no formal education and has never attended a seminar or training session in the area of vehicle parking aids. *See id.* at p. 30.

### G.   Opinions of Lila Laux

Laux has proposed that the 2001 Ford Expedition involved in the accident was defectively designed and marketed. Specifically, Laux sets for the following opinions in her signed report authored in this case:

1. The design of the vehicle results in a large blind spot behind the Expedition. As designed, there is no way for a driver to detect a young child who goes behind the vehicle after the driver has entered the vehicle.

2. The large blind spot creates a significant safety hazard for young children.

3. There are a significant number of deaths and injuries to small children when drivers are backing, because of the blind spot in vehicles. SUVs are responsible for a disproportionate number of those deaths and injuries. The reverse field of view in a SUV is typically more restricted that it is for a sedan.

4. There is technology that reduces or eliminates the blind spot behind SUVs. Ford is aware of one type of such technology, the reverse sensing system, and made it available on some models such as the Navigator. It is the reverse sensing system was an option available with the 2001 Expedition. (error in original).

5. There is no warning in the owner's manual about the fact that the reverse field of view in the Expedition is significantly restricted. There is no discussion of the safety hazards associated with this restriction. Purchasers of this vehicle are not made aware that Ford knows about this hazard and can provide a device that significantly reduce or eliminate the hazard.

6.      The Ford Expedition is a high-end vehicle in terms of price.  The addition of the reverse sensing system would not significantly add to the production/manufacturing costs for this vehicle.  The Expedition has more seating than a typical sedan.  Families who purchase the Expedition often do so because they perceive it to be a safe car for transporting their families and they are likely to have children in their families.  It is not likely that the additional cost of the reverse sensor system would deter them from purchasing it - on the contrary, if they understood the advantages of the reverse sensing system as a safety feature, it would likely attract additional buyers who have children.

7.      It was absolutely foreseeable that a child would walk or stand in the blind spot behind the Expedition and get injured or killed.  This happens with an unacceptable frequency due to the fact that children do not perceive or appreciate the hazard and drivers cannot see the children.  Families with SUVs are also likely to be families with children, and they are also likely to be at locations where there are young children.

8.      The hazard associated with backing vehicles, and the increased hazard associated with backing SUVs because of their reduced reward field of view, was well known to Ford when this Expedition was planned, and Ford had the means to reduce or eliminate this hazard in the Expedition that caused the death of Cade Wright.

9.      Ford could, and should, have provided a reverse sensor system on the Explorer (*sic*) driven by Robin McCutcheon.  Failing to do so shows a callous disregard for the safety of children and adults and for the driver of an Expedition who causes a child's injury or death.

10.     Ford could, and should have the educated and warned purchasers of their vehicles about the need for and use of the reverse sensor system.  There is nothing in the owner's manual that informs users whose vehicles are not equipped with this system that there are many after-market reverse sensor systems that they can have installed in their vehicles.

11.     Failing to provide a reverse sensor system and failing to educate the purchasers of the Expedition about the availability and need for such a system shows a callous disregard for the safety of both children and adults.

A summary of Laux's opinions in this case, based on both her written report and her deposition testimony, is that every vehicle manufactured in the world is defective unless: (1) the vehicle is equipped with a reverse parking aid, or (2) the manufacturer informed the purchaser of the need for a reverse parking aid, and/or (3) the manufacturer provided the consumer with

information on how to obtain a rear parking aid from a third-party vendor. *See* Deposition of L. Laux at p. 37.

**H.   Methodology Employed by Lila Laux**

In order to formulate her conclusions in this matter, Laux testified that she undertook a review of the documents that Defendant produced to Plaintiffs during the discovery process in this case. *See id.* at pp. 15 and 67.  Laux also conducted a search for materials relevant to vehicle parking aids on the Internet.  Laux's independent research, according to materials listed in her signed expert report, includes news accounts relating to individual backing accidents, Consumer Reports reviews of rear parking aid technology, and marketing materials from after-market vendors of rear parking aid devices.  Laux testified that the totality of her opinions in this case were derived from her review of the aforementioned documents, as well as her personal experience as a human factors consultant. *See id* at p. 15.

Defendant would respectfully suggest that the Court's *Daubert* inquiry be motivated more by examining the methods Laux failed to employ as opposed to the methods she did employ.  Most compelling in this regard is the wholesale absence of any human factors assessment by Laux of the rear parking aid device at issue in this case. *See id.* at pp. 31, 56, and 60.  In fact, Laux testified that she failed to "look at the technology" and mistakenly believed, at the time of her deposition, that the sensors included in the system were infrared as opposed to ultrasonic. *See id.* at pp. 48 and 49.  Laux did not conduct any testing of the vehicle or rear parking aid relevant to her opinions rendered in this case. *See id.* at pp. 30, 31, and 36.  Laux acknowledged the importance of assessing failure rates for her proposed design, but failed to assess the error/failure rates of the rear parking aid system. *See id.* at pp. 55 and 70.  Laux did not conduct or review any studies regarding the alleged blind spot deficiencies allegedly inherent

in the Expedition, and she did not conduct a comparative study as to how the Expedition relates in this regard to other vehicle model lines. *See id.* at p. 41. Laux did not visit the scene and has not inspected the vehicle. *See id.* at pp. 30 and 35.

## II. ARGUMENT AND AUTHORITIES

The landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and the Federal Rules of Evidence, provide the analytical framework regarding the admissibility of Plaintiffs' proffered expert testimony in the matter at bar. *Daubert* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 469 (1993). In *Daubert*, the Supreme Court instructed district courts to act as evidentiary "gatekeepers" to insure that only relevant and reliable expert testimony is submitted to the jury. *Id.* at 590-93. The Federal Rules of Evidence instruct a district court to allow the submission of expert testimony only if the expert is qualified to testify by virtue of his "knowledge, skill, experience, training, or education." Fed. Rule of Evid. 702.

In addition to substantiating the qualifications of an expert witness, the court is also charged with the responsibility of determining whether the evidence is relevant and reliable. To determine whether these twin benchmarks are met, the court is expected to make a preliminary assessment of whether the reasoning and methodology employed by the expert witness can be applied to the facts at issue in the case. *Daubert*, 509 U.S. at 592-93, *see also Black v. Food Lion*, 171 F.3d 308, 311 (5th Cir. 1999). Four non-exclusive "guideposts" are pertinent in assessing the reliability and validity of an expert's methodology: (1) whether the expert's testimony can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the known or potential rate of error has been explored; and (4) whether their exists a general acceptance of the theory or technique within the relevant scientific community. *See Daubert*, 509 U.S. at 592.

The court's "gatekeeping" obligation applies to all types of expert testimony, including the human factors engineering testimony specific to this case. *Kumho Tire*, 526 U.S. at 147, 119 S. Ct. at 1174 . In *Kumho Tire*, the Court concluded that a district court, when faced with a proffer of technical expert testimony, may consider one or more of the enumerated factors listed in *Daubert*, if such an analysis will help determine that testimony's reliability. *Id.* at 152. The focus of a trial court's gatekeeping function "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. The burden lies with the proponent of the expert to prove by a preponderance of the evidence that the testimony is reliable. *Moore v. Ashland Pharmaceuticals*, 151 F.3d 269, 276 (5th Cir. 1998). The trial court's assessment is governed by Rule 104(a). *See* Fed. R. Evid. 104(a).

A.     **Laux Lacks the Requisite Qualifications to Render Opinions Regarding Vehicle Design**

Laux's credentials reveal that she has considerable experience in the field of human factors assessment. *See curriculum vitae.* However, most of Laux's opinions in this case exceed the boundaries of her stated expertise. Foremost, Laux is not an engineer and is not qualified to render any opinions regarding the design of the 2001 Expedition. *See curriculum vitae.* Any testimony educed by Laux relating to her opinions that the design of the 2001 Expedition results in a large rearward blind spot should be excluded. Likewise, any opinions held by Laux that the alleged blind spot deficiencies in the 2001 Expedition cause a significant safety hazard for small children should also be excluded. Laux should be barred from proffering any opinion testimony that the 2001 Expedition is defectively designed when not equipped with a rear parking aid, and/or that the optional equipment would have eliminated the possibility of the collision between Cade Wright and the McCutcheon's vehicle. Laux is simply not qualified, as an industrial psychologist, to render opinions regarding automotive design.

A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1998), *see also* Fed. Rule of Evid. 702.  The issue before this Court is specific, not general, and is centered on whether Laux has "sufficient specialized knowledge to assist the jurors in deciding the particular issues *in this case*." *Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999) (quoting *Kumho Tire*, 526 U.S. at 156) (emphasis added).  Specialized knowledge "connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Based chiefly on Laux's plenary lack of qualifications and experience in vehicle design, her opinions regarding a purported design defect of the 2001 Expedition are drenched in speculation. *See id.*  Based on the foregoing, Ford respectfully moves to exclude any testimony from Laux regarding vehicle design.

## B.   The Methodology Employed by Laux Fails to Satisfy the Evidentiary Gates of *Daubert*.  Laux's Testimony is Unreliable and Should be Excluded.

Laux's methodology employed in arriving at her conclusions is fundamentally flawed and any opinions derived therefrom are unreliable and will not assist the trier of fact. *Daubert* instructs a trial court to conclude whether an expert's testimony is based on "scientific, technical, or other specialized knowledge" by evaluating the methods, analysis and principles relied upon in reaching the opinion. *Daubert*, 509 U.S. at 589.  The word knowledge "connotes more than subjective belief or unsupported speculation," as it is "knowledge" that establishes the standard of evidentiary reliability. *Daubert*, 509 U.S. at 589-90; *Kumho Tire*, 526 U.S. at 147.  The proposed testimony must also be supported by appropriate validation and must comport with the professional standards of the applicable technical field. *Id.*

As described at page 6 *supra*, Laux's methods, analysis, and principles utilized to formulate her conclusions in this case sorely lack the requisite indicia of intellectual rigor as required by *Daubert*.

### 1.    *Laux's Human Factors Testimony Should be Excluded.*

Laux testified that she was retained in this case to conduct a human factors analysis of how the accident occurred. *See* Deposition of L. Laux at p. 15. In her written report, Laux stated that the human factors assessment was conducted, "with regard to the safety of the effective field of view when backing the [2001 Expedition]." Although she was apparently retained by the Plaintiffs to do so, Laux failed to conduct a relevant human factors analysis in this case.

Whether a rear parking aid would have prevented Cade Wright's accident lies at the core of Plaintiffs' claims pleaded in this lawsuit. Inexplicably, Laux testified that she has not conducted **any** human factors work on the ultrasonic rear parking aid in dispute in this lawsuit. *See id.* at pp. 31, 56, and 60. Ford strains to find the propriety of Plaintiffs' attempt to qualify Laux as a human factors expert in this case when she, admittedly, has not conducted the analysis on which her testimony must be based. Any testimony offered by Laux regarding her human factors opinions must be excluded as unreliable when no human factors analysis was conducted by the witness.

### 2.    *Laux's Product Defect and Warnings Testimony should be Excluded.*

Laux's opinions in this case are that the 2001 Expedition is defectively marketed and designed. Specifically, Laux opines that the vehicle is defective because the manufacturer did not warn of the alleged dangers of the 2001 Expedition's rearward blind spot, and did not warn about the need for a reverse parking aid. Laux concludes that a rear parking aid device would

have eliminated the possibility that the accident involving Cade Wright would have occurred. *See id.* at p. 67.

Laux testified that she has not conducted any human factors analysis relating to vehicle blind spots or the rear parking aid in dispute; she has not authored any papers on vehicle blind spots or rear parking aid technology; she has not conducted any developmental work on vehicle blind spots or rear parking aids; she has not conducted any testing on vehicle blind spots or rear parking aids; she admitted that she has no education or training specific regarding rear parking aids; she has not attended any human factors/warnings seminars regarding vehicle blind spots or rear parking aids; she has not conducted a comparative analysis of vehicle blind spots across model lines; and she has not conducted any tests regarding failure rates for rear parking aids. To summarize her methodology utilized in this case, Laux reviewed engineering documents produced by Ford, along with several internet articles confirming pedestrian injuries from vehicle back-up accidents, from which review she concluded that the 2001 Expedition was defective.

Most important to this Court's *Daubert* inquiry is the fact that Laux has not drafted a proposed warning to satisfy her marketing opinions in this case. Laux testified that she has not drafted a proposed warning in this case because product warnings must be tested and standardized before they are integrated into a product line. *See id.* at p. 86

"Application of the *Daubert* factors is germane to evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." *See Watkins v. Telsmith*, 121 F.3d 984 (5th Cir. 1997). Considering that none of her opinions satisfy the *Daubert* criteria for admissibility, it is not unreasonable to conclude that Laux is a "hired gun" in this litigation. Although she claims that

Ford is culpable in this case for failing to include specific vehicle warnings, Laux has not drafted a proposed warning that she would consider appropriate in this matter. While Laux acknowledged the propriety of testing a warning to assess its efficacy, one cannot test a warning that has not yet been created. Failing to propose and subsequently test her alternative design, *i.e.* a suitable product warning, renders Laux's opinions unreliable. *Id.* at 992. Without adequate testing, an expert's proposed design cannot be subjected to peer review, cannot be evaluated for general acceptance, and cannot be evaluated for potential rates of error. *Id.* at 990, *see also Black v. Food Lion,* 171 F.3d at 313.

If a witness is relying primarily on experience, as Laux is in this matter, the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *See Daubert v. Merrell Dow Pharmaceuticals,* 43 F.3d 1311, 1319 (9th Cir. 1995). Laux has not explained how her training as a human factors practitioner lends support to her conclusions in this case. Laux's testimony regarding product design and warnings clearly fails the *Daubert* "gatekeeping" test and should be excluded.

**C.    Laux's Methodology Is Not Adequately Linked to the Facts of this Case.**

In a part of the opinion that is often overlooked, *Daubert* also cautions against admitting expert testimony in a case when the application of the expert's methodology to the facts of the case involves an impermissible leap of faith.   The Supreme Court in *General Electric v. Joiner* acknowledged, "[t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert." *General*

*Electric v. Joiner*, 522 U.S. 136, 146, 139 L. Ed. 508, 519 (1997). If there exists to great an analytical gap between the data and the opinion offered the testimony is not reliable. *Id.*

*Joiner* reminds district courts that they must review the reasoning used by an expert in applying a given methodology to the expert's ultimate opinion. It is imperative that an expert explain the "how" and the "why" behind their conclusions. *See id.* at 144; *see also Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (stressing that the expert must state both the foundation for his opinions and the reasoning from that foundation). Ultimately, when the evidence does not "fit" with the conclusion, the testimonial evidence is not reliable. *Cavallo v. Star Enterprises*, 892 F. Supp. 756, 761-63 (E.D. Va. 1995), aff'd in part and rev'd in part, 100 F.3d 1150 (4th Cir. 1996).

To date, the following fact witness depositions have been conducted in this case: Robin McCutcheon, Darren McCutcheon, Brian Wright, Lisa Wright, and Officer Jerry Lind. None of the witnesses at the scene can testify when, and at what location, Cade Wright walked behind the Expedition before being struck by the vehicle. Notwithstanding the fact that there are countless scenarios which could explain how Cade Wright walked behind the vehicle, Laux chooses to base her opinions on the fact that Cade Wright was standing behind the vehicle, in the area capable of detection by a rear parking aid device, prior to Robin McCutcheon placing the vehicle in reverse gear. *See* Deposition of L. Laux at pp. 62 and 88.

Laux relies on this assumption when she concludes that the rear parking aid would have prevented this accident because the device would have ostensibly alerted the driver to Cade Wright's presence behind the vehicle. *See id.* The rear parking aid has a maximum rearward detection zone of 5.8 feet *See* Owner's Manual at p. 25. Plaintiffs' expert on accident reconstruction, Andrew Irwin ("Irwin"), has opined that the McCutcheon vehicle traveled

between six (6) and nine (9) feet rearward prior to striking the deceased. Assuming Irwin's reconstruction is accurate, Cade Wright **would not have** been located behind the vehicle in the zone capable of detection by the rear parking aid. Laux's opinion that the driver would have been alerted of Cade Wright's presence prior to traveling in reverse defies the analysis conducted by Plaintiffs' accident reconstruction expert on whose opinions she allegedly relies. *See id.* at p. 88. Based on the lack of eyewitness testimony in this case, it is a distinct possibility that Cade Wright walked behind the McCutcheon vehicle from the side after the vehicle was placed in reverse gear. Assuming this likely scenario, Laux concedes that the she does not know if the vehicle would have had time to stop prior to impact. *See id.* at p. 62.

Laux's opinions require such an enormous leap of faith to connect the facts to the conclusions in this case that her testimony is unreliable and should be excluded from the trial of this cause.

### III. CONCLUSION

Lila Laux, Plaintiffs' designated human factors/warnings expert, has opined that the 2001 Ford Expedition involved in this accident was defectively designed and marketed. The basis for Laux's opinions resides in the fact that the vehicle was not equipped with a reverse parking aid device at the time of the accident involving Cade Wright, and that Ford breached its duty to warn the consumers of the need for same. Although she was retained to conduct a human factors assessment in this case, Laux admittedly failed to evaluate the human – machine interface of the rear parking aid, which is germane to a relevant human factors assessment in this case. Laux also maintains the vehicle is defective because the 2001 Expedition lacks a warning concerning the rearward blind spot and the corresponding need for a rear parking aid. Laux, however, testified that she has not formulated a warning relevant to her opinions in this case. Plaintiffs'

expert testimony in this case proffered by Lila Laux is not reliable and should be excluded as part of the Court's "gatekeeping" function under *Daubert*.

Based on the foregoing, Defendant, FORD MOTOR COMPANY, respectfully requests this Honorable Court to exclude the testimony of Lila Laux in its entirety.

Respectfully submitted,

/s/ Evan N. Kramer

By:_____

Evan N. Kramer (Attorney-in-Charge)
SDTX No.: 12346
State Bar No.: 11704650
ekramer@mailbmc.com

OF COUNSEL:
BROWN MCCARROLL, L.L.P.
William R. Moye (Assisting Attorney)
SDTX No.: 34007
State Bar No. 24027553
wmoye@mailbmc.com
1111 Bagby, 47th Floor
Houston, Texas 77002
Tel:  (713) 529-3110
Fax: (713)525-6295

**ATTORNEYS FOR DEFENDANT**
**FORD MOTOR COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of December, 2004 I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which sent notification of such filing to the following parties:

Brett S. Thomas
BUSH, LEWIS & ROEBUCK, P.C.
1240 Orleans Street
Beaumont, Texas  77701

/s/ Evan N. Kramer

_____
Evan N. Kramer

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| BRIAN AND LISA WRIGHT, | § | |
| Individually and as Representatives | § | |
| of the Estate of CADE WRIGHT, | § | |
| Deceased | § | |
|     *Plaintiffs,* | § | |
| VS. | § | CIVIL ACTION NO.:  1:04-CV-11(MAC) |
| | § | JURY |
| FORD MOTOR COMPANY | § | |
|     *Defendant.* | | |

## ORDER ON FORD'S MOTION TO EXCLUDE
## THE TESTIMONY OF LILA F. LAUX, Ph.D.

On this day, the Court considered Ford's Motion to Exclude the Testimony of Lila F.

Laux, Ph.D.  After considering the pleadings, Ford's Motion, and Plaintiffs' response, the Court

is of the opinion that Ford's Motion to Exclude the Testimony of Lila F. Laux, Ph.D. should be

granted.

IT IS THEREFORE ORDERED that Ford's Motion to Exclude the Testimony of Lila F.

Laux, Ph.D. is granted and Dr. Laux shall not be permitted to offer any expert-opinion testimony

at the trial of this cause regarding the accident made the basis of this litigation.

SIGNED: _____

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT "A"

GROVES POLICE DEPARTMENT
Supplemental Report

OFFENSE: DEATH INVESTIGATION                           CASE # 4649-03
COMPLAINANT: Brian Wright          LOCATION: 5041 Twin City
ADDRESS: 3162 Jamestown, Pt. Neches   DATE OF OFFENSE: 6-30-20003

---

NARRATIVE


\*   DECEASED   \*

CADE DAWSON WRIGHT
October 20, 1999 - June 30, 2003


On 6-30-2003 at approx. 3:19pm Central Communications Dispatched an auto / pedestrian accident in the parking lot at the Twin City Sno-Cone factory located at 5041 Twin City Highway in Groves, Jefferson County, Texas.

Upon arrival at approx. 3:22pm two Emergency Medical Technicians with Metro-Care Ambulance service were already on the scene. Keith Hebert and Marvin Grier examined the body and already concluded the death of the child. The child was observed laying on the asphalt completely covered with a sheet.

The death investigation was then directed toward identifying all parties relevant, locating witnesses, and documenting vehicles involved.

Two witnesses Shawntelle Hillman, a Sheriff's Office employee and Johnnye Williamson a Port Arthur Police Officer's wife directed my attention to the Father and Mother of the deceased and the vehicle involved. The vehicle in question was a 2001 Ford Expedition, black in color, bearing Texas license 6DH-P87. The vehicle was occupied by a female in the driver seat and a white male in the passenger seat. Two small children were in the seat directly behind the two front seats. The female driver was completely distraught, hysterical, and unable to communicate. The male passenger was moving the small children to another relatives vehicle. The male in question was identified as Darren Lee McCutcheon DOB 2-25-69 who resides at 5240 Frances Court in Groves, Texas. Darren identified the female driver as his wife and secured her drivers license. The driver was identified by Texas drivers license #13468037 as Robin Elizabeth McCutcheon DOB 3-11-69. Robin was transported to Dr's Hospital to submit a specimen of her blood to determine any level of intoxication.

NOTE: There were no physical indicators that would make one believe that Robin or Darren were under the influence of any substance. A search of their vehicle produced no evidence that would confirm or support intoxication.

I then directed my attention toward the parents of the deceased. Both parents were separated and traumatized. Jesse Goodman, the grandfather arrived on the scene and assisted in identifying the Mother, Father, and Child. The father was identified as Brian Wright

REPORT MADE BY: Deputy Marshal Stephen R. Hinton

GROVES POLICE DEPARTMENT – SUPPLEMENT TO OFFENSE REPORT
Case F:04-cv-00001-MAC  Document 58  Filed 12/29/04  Page 24 of 178

CASE # *4649-03*

DOB 3-29-1968, the mother Lisa Wright DOB 5-12-1970, and the deceased
CADE DAWSON WRIGHT 3YOA DOB 10-20-1999.  The family lives at 3162
James Town in Port Neches, Texas.  Also, Jesse identified their
vehicle as a Ford 250 Lariat Super Duty 4 X 4 - 4 door, white in
color, bearing Texas license 7KF-Z22.

Chief Deputy Wilmore was summoned to the location and assisted in
the investigation.  Chief Wilmore documented the scene through digital
photography (Disc 2003-10).  Justice of The Peace Bob Morgan was
notified and summoned to the scene.  Judge Morgan arrived and
concluded time of death to be 3:19pm.  Judge Morgan conducted his
preliminary investigation and ordered an autopsy.  B J Transport was
dispatched to the scene and secured the body and transported same to
the County Morgue.

The surrounding area was canvassed several times for witnesses.
Employees of a nearby Nail Manicure shop at 5040 Twin City Hwy stated
they only heard screaming.  Numerous people who had gathered outside
the area of investigation were questioned.  No other witnesses were
discovered other than those who were in the immediate area of the
scene.

Three employees at the sno-cone factory Katie Trahan, Lindsey
Gaspard, and Jennifer Felix were all questioned.  Katie stated she
called 911.  Lindsey stated that Brian and Cade Wright were frequent
customers.  Cade always received an orange cone and Brian a raspberry.
Lindsey further stated that Brian and Cade were at the window and
Brian allowed Cade to go back to their truck where his mother was
waiting.  Cade was carrying his orange sno-cone.  Brian was paying for
the cones when they both heard the commotion.  Jennifer stated she was
not working the window and didn't see anything.

A follow up interview with Darren McCutcheon was initiated.
Darren stated his family purchased some sno cones and his wife and he
was attempting to settle down their kids in the back seat.  Robin
began to back up when they felt a jolt and believed they backed into
another vehicle.  Darren stated that Robin pulled up so they could get
out and asses the damage.

Based upon eyewitness accounts, there is no one who observed the
actual event that resulted in the childs head being under the wheel of
the vehicle.  All information received were after the fact.  Brian,
Lisa, and Robin have not been interviewed at time of report.


FATHER: Brian Wright DOB 3-29-68 3162 Jamestown, Pt. Neches 722-4993

MOTHER: Lisa Wright  DOB 5-12-70 3162 Jamestown, Pt. Neches 722-4993

CHILD:  CADE DAWSON WRIGHT 3YOA DOB 10-20-1999

Grandfather: Jesse Goodman 5252 Twin City #460  Groves 960-7364

VEHICLE: Ford 250 Lariat Super Duty 4 Door  License 7KF-Z22

**************************************************************** END *****2

REPORT MADE BY: Deputy Marshal Stephen R. Hinton

CASE # *4649-03*

DRIVER: Robin Elizabeth McCutcheon DOB 3-11-69 TX DL#13468037
    5240 Frances Court, Groves H.962-5532 W.880-7765

PASSENGER: Darren Lee McCutcheon DOB 2-25-69
    5240 Frances Court, Groves H.962-5532 W.960-5227

CHILDREN: Laura 5YOA & Jacob 1YOA

VEHICLE: 2001 Ford Expedition 4-door License 6DH-P87
    State Farm/Agent Tony Falgout-Policy 745-5133-C22-53L

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SNO-CONE FACTORY
OWNERS-Susan & Mike Felix 727-6374
Katie Trahan   727-5349
Lindsey Gaspard   729-0275
Jeniffer Felix   727-6374


METRO CARE EMS   842-8202
Supervisor-Doyle Lee   729-2104
EMT-Keith Hebert   962-8400
EMT-Marvin Grier   842-1086


MALACHITE GROUP OF TEXAS, INC.
Property Manager-Mackie Allen
W.962-0296   Cell.284-2413


STATE FARM INSURANCE
Agent-Tony Falgout   963-1018


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


WITNESSES

SHAWNTELLE HILLMAN
4201 Turtle Creek #B-81
H.363-4588   W.729-5044


JOHNNYE WILLIAMSON
982-7656   983-8633


JANET DRAGO
5110 Twin City Groves, Texas
H.727-8125   W.963-3800

3

REPORT MADE BY: Deputy Marshal Stephen R. Hinton

GROVES POLICE DEPARTMENT   SUPPLEMENT OFFENSE REPORT

CASE # *4649-03*

Lt. Robert Williamson
Port Arthur Police Department
H.982-7656  W.983-8600


   Metro Care Services and Groves Fire Department run sheets were
ordered and attached to the report.  Also, both vehicle registrations
are attached.  Central Dispatch secured the 911 tape for future
reference.  A drivers license query on Robin McCutcheon was performed
and exhibited no violation entries or suspensions.  Also, a criminal
history query was performed that reflected no criminal record
including no intoxication arrests or convictions.

REPORT MADE BY: Deputy Marshal Stephen R. Hinton

G R O V E S   P O L I C E   D E P A R T M E N T

Supplemental Report

OFFENSE: Death Investigation                         CASE #4649-03
COMPLAINANT: Wright, Cade         LOCATION: 5041 Twin City Hwy
ADDRESS: 3162 Jamestown, Port Neches, TX.    OFFENSE DATE: 6-30-03

---

### NARRATIVE

On 6-30-03, at about 3:19PM, Sgt.  Steve Hinton of the Groves Police Department received a call of traffic accident involving a  pedestrian in the parking lot of the SnoCone Factory located at  5041  Twin  City Hwy, Groves, Texas.   Sgt.   Hinton arrived at 3:22PM and found that a Metro-Care Ambulance was already on the scene.  Sgt.  Hinton contacted the attendants and was informed that a small child  was  dead  as  the result of the accident.   Sgt.   Hinton began his  investigation  and called   out   officer   Jerry   Lind   as   an   advanced   accident reconstructionist and this investigator to assist in  documenting  the scene.

This investigator arrived at about 3:30PM and after a  short  briefing by Sgt.  Hinton,  began to photograph the scene with  a  Sony  Mavica CD-400 digital camera.   Sgt.   Hinton had been able to determine that the pedestrian (CADE DAWSON WRIGHT, W/M, DOB 10-20-99) had been backed over by the operator of a late model Ford  Expedition.   This  vehicle and the vehicle that the victim was transported to the scene  in  were parked parallel   in  an open area of the parking lot.   The  area  of the lot where the accident occurred is not  striped  for  parking  and many of the vehicles park in a somewhat erratic manner.

Photos were taken of the position of the body as found by Sgt.  Hinton and of the placement of the vehicles as they were parked.   All  photos taken will be listed at the end of this report.   The  initial  report was prepared by Sgt.   Hinton with all witnesses,  participants,  etc. included in his report.

Sgt.   Hinton advised this investigator that he had been informed that the operator of the Expedition started to back up and immediately felt that the car had struck something.   The vehicle was then stopped  and pulled back forward.   It was after exiting the vehicle that the child was found.   Other witnessed supported the vehicle backing up at a slow rate,  make an unusual motion up/ down, then pull forward.   After the occupants  exited  the  vehicle  they  found  the  child  and  became emotional,   thus drawing the attention of other bystanders.   However, Sgt.   Hinton was not able to locate a direct eyewitness to the entire incident.

On July 1, 2003, this investigator observed the autopsy of Cade Wright (w/m,  DOB 10-20-99,  3 yoa) as performed by Dr.  Tommy Brown  and assisted by Richard Skinner.   The child died as a result  of  massive craniocerebral injury when the tire of the Expedition passed onto  his head.   Bruising could be seen that indicated that  the  tire  of  the vehicle passed up the center line of the body on the childs back  with first contact made at the lower legs and ended at the  head.   Other contact marks would indicate the the child's head was  facing  to  the left left  when  the  tire  made  contact.   All  of  the  injury  was consistent with details given to this investigator by Sgt.  Hinton.   **5**

REPORT MADE BY:  Chief Deputy Jeff Wilmore

GROVES POLICE DEPARTMENT - SUPPLEMENT TO OFFENSE REPORT

CASE # 4649-03

On July 2, 2003, this investigator interviewed the operator of the Expedition, Robin E. McCutcheon and her husband, Darren McCutcheon. As A sworn statement was obtained from Robin McCutcheon. In her statement, she explained that she and her husband brought the kids to get a snow cone and parked in front of the building. Her husband and the kids went up to the window to get their snow cones. The Wright vehicle arrived while they were at the window and parked next to them. After they made their purchase, Darren McCutcheon and their kids then entered the Expedition. Both her and her husband were turned around in the seat getting the children settled prior to backing up. She stated that they were having trouble with their 2 yoa son due to not allowing him to have his snow cone until they went home.

She stated that she then looked in her rear view mirrors and did not see a vehicle or a person behind them. She then put the vehicle in gear and began backing up. Almost immediately she felt a bump and thought that their vehicle may have been struck. She then pulled up and found that they had run over a child.

Darren McCutcheon gave a similar account and stated that he was also facing to the rear dealing with his young son just prior to the accident. He stated that moments prior to their backing up, he noticed a car entering the parking lot at a high rate of speed and this concerned him. Thus, as soon as his wife started backing up and they felt the bump, he immediately thought that someone had struck their vehicle. Upon exiting, he found that they had struck a child.

Both of the McCutcheon's stated that they did not know how the child got behind their vehicle. They did not see the child walk beside the vehicle and did not see him once he was behind the vehicle. They did note that he was at the snow cone stand with his father just prior to the accident.

On July 10, 2003, this investigator interviewed Lisa and Brian Wright, who are the parents of Cade. They stated that they pulled into the parking lot after the Expedition was already parked. Brian carried Cade up to the window and they placed their order. Lisa stayed inside the truck in the front passenger seat. Brian stated that when they received their snow cones, Cade wanted to take his to his mother at the truck. Brian stated that he waved to her that Cade was coming and thought that she saw him. He then allowed Cade to walk to the truck while he turned around to pay for the snow cones. Seconds later, he heard people screaming and he turned and saw a child on the ground. He ran over to the child and found that it was Cade. He picked him up and found him to be severely injuried.

Lisa stated that she did not see Brian wave to her and was looking down at a portfolio of her husbands that she had picked up. She stated that she noticed out of the "corner of her eye" the Expedition move and then stop suddenly. She then heard the screams of Robin McCutcheon as she saw Cade on the ground. Lisa then turned and saw her son laying on the ground motionless.

Significant factors are noted in several areas. The Wright's were driving a late model Ford F-250 4dr 4x4 truck that is high profile and

REPORT MADE BY: Chief Deputy Jeff Wilmore

2

**6**

GROVES POLICE ᴅEPARTMENT - SUPPLEMENT TO ᴏFFENSE REPORT

CASE # 4649-03

has dark tinted windows.   When they arrived at the SnoCone   Factory,
they parked to the left of the McCutcheon's  Expedition  and   slightly
back.    Thus the passenger doors of the Wright vehicle was at or   near
the back of the Expedition.    The vehicles  were  also  about  4  feet
apart.    The area where they were  both  parked  is  not  striped  for
parking and all of the patrons of the SnoCone Factory park in a random
manner.

The height of the bumper was measured by Officer  Lind  and  it  would
have appeared to have struck Cade in the back at the  upper   shoulder.
By the location of the body on  the  ground  and  the  snow  cone,  he
appeared to have been  holding  the  snow  cone  when  struck  by  the
vehicle.   By the bruising to the body from the tire,  it is  apparent
that after being struck,  the tire almost immediately ran over his leg
and then ran up the center line of the body stopping at the middle  of
the head.

Thus the child would have been behind the drivers side of the vehicle,
in line with the tire.   This would have placed him in a  questionable
location as to whether there was any chance the  operator  could  have
seen him behind the vehicle at any time.   The  child's  clothing  was
light (light blue shirt and tan shorts) and thus  could  have  blended
into the background (concrete and light asphalt).   The  drivers  side
rear view mirror is the only mirror that would  have  been  useful  in
this situation.   The center rear view mirror is too high and the third
row seat blocks the view  of  the  operator.   This  vehicle  was  not
equipped with any type of back up warning device.

It is this investigator's opinion that Cade  walked  directly  to  his
parents vehicle after being  released  from  his  father's  care.   He
walked between the Wright's truck and the McCutcheon's Expedition  and
then stopped behind the Expeditions' rear bumper,  possibly to eat his
snow cone.   Almost immediately after stopping he was  struck  by  the
Expedition as it started backing up and knocked to the ground.   Again,
almost immediately,  the tire ran over his body and pinned him to  the
ground where the tire ran up the centerline of his body  to  the  head
and caused massive craniocerebral injury.


A listing of the digital photos taken is as follows:

   a) View of scene depicting location of vehicles
   b) "
   c) "
   d) "
   e) "
   f) "
   g) "
   h) "
   i) "
   j) View of scene depicting alignment of tires with impact area
   k) Closeup of scene
   l) Closeup of pedestrian
   m) "
   n) "                                                      ᴜᴜᴜ   **7**
   o) "

REPORT MADE BY:  Chief Deputy Jeff Wilmore

                              3

p) Closeup of straw from snow cone
q) Closeup of marks from ground contact
r) "
s) Closeup of marks from tire contact
t) Closeup of marks from ground contact
u) Closeup of head trauma
v) Closeup depicting alignment of tires to head of pedestrian
w) Closeup of contact tire
x) "
y) Closeup after moving vehicle to observe impact tire
z) Autopsy photo- tire marks to back
aa) Autopsy photo- depicting approx. position of body upon impact
bb) Autopsy photo- closeup "
cc) Autopsy photo- closeup of tire marks on back
dd) Autopsy photo- closeup of tire marks on buttocks/ upper thigh
ee) Autopsy photo- closeup of lower legs/ feet
ff) Autopsy photo- closeup of head depicting tire marks
gg) Autopsy photo- closeup of head depicting trauma
hh) Autopsy photo- closeup of lower torso depicting ground contact
ii) Autopsy photo- closeup of head trauma
jj) Bumper height of impact vehicle
kk) "
ll) Bumper height relative to 36" pedestrian
mm) Distance of outer edge of back left quarter panel to tire
nn) Method of measurement from edge of rear tire to outer edge of bumper
oo) Measurement of bumper's edge from rear tire
pp) Photo representing height of child and placement behind vehicle

**8**

REPORT MADE BY: Chief Deputy Jeff Wilmore

# Groves Police Department
## Supplemental Report

**Offense:** Death Investigation      **Case#:** 4649-03
**Complainant:** Cade Wright      **Location:** 5041 Twin City Hwy
**Address:** 3162 Jamestown , Port Neches Tx.      **Date:** 6-30-03

### Summary of Incident

On 6-30-03 at approximately 330pm, I received information via voice mail on a cellular phone that an Auto-pedestrian accident had occurred in the Bog Lot's parking lot and my assistance was needed in the investigation. I am currently the Advanced Automobile Accident Reconstructionist for the Groves Police Department and responded in that capacity. After obtaining my vehicle, I arrived at the scene and met with Chief Deputy Jeff Wilmore. Upon arrival I discovered that the accident occurred in the parking lot near the SnoCone stand located at 5041 Twin City Hwy, Groves Jefferson County Texas. The SnoCone stand is located in the far northwest corner of the parking lot. There were numerous emergency vehicles on the scene so I parked away from the area. I approached to meet with investigators. I observed a white Ford F-250 4x4 Truck parked near an ambulance and at both ends of the two vehicles were sheets hung to protect the scene from bystanders. I approached and could see a sheet on the ground covering the victim, which was lying approximately 2 feet from the front right tire of the Ford F-250 4x4. The vehicle was facing north. I approached the victim to view the body and discovered it to be a small child with traumatic facial and head injuries. The victim was lying on the ground facing up. Just to the east of the body less than two (2) feet away was a large amount of what appeared to be brain matter and body tissue. Due to the massive face and head injuries and the location of the body tissues, I felt the body was moved or rolled. Deputy Chief Wilmore confirmed my beliefs and advised me that after the accident the father of the victim had indeed moved the body.

Just to the north of the victim's body was a dark blue Ford Expedition. I was advised that this vehicle was the vehicle, which caused the injuries to the child. To better secure the location of the vehicles, I utilized orange spray paint to mark all four tires of both vehicles on the scene. The same paint was used to mark the location of the victim's body tissues and blood. As I was looking at the scene I became curious of the distance between the Ford F-250 4x4 and the parking curb stops in front of the SnoCone stand. It appeared to me that there was enough distance in front Ford F-250 4x4 for another vehicle to park there. I was advised that there were no vehicles that left the scene and that was the placement of the F-250 4x4 when it initially arrived at the scene. It should be noted that the parking area has no striping and parking is erratic during the evenings, which is the busiest time of the day at this location.

Next my attention was focused on the Blue Ford Expedition, which was reported to have caused the injuries to the child. Due to the injuries to the child's face and head, and the location of the body tissues and blood, it is believed that the injuries were caused by the Expedition's rear driver's side tire. I inspected the rear bumper of the vehicle. It was very clean and appeared to have been recently washed. There was no displacement of dirt or any marks to provide assistance in determining point of impact with the bumper. The rear driver's side tire was examined and on the inner side was located a small amount of body tissue/ brain matter which is believed to be from the victim.

I assisted Chief Deputy Wilmore take photographs on the scene. Various photographs were taken depicting placements of vehicles and the victim. On scene photographs of the victim were obtained. The victim was pronounced dead by Judge Morgan and was transported to the Jefferson County Morgue by BJ's Transport. Placement of the victim and vehicles were secured with marking paint and I returned the next morning to get detailed measurements for a to scale diagram of the scene. The vehicles involved and all parties were allowed to leave scene. Due to the traumatic event, the Wright family was transported away by family members and the F-250 4x4 was left on scene. I personally entered the McCutcheon's vehicle to move it from it's location across the parking lot to the owner. I observed all mirrors to set in an acceptable manner and the vehicle operated normally.

**Report Done By: Deputy John G. Lind #61**

The next day I arrived in the early morning hours to obtain measurements. This was done due to the lack of pedestrians, onlookers, and vehicular traffic. Using a "Rolla tape" measuring device, I obtained enough measurements to draw a to scale diagram of the scene depicting placement of vehicles, victim and surrounding immediate area.

Results of the autopsy showed the child died of massive craniocerebral injuries. I was allowed to review autopsy results and injuries suffered by the victim. The child was measured at during the autopsy at 36" tall. In order to determine the point of impact of the child with the rear bumper of the Expedition, I utilized a yard stick (36") to represent the height of the child. I located a 2001 Ford Expedition to represent the actor vehicle. It should be noted that the vehicle used was not the actor vehicle only one of exact make and model. Using the yardstick, I determined that approximately 8' of the child's head and upper body would have been above the bumper of the Expedition. The fender well of the drivers side quarter panel extends less than two (2) inches past the sidewall of the tire in question. Next I obtained a measurement from the edge of the tire, which contacts the pavement and measured to the outer contacting edge of the bumper and determined it to be approximately 32". These measurements were photographed by me with a Sony CD Mavica and are fully listed on Chief Deputy Wilmore's report. Also photographed by me was a rear view of the demonstration vehicle with the yardstick (36") representing the victim.

Chief Deputy Wilmore interviewed all parties involved and I was able to review their accounts of the incident. After all factors were considered, I came to the following conclusion:

The SnoCone stand has two windows, which service customers. The McCutcheon's and the Wright's were at different windows at the same time. The McCutcheon's left their window first and entered the vehicle. As per their statements it took them some time to settle their children prior to leaving. The victim was allowed to leave his father and walk back to his vehicle to meet his mother waiting in the F-250 4x4. At sometime, the victim stopped behind the McCutcheon's vehicle possibly to take a bite of his snocone. This places the child in a location that is unknown if he could have been observed due to the height of the Expedition and the small size of the child. Also taken into consideration is the color of the child's clothing which could have easily blended in with the color of the parking lot. The McCutcheon's vehicle was parked closer to the business with the F-250 4x4 to the rear and approximately 4 feet to the west. Robin McCutcheon began to back up to leave. The bumper struck the child in the shoulder/ upper back causing him to fall face first to the ground. It appeared that the child was still holding the snocone upon falling to the ground. Due to the height of the child and the distance between the bumper and the rear tire, I feel the child was pinned almost immediately by the rear driver's tire. The tire traveled down the middle of the child's body and onto his head. This is when the McCutcheon's thought they hit another vehicle and stopped, she put the vehicle in drive and drove off of the child.

STATEMENT OF FACTS, NOT IN CUSTODY

STATE OF TEXAS
COUNTY OF JEFFERSON                         DATE: July 2, 2003

Before me, the undersigned authority, on this day personally appeared Robin McCutcheon, who being by me duly sworn upon oath says:

My name is Robin E. McCutcheon and I am 34 years of age. My date of birth is March 11, 1969. I reside at 5240 Frances Court, Groves, Texas. I am married to Darren McCutcheon and we have two children, Jacob- 2yoa and Lori- 4yoa. I am employed with Lamar University in the Education Department.

On 6-30-03, at about 3:15PM, my husband and I brought the kids to the SnoCone stand located in the parking lot of the Big Lots store on Twin City Hwy in Groves, Texas. We had just left the car wash in Nederland and drove directly to the store. Once we arrived at the SnoCone stand, we parked in front and went up to place our orders. We stood in line for awhile and spoke with several people that we know.

After while, the kids started to get hot, so I took them back to the car to get in the air conditioning. Darren then brought the snow cones to them and it took us a little while to get them situated in the car. We gave Lori her snow cone, but we did not give Jacob his because of his age and this upset him. We both were turned around in our seats dealing with them for a little while.

There was a green Explorer parked directly beside us ~~and that lady left~~ while we were still getting our kids settled in. I noticed a large truck parked on our left side and did not see it getting ready to move.

I then checked the rear view mirrors on the Expedition and put the car in reverse. I did not see anything behind the car in both side mirrors and prepared to back up. Darren was still turned around dealing with Jacob as I released pressure on the brake and the car started rolling backwards. Almost immediately, after traveling just a few feet, we felt the car bump in a strange way. I pulled back up slightly and put the car in park. I could not tell what caused it, but Darren thought someone may have hit us and got out of the car to check.

I also got out of the car and it was then that we found out that we had backed over a child. I became very emotional as did everyone and climbed back into my car. I never saw the child and do not know how it got behind our car.

I hereby state that I have read the above statement and it is true and correct to the best of my knowledge and belief.

Signed: _Robin McCutcheon_

Subscribed and sworn to before me, by the said Robin McCutcheon this the ___ day of July, 2003, to certify which witness my hand and seal of office.

_Jeff Wil_____
Notary Public in and for the State of Texas

-1-                                                                    11

# EXHIBIT "B"

1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF TEXAS
2            BEAUMONT DIVISION

3   BRIAN AND LISA WRIGHT,           )
    INDIVIDUALLY AND AS              )
4   REPRESENTATIVES OF THE           )
    ESTATE OF CADE WRIGHT            )   CIVIL ACTION
5                                    )
                                     )   NO. 1:04CV0011
6   VS.                              )
                                     )
7                                    )
                                     )
    FORD MOTOR COMPANY               )
8                                    )

9

10  ********************************·*******************************

11

12           VIDEOTAPED AND ORAL DEPOSITION OF

13                    TOMMY J. BROWN

14                   November 4, 2004

15

16  *********************************************************

17                      ⓒⓞⓟⓨ

18

19       VIDEOTAPED AND ORAL DEPOSITION OF TOMMY J. BROWN, taken in

20  the above-styled and numbered cause on November 4, 2004,

21  commencing at 2:53 p.m., before Angela L. Morman, CSR No. 2682

22  in and for the State of Texas, reported by machine shorthand,

23  at the law offices of Bush, Lewis & Roebuck, 1240 Orleans

24  Street, Beaumont, Texas, pursuant to the Federal Rules of Civil

25  Procedure and the provisions stated on the record.

1  have been conscious and aware that something was happening to

2  him?

3      A.   Something, yes.

4      Q.   Probably a 3-year-old boy wouldn't know exactly what

5  was going on?

6      A.   I think that would be correct.

7      Q.   But he would have felt the pressure and the presence

8  of the vehicle as it rolled up his body?

9      A.   Yes.

03:35PM 10      Q.   And then once it reached his -- his head area,

11  that's where the fatal injuries occurred?

12      A.   Yes.

13      Q.   And at that point, death would have been pretty much

14  instantaneous?

15      A.   Absolutely.

16      Q.   Doctor, would the injuries and the pattern of injury

17  that you observed be consistent with Cade standing behind the

18  Expedition, waiting on his mom or someone to open the car

19  door -- or the truck door of the vehicle that he was riding in,

03:36PM 20  as you said, concentrating on his snow cone, prior -- prior to

21  being struck --

22              MR. MOYE:  Object to form.

23      Q.   (By Mr. Thomas)  -- would that be consistent?

24      A.   I'm not sure of the location of the vehicles or how

25  they were placed.  So, I can't give you a good answer on that.

# EXHIBIT "C"

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
2                      BEAUMONT DIVISION
   BRIAN AND LISA WRIGHT,       )
3  INDIVIDUALLY AND AS          )
   REPRESENTATIVES OF THE       )
4  ESTATE OF CADE WRIGHT,       )
       DECEASED                 )
5                               )
   VS.                          ) CIVIL ACTION NO.: 1:04-CV-11(MAC)
6                               )          JURY
   FORD MOTOR COMPANY           )
7

8  * * * * * * * * * * * * * * * * * * * * * * * * * *

9

10              ORAL AND VIDEOTAPED DEPOSITION OF

11             **DARREN LEE McCUTCHEON**

12                    September 22, 2004

13

14 * * * * * * * * * * * * * * * * * * * * * * * * * *

15

16       ORAL AND VIDEOTAPED DEPOSITION OF DARREN LEE McCUTCHEON,

17  produced as a witness at the instance of the Defendant, and

18  duly sworn, was taken in the above-styled and numbered cause

19  on the September 22, 2004, from 11:50 to 1:14, before

20  JODY RUTH SIMMONS, CSR, RPR, in and for the State of Texas,

21  reported by machine shorthand, at the offices of Germer,

22  Gertz, L.L.P., 550 Fannin Street, Suite 700, Beaumont, Texas

23  77701, pursuant to the Federal Rules of Civil Procedure and

24  the provisions stated on the record or attached hereto.

25

1    when we parked there at a quarter to 3:00 or 3:00 o'clock that

2    afternoon, when I say it was crowded -- and Robin used the

3    word "lots" of vehicles -- I'm saying there was 12 vehicles

4    there -- greater than ten.  So, you had -- you have vehicles

5    parked any which way they want to park and there might have

6    been one parked at an angle and it was crowded and there was

7    no crowd control over the parking lot.

8         Q.    Is it an overstatement -- or is it fair to say that

9    the parking lot on that day was a madhouse?

10        A.    It was a madhouse, yes.

11        Q.    Do you believe that those conditions in the parking

12   lot were one of the factors that contributed to Cade Wright

13   being --

14        A.    Yes, sir, I do.

15        Q.    -- hit --

16              MR. THOMAS:  Objection --

17        Q.    (BY MR. KRAMER) -- and killed on that date?

18              MR. THOMAS:  -- form.

19        Q.    (BY MR. KRAMER) How tall are you?

20        A.    Six-one.

21              MR. KRAMER:  I appreciate your time.  Thank

22   you.

23                        REEXAMINATION

24   BY MR. THOMAS:

25        Q.    Just a couple of real quick questions.

1       When you were looking at the web page and you said

2   that you had a friend who had an F-250 that had some type of

3   backup alarm on it and that's not something you really

4   considered for the Expedition, tell me why you reached -- you

5   say that, "That's not really something I would consider."

6       A.   At that time?

7       Q.   Yeah, at that time.

8       A.   At the time the friend of mine that has this truck

9   with the backup alarm on it, I -- he's one of those guys that

10  likes to have something that somebody else doesn't have.  He

11  wants buy a truck that -- and he's -- from what I understand,

12  had a truck that always has all the bells and whistles,

13  figuratively speaking.

14      Q.   Sure.

15      A.   To me, that -- a backup alarm at that time, my train

16  of thought was, "That's for industrial equipment -- forklifts,

17  things of that nature."

18       When I was buying a vehicle, I -- you know, I

19  knew -- I obviously knew that it was available because he had

20  one; but I didn't think I needed it, you know.

21      Q.   At the time you were buying this Expedition, did you

22  have an understanding as to the extent and nature of any blind

23  spots that were unique to this particular vehicle?

24           MR. KRAMER:   Objection.   Form.

25      A.   Not unique to that vehicle.   I mean, everybody is

# EXHIBIT "D"

1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF TEXAS
2              BEAUMONT DIVISION

3   BRIAN AND LISA WRIGHT,          )
                                    )
4   Individually and as            )
    Representatives of the          )   CIVIL ACTION
5   Estate of CADE WRIGHT,          )
    Deceased                        )   NO.: 1:04-CV-11(MAC) JURY
6                                   )
                                    )
7   VS.                             )
                                    )
                                    )
8   FORD MOTOR COMPANY              )

9

10  **********************************************************

11

12            VIDEOTAPED ORAL DEPOSITION OF

13                    LISA WRIGHT

14                 November 23, 2004

15

16  **********************************************************

17                    COPY

18

19     VIDEOTAPED ORAL DEPOSITION OF LISA WRIGHT, taken in the

20  above-styled and numbered cause on November 23, 2004,

21  commencing at 9:24 a.m., before Angela L. Morman, CSR No. 2682

22  in and for the State of Texas, reported by machine shorthand,

23  at the law offices of Bush, Lewis & Roebuck, 1240 Orleans

24  Street, Beaumont, Texas, pursuant to the Federal Rules of Civil

25  Procedure and the provisions stated on the record.

48

1       A.    Yes, that's true.

2       Q.    And, of course, I mean from the outside, if he's

3  standing on the outside of the vehicle.

4       A.    Yes.  It would have been too tall for him to reach.

5       Q.    Okay.  Are you aware that your attorneys on your

6  behalf have made a claim against the parking lot owner and the

7  management company in this lawsuit?

8       A.    Yes.

9       Q.    Okay.  And you've since settled that claim; is that

10 true?

11      A.    Yes, sir.

12      Q.    Okay.  And I was provided some discovery that shows

13 the settlement amount's roughly [omitted pursuant to agreement

14 of counsel] or so?

15                MR. MOYE:  Is this confidential?

16                MR. THOMAS:  I don't remember, probably.

17                MR. MOYE:  Okay.  We can agree to strike the

18 amount.

19                MR. THOMAS:  Yeah.

20                MR. MOYE:  Is that okay?

21                MR. THOMAS:  (Nods head up and down.)

22      Q.    (By Mr. Moye) And we talked earlier about the

23 parking lot before the accident and, in fact, on the day of the

24 accident, did not have parking designations at the front of the

25 SnoCone stand.  Is that what you remember?

1     A.    Yes.

2     Q.    Okay.  Since then have they striped parking spaces?

3     A.    Yes, they have.

4     Q.    And since then have they painted a big banner on the

5  asphalt that says "No Parking"?

6     A.    I'm not sure if that's painted, but I know there are

7  parking stops and parking stripes now.

8     Q.    In your opinion do you believe that the parking

9  lot's failure to have striped parking lots contributed to this

10:50AM 10  accident?

11     A.    Yes, to some degree.

12     Q.    And your attorneys on your behalf have also made a

13  claim against Ms. McCutcheon through her insurance.  Are you

14  aware of that?

15     A.    Yes, sir.

16     Q.    And have you settled that claim with Ms. McCutcheon?

17     A.    Yes, sir.

18     Q.    Okay.  Do you believe that some of Ms. McCutcheon's

19  acts might have contributed to this accident?

10:51AM 20     A.    Yes, sir.

21          MR. MOYE:  Ms. Wright, I would like to maybe

22  take a minute just to go through my notes and make sure I don't

23  have anything else; but I believe I'm probably done.  If you

24  want to take just a short five-minute break and we'll revisit.

25          THE WITNESS:  Okay.

# EXHIBIT "E"

Contents

# Before driving

Introduction ................................................. 2

Instrumentation ........................................... 8

Controls and features .................................. 21

Seating and safety restraints ..................... 104

# Starting and driving

Starting ..................................................... 137

Driving ...................................................... 152

Roadside emergencies .............................. 176

# Servicing

Maintenance and care .............................. 201

Capacities and specifications ................... 246

Customer assistance ................................. 257

Reporting safety defects ........................... 270

Index ......................................................... 271

All rights reserved. Reproduction by any means, electronic or mechanical including photocopying, recording or by any information storage and retrieval system or translation in whole or part is not permitted without written authorization from Ford Motor Company. Ford may change the contents without notice and without incurring obligation.

Copyright © 2000 Ford Motor Company

Controls and features

The ignition must be in the ON position to operate the rear window defroster.

The defroster turns off automatically after 10 minutes or when the ignition is turned to the OFF position. To manually turn off the defroster before 10 minutes have passed, push the control again.

## 4WD CONTROL (IF EQUIPPED)

This control operates the 4WD. Refer to the *Driving* chapter for more information.



## REVERSE SENSING SYSTEM (IF EQUIPPED) P))▲

The reverse sensing system (RSS) sounds a tone to warn the driver of obstacles near the rear bumper when the reverse gear is selected.





24



The RSS will assist the driver in detecting certain objects while the vehicle slowly moves in reverse at speeds less than 6 km/h (4 mph). The RSS is not effective at speeds greater than 6 km/h (4 mph) and may not detect certain angular or moving objects.

The reverse sensing system detects obstacles within approximately 1.8 meters (5.9 ft.) of the rear bumper with a decreased coverage area at the outer corners of the bumper, (refer to the figures for approximate zone coverage areas). As you move closer to the obstacle, the rate of the tone increases. When the distance to the obstacle is less than 25.0 cm (10 in.), the tone will sound continuously. If the system detects a stationary or receding object further than 25.0 cm (10 in.) from the side of the vehicle, the tone will sound for only three seconds. Once the system detects an object approaching, the tone will sound again.



# EXHIBIT "F"

### Lila F. Laux, PhD
**Human Factors Consulting**
**417 Leyden Street**
**Denver, CO 80220**
(303) 388-4659

## EDUCATION

Doctor of Philosophy, Industrial Psychology/Human Factors Engineering, Rice University.
Master of Science, Applied Psychology, University of Southwest Louisiana.
Bachelor of Arts, Rice University.
Certification, Assistive Technology, California State University, Northridge

## PROFESSIONAL AFFILIATIONS

The Human Factors and Ergonomics Society
Editorial Board of the Human Factors and Ergonomics Society
American Psychological Association

President of the Rocky Mt. Chapter of the Human Factors and Ergonomics Society (HFES), past President Houston/NASA Chapter of the HFES, formerly on the Board of Directors of the Texas Safety Association, the Advisory Board of the AAA/Texas Region, the Houston Council on Aging, member of the Texas Dept. of Health Working Committee to Establish Goals for the Reduction of Unintentional Injury for Texas, Year 2000, Co-chair of the Texas Older Driver Taskforce Committee on Testing/relicensing, and chair of several technical groups for the HFES.

## PROFESSIONAL EXPERIENCE

October 22, 2001 to Present
Micro Analysis & Design, 4949 Pearl St. E. Suite 300, Boulder, CO
Senior Human Factors Engineer

July 1, 2001 to Present
Principal, Human Factors Consulting

February 1, 1994 - June 30, 2001
US West Technologies/Qwest Communications, Lead Human Factors Engineer

September 1985 - December 31, 1993
Baylor College of Medicine - Dept. of Community Medicine, Houston, TX
Research Staff and Faculty conducting basic human factors research.

August 1986 – December 1993
Research Associate and Instructor, Dept. of Psychology, Rice University.
Conducted basic human factors research. Taught human factors and Industrial Psychology.

June 1982 – August 1993

Office of Continuing Studies, Rice University, Director of Testing for the ESL program.
Jan 1990 – Aug 1991

> Co-principal on a grant funded by the AAA Foundation to study the safety implications of changes in the location and demands of vehicle displays and controls.

Mar 1990 – June 1991

> Research Associate on a grant funded by the National Institute on Alcohol Abuse and Addiction to study attention effects with respect to warnings on alcohol containers.

Aug 1988 – Jan 1991

> Consultant to Lockheed Engineering to work on a NASA project to develop a nonintrusive inflight data collection system for human factors analysis of astronaut performance.

Jan 1989 – May 1990

> Co-principal on a General Motors contract to develop human factors requirements for the Access Car, a car designed to meet the needs of older drivers

Apr 1988 – Aug 1988

> Co-principal on a grant from Pontiac Division of General Motors to develop a manual outlining the human factors approach to developing facilitators (warnings, labels, and instructions).

May 1987 – Aug 1987

> Co-investigator on a project funded by Chevrolet Division of General Motors to perform Human Factors analysis of vehicle owner's manuals, labels, and warnings.

May 1985 – Aug 1985

> Co-authored a manual for participants in the extensive outplacement program offered by King, Chapman & Broussard, a consulting firm in Houston.

Jun 1984 – Feb 1985

> Industrial/Organizational Internship with King, Chapman & Broussard, 1000 Louisiana, Suite 1060, Houston, TX, 77002. Evaluated the Emplyee Involvement Intervention at Ford Motor Company, Detroit, MI. Developed questionnaires and survey instruments, designed research protocol, carried out research and analyzed data, wrote final report.

Jul 1981 – Jul 1984

> Baylor College of Medicine, Dept. of Community Medicine. Research Associate for a three year grant entitled Ergonomics in

Medicine.  Developed research design, developed instruments to collect data re predictor and criterion variables, collected and analyzed data, wrote reports.

Mar 1984 – Oct 1984

Houston Independent School District, Research and Evaluation, 3310 Cummins, Houston, TX, 77098.  Consultant.  Performed job abalysis interviews of principals, vice-principals, and administrators that were used to develop assessment center exercises to evaluate the performance of these groups of employees.

Jul 1983 – Oct 1983

Houston Independent School District, Research and Evaluation, 3310 Cummins, Houston, TX, 77098.  Member of a three person team that developed the mathematics proficiency portion of HISD's basic competency test for teachers.

June 1982 – Jun 1983

Psychology Dept., Rice University, Houston, Tx, 77251.  Research associate on an NIMH grant to investigate the information processing components of substitutions tests, and age-related differences in performance on these tests.  Employed componential analysis, designed experimental procedure for study, wrote computer programs to collect data, collected data from over 300 children and young and older adults, anal;ysed data and wrote report.

Aug 1980 – Sep 1981

Psycjology Dept., Rice University, Houston, TX 77251.  Research Associate on a grant to evaluate the effects of training on spatial visualization ability.  Collected and analysed data.

May 1980 – Sep 1980

The University of Texas Medical School Houston, Office of the Dean, Houston, Texas, 77030.  Assisted in developing the instrument to assess medical students' attitudes toward residency programs.  Assisted in analysis of data and report writing.

Apr 1978 – Apr 1979

Testing and Counseling Center, University of Southwest Louisiana (now University of Louisiana at Lafayette), Lafayette, LA.  Worked with student clients to test abilities and aptitudes and recommend educational programs.  Counseled students.  Developed and presented workshops and training programs for students and staff.

Aug 1961 – May 1968

Secondary science teacher (general science, earth science, biology, chemistry).  Hope Mills, NC; Austin, TX; New Orleans, LA.

SKILLS     Experimental and applied research: methods and design, data collection and analysis.

Hazard pattern analysis; development of hazard communication systems.

Development and evaluation of training programs and interventions.

Task and job analysis.  System analysis.

Statistical analysis: univariate and multivariate analysis of variance, correlational and regression analysis, factor analysis; analysis of results.

Proposal writing; report and grant writing; technical writing and editing;

Design, development, validation and implementation of tests, questionnaires and survey instruments.

## REFERENCES

Kenneth Laughery, PhD.  Professor of Human Factors Psychology. Psychology Dept.  Rice University, Houston, TX 77251

William Howell, PhD.  Professor.  Arizona State University.  7001 E. Williams Field Rd., Building 20, Mesa AZ 85212

Betty Sanders, PhD. President, Humanomics, Inc.  10814 Oak Hollow Dr., Houston, TX 77024

Laurel Allendar, PhD.  US Army Research Lab, AMSRL-HR-MB, Aberdeen Proving Ground, MD 21005-5425

October 2004

## SELECTED PUBLICATIONS

Brockett, Alan, Laux, Lila., & Dahn, David. (2002). A human centered approach to controlling multiple semi-autonomous vehicles. *Proceedings of the American Institute of Avionics and Astronautics, Unmanned Aerospace Vehicles, Systems, Technologies, and Operations Conference and Workshop*, Portsmouth, VA.

Laughery, Ronald & Laux, Lila. (2002). Decision-centered design as the basis of defining the human role in systems. IEEE Power Engineering Society, Proceedings of the IEEE 7th Conference on Human Factors and Power Plants: New Century, New Trends. Scottsdale, AZ. September 15th – 19th.

Laux, Lila & Lane, David. (1985). Information processing components of substitution test performance. *Intelligence*, vol. 9, pp. 111-136.

Laux, L. & Lane, D. (1988). Individual differences in visual perceptual processing: Attention, intelligence, and display characteristics. Proceedings of the 32nd Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA.

Laux, L. & Carson, C. (1989). Non-intrusive inflight data collection: Concept, utility and status. NASA JSC Publication N0. 24197, September 1989.

Laux, Lila F. & Brelsford, John. (1990). *Age-related changes in sensory, cognitive, psychomotor, and physical performance. (1990)*. AAA Foundation for Traffic Safety, Washington, D.C.

Laux, Lila & Mayer, David. (1991). Road sign comprehension: Age and sex effects. *Proceedings of the 70th Annual Meeting of the Transportation Research Board of the National Research Council*, Washington, D.C.

Laux, Lila & Mayer, David. (1991). *Locating vehicle controls and displays: Effects of expectancy and age*. AAA Foundation for Traffic Safety, Washington, D.C.

Laux, Lila & Mayer, David. (1992). A human factors approach to developing facilitators (warnings and instructions). In Brian Peacock & Waldemar Karwowski, (Eds.). *Automotive Ergonomics*, Taylor & Francis, Ltd.: Washington, D.C.

Laux, Lila F. (1993). Perceptual demands of reading blood glucose strips. *Proceedings of the Interface '93 Conference*, Raleigh, N.C.

Laux, Lila (1995). Aging techniques. In Jon Weimer, (Ed.) *Research Techniques in Human Engineering*. Prentice Hall, Englewood Cliffs, N.J.

Laux, Lila. (1998). Designing web pages and applications for people with disabilities. In Chris Forsythe, Eric Grose, & Julie Ratner (Eds.) *Human Factors and Web Development*. Lawrence Earlbaum, Mahwah, N.J.

Laux, Lila. (2001). Aging, communication, and interface design. In Neil Charness, Denise Parks, & Bernhard Sabel (Eds). *Communication, Technology & Aging*. Springer, Canada.

Laux, Lila, Laughery, Ronald, Endsley, Mica, & Strub, Michael. (2002) Designing systems around soldier decision making: Improving C4ISR processes. The 23rd Army Science Conference, Orlando, FL.

Mayer, David & Laux, Lila. (1992). *Evaluating vehicle displays for older drivers*. AAA Foundation for Traffic Safety, Washington, D.C.

PUBLICATIONS AND PAPERS PRESENTED:

1.    Development of a Hassle Index to Measure Vexation Among Active Medical Practitioners. E.V.Boisaubin, L. Laux, J.M.Merrill. Clinical Research, 1982;30:638A (Abstract).

2.    "Observer Drift": A New Name for Physician Error. B.L.Lounsbury, L. Laux, A. Peek, J. Thornby, J.M. Merrill. Clinical Research, 1982;30(5):918A (Abstract).

3.    Predicting Those Physicians Who Will Find Practice Vexatious. E. V. Boisaubin, L. Laux, J. Lester, B. Rankin, R. Roessler, J. Thornby, J.M. Merrill. Clinical Research, 1983;31:294A (Abstract).

4.    Physician Responses to Difficult Patients. J.M. Merrill, E.V. Boisaubin, L. Laux. Journal of Family Practice, 1983;16:678.

5.    Teaching Humanistic Medicine. J.M. Merrill, E.V. Boisaubin, R. Roessler, L. Laux. New England Journal of Medicine 1983;309:860-861 (Letter).

6.    Measuring Bias and Open Mindedness in Physicians. L. Laux, E.V. Boisaubin, J.M. Merrill. Clinical Research, 1983;31:684A (Abstract).

7.    The Personality Profile of the Biased Physician. E.V. Boisaubin, L. Laux, R. Roessler, B. Rankin, J. Lester, J. M. Merrill. Clinical Research, 1983;31:923A (Abstract).

8.    Micro and Macro Ethical Aspects of Caring for the Aged. J.M. Merrill, J. Jones, L. Laux. In Aging 2000: Our Health Care Destiny. C.M. Gaitz, G. Niederehe, N.L. Wilson (Eds.) New York, Springer Verlag, 1985, 359-365.

9.    Information Processing Components of Substitution Test Performance. L. Laux, D.M. Lane. Intelligence, 1985;9:111-136.

10.   Quantitating Medical Students' Attitudes Toward the Elderly. J.M. Merrill, L. Laux, J.I. Thornby, S. Yusim, V. Pavlik, and C. Vallbona. Society Health and Human Values, 16:6A, 1986.

11.   Measuring "Humanism" in Medical Residents. J.M. Merrill, E.V. Boisaubin, L. Laux, R. Roessler, J. Thornby. Southern Medical Journal, 1986;79:141-145.

12.   Culture as a Determinant of "Humanistic Attributes" of Medical Residents. J.M. Merrill, E.V. Boisaubin, F.A. Cordova, L. Laux, E. Lynch, J. Thornby, M. Martinez-Maldonado. Clinical Research, 1986;33:203A (Abstract).

13.   Attributions: A Psychological Mechanism Underlying Health Care Professionals' Avoidance of Geriatric Patients. J.M.Merrill, L.F.Laux, J.I.Thornby, and C. Vallbona. Proceedings of the North American Primary Care Research Group, 15th Annual Meeting; Minneapolis, Minn., May, 1987.

y Medical Students Shun the Elderly Patient. J.M.Merrill, L.Laux, E. saubin, and J.I. Thornby, <u>Clin. Res.</u> 35:p.90A, 1987.

ng Health Care Professionals' Beliefs About the Geriatric Patient. R.J. mar, C.E. Fasser, L.F. Laux, J.I. Thornby, and J.M.Merrill. <u>Clin. Res.</u>:p.90A, 7 (Abstract).

ure as a determinant of "Humanistic Traits" in Medical Residents. J.M. rill, E.V. Boisaubin, F.A.Cordova, L.F. Laux, E.C. Lynch, J.I. Thornby, and M. tine-Maldonado. <u>South. Med. Jour.</u>, 80:233-236, 1987.

butions: A Psychological Mechanism Underlying Health Care essionals' Avoidance of Geriatric Patients. J.M.Merrill, L.F.Laux, J.I. nby, and C. Vallbona. <u>Proceedings of the North American Primary Care arch Group, 15th Annual Meeting</u>, Minneapolis, May 1987.

blesome Aspects of the Patient-Physician Relationship: A Human Factors y. J.M. Merrill, L.F. Laux, and J.I. Thornby. <u>South. Med. Jour.</u>, 81: 1210-, 1987.

icians' Success Expectancy and the Geriatric Patient. L.F. Laux, C. rson, J.I. Thornby, and J.M. Merrill. Paper presented to the Society of hers of Family Medicine, South Central Regional Meeting, Houston, Texas. 8-10, 1987.

w Look at Patient Compliance. L.F. Laux, S. Baker, D. Mayer, V. Pavlik, and C. ona. Paper presented to the Society of Teachers of Family Medicine, South Regional Meeting, Houston, Texas. Oct. 8-10, 1987.

s lo que el Alcoholismo, Hipocondriasis, y Obesidad Tienen en Commun con riatria? J.M.Merrill, L.F. Laux, and J.I. Thornby. Paper presented to the dad de Geriatria y Gerontologia de Mexico. Mexico City, Oct. 26, 1987.

utions and Patient Compliance. L.F.Laux, V. Pavlik, C. Vallbona, S. Baker, Merrill, D. Mayer. <u>Proceedings of the North American Primary Care rch Group, 16th Annual Meeting</u>, 275, 1988 (Abstract).

sions of AIDS Dysphoria. J.M.Merrill, L. Laux, J, Thornby, C. Vallbona. edings of the North American Primary Care Research Group, 16th Annual ng, 274, 1988 (Abstract).

do Alcoholism, Hypochondriasis, and Obesity Have in Common with ics? J. Merrill, L. Laux, E. Boisaubin, J. Thornby, C. Vallbona. <u>Clinical rch</u>, 36:91A, 1988 (Abstract).

unicating with the Worker Through the MSDS. K. R. Laughery and L. F. <u>Hazard Communication II: Material Safety Data Sheets Are a unication Tool, ASTM STP,</u> Paper presented to the American Society for and Materials Annual Meeting, Williamsburg, VA., April, 1988.

26.  Success Expectancy as a Determinant of Health Care Quality.  J. Merrill, L. Laux, J. Thornby, C. Vallbona.  Proceedings of the 4th International Conference on System Science in Health Care, Lyon, France, 1988.

27.  Reliability of Evaluation Instruments in Low Income Bilingual Settings.        V. Pavlik and L. Laux.  In Advances in Health Education, R. Feldman and J. Humphrey, Eds..New York: AMS Press, 1991, pp. 269-276.

28.  Physician Affect and Patient Beliefs Related to Expected Failure in the Management of Diabetes. L. Laux, C. Vallbona, J. Merrill, S. Baker, and V. Pavlik. Diabetes, V. 37, Supplement 1: 55A,1988 (Abstract).

29.  Individual Differences in Visual Perceptual Processing: Attention, Intelligence, and Display Characteristics. L. Laux and D. Lane, Proceedings of the 32nd Human Factors Conference, Anaheim, CA, Oct. 1988.

30.  Individual Differences in Perceptual Processing and Their Relationship to Intelligence and Reading. Under revision, Intelligence.

31.  Visual Display Principles for $C^3I$ System Tasks. W.C.Howell, D. Lane, L. Laux, L. Anderson, K. Holden. Technical Report, Army Research Institute Grant Number MDA 903-85-C-0347, June 1988.

32.  AIDS and Student Attitudes. J.M.Merrill, L. Laux, J.I.Thornby. Southern Medical Journal, 82:426-432, 1989.

33.  Developing an Effective Vehicle Facilitator System: A Human Factors Approach. Lila F. Laux and Kenneth Laughery, Center for Applied Psychological Services, Rice University, for Pontiac Division, General Motors Corp., Dearborn, Michigan, September, 1988.

34.  Development and Validation of a Scale to Assess Co-dependence. William H. Beck and Lila F. Laux,  Presented to the Texas Psychological Association, Austin, Texas, November 10, 1988.

35.  Self-concept and Primary Care. J. Merrill, L. Laux, J. Thornby, E. Lynch, and C. Vallbona. Proceedings of the 17th Annual Meeting of the North American Primary Care Research Group, San Antonio, Texas, April 12-15, 1989. (Abstract)

36.  Usefulness of Pictorials and Symbols in Communicating Hazard Information. Lila F. Laux, David Mayer, and Nellee Thompson. Proceedings of Interface 89: Sixth Symposium on Human Factors and Industrial Design in Consumer Products, May 22-24, 1989, Carnegie-Mellon University, Pittsburg, PA.

37. Locus of Control, Risk Perception, and Precautionary Behavior. Lila F. Laux and John Brelsford. Proceedings of Interface 89: Sixth Symposium on Human Factors and Industrial Design in Consumer Products, May 22-24, 1989, Carnegie-Mellon University, Pittsburg, PA.

38. Physician Gender and the AIDS Patient. J. Merrill, L. Laux, and J. Thornby. Paper presented to the Southern Medical Association, Annual Meeting, New Orleans, LA, November, 1989.

39. Self-esteem and Primary Care.  J.M.Merrill, L.F.Laux, J.I.Thornby, E.C.Lynch, and C. Vallbona. Proceedings of the North American Primary Care Research Group 16th Annual Meeting, San Antonio, TX, April, 1989.

40. Public Knowledge and Understanding of Overhead Electrical Power Lines: A Second Look. K. Vaubel, K. Donner, S. Parker, L. Laux, and K. Laughery. Proceedings of the Human Factors Society 33rd Annual Meeting, 560-564, 1989.

41. Recognizability and Effectiveness of Warning Symbols and Pictorials.  D. Mayer and L. Laux, Proceedings of the Human Factors Society 33rd Annual Meeting, 984-988, 1989.

42. The Relation of Sensory/Cognitive Functioning and Driving Performance in Drivers Aged 40 to 90+. Paper presented at the 33rd Annual Meeting of the Human Factors Society, October 17, 1989, Denver, CO.

43. Elderly Behind the Wheel.  Paper presented at the Southwest Traffic Safety Workshop IV, San Antonio Texas, November 14, 1989.

44. Effectiveness of Car Owners' Manuals: Reading Level, Indexing, Signal Words, and Mental Models.  Paper presented at the 1989 South Texas Symposium on Human Factors and Ergonomics, The University of Texas at San Antonio, Dec. 1, 1989.

45. Reliability of Evaluation Instruments in Low Income Bilingual Settings. Pavlik, V. and Laux, L.F.  Paper presented to the American Public Health Association, Boston, MA, Nov. 13-17, 1988.

46. Improving the Care of AIDS Patients: Roles of Provider Gender and Specificity of Training.  J.M. Merrill, L.F. Laux, S. Wente, J.I. Thornby, and C. Vallbona. Presentation at the V International Conference on AIDS.  Montreal, Canada, June 4-9, 1989.

47. AIDS, Minority Patients, and Their Doctors:  What's the Risk? Who's Talking. John Coverdale, John Aruffo, Lila Laux, Carlos Vallbona, and John Thornby. Submitted to the Southern Medical Journal, June 1990.

48. Why Doctors Have Difficulty With Sex Histories.  Joseph Merrill, Lila Laux, and John Thornby, Southern Medical Journal, in press 1990.

49. Motivating Medical Students to Care for Geriatric Patients. Lila F. Laux, Book of Abstracts, 16th Annual Meeting of the Association for Gerontology in Higher Education. Kansas City, March 1990.

50. Motivating Health Care Givers for Geriatric Patients. Lila F. Laux, J. M. Merrill, and J. I. Thornby, Proceedings of the Annual Conference of the American Society on Aging, April 5-8, 1990, San Francisco.

51. Maladaptive Attributions and the Care of Elderly Patients. Lila F. Laux. Proceedings of the North American Primary Research Group Eighteenth Annual Meeting, May 13-16, 1990, Denver, Co.

52. Age-related Changes in Sensory, Cognitive, and Physical Functioning: Driver System Implications. Paper presented at the Annual Meeting of the American Psychological Association, Boston, August, 1990.

53. Non-intrusive Inflight Data Collection: Concept, Utility, and Status. Lila F. Laux and Cathy Carson, NASA, JSC Publication No. 24197, September, 1989.

54. Driver Locus of Control: Age and Sex Differences in Predicting Driving Performance. Lila F. Laux and John Brelsford, Jr. Proceedings of the 34th Annual Meeting of the Human Factors Society, Orlando, FL. Oct. 8-12, 1990.

55. Motivating Changes in Diet and Exercise: Applying Attribution Theory. Lila F. Laux, Final Program and Abstracts, Seventh Symposium on Nutrition and Cancer, U.T.M.D.Anderson Cancer Center, Houston, Texas, June 7-8, 1990.

56. Alcoholism Treatment: The Structure and Role of MDs' Attributions (1990). J. M. Merrill, Lila F. Laux, J. I. Thornby. Paper presented at the 84th Annual Scientific Assembly of the Southern Medical Association, Oct. 12-14, 1990, Nashville, Tenn.

57. Age-related Changes in Sensory, Cognitive, Psychomotor, and Physical Functioning and Driving Performance in Drivers aged 40 to 92. Lila F. Laux & John Brelsford, Jr. AAA Foundation for Traffic Safety, Washington, D.C., May, 1990.

58. Automotive Maintenance and Safety Preparedness Among Drivers: Aspects of Age and Gender. David L. Mayer and Lila F. Laux. Proceedings of the 34th Annual Meeting of the Human Factors Society, Orlando, FL, Oct. 8-12, 1990.

59. A Look at the Older Driver. L. F. Laux. Paper presented to the Highway Users Federation, Annual Meeting, Gulfport, Mississippi, Oct. 22, 1990.

60. Locus of Control, Aging, and Driving. L.F.Laux, J. Brelsford, and D. Mayer. Proceedings of the 43rd Annual Meeting of the Gerontological Society of America, p. 52A,Boston, Mass, Nov. 15-19, 1990 (Abstract).

61. Medical Students Like Geriatric Patients. J. Merrill, L. Laux, and J. Thornby. Proceedings of the 43rd Annual Meeting of the Gerontological Society of America, p. 274A, Boston, Mass. Nov. 15-19, 1990 (Abstract).

62. Why Doctors Avoid Sexuality as a Health Issue. J.M. Merrill, Lila Laux, and J.I. Thornby. Paper presented to the Northwest Medical Association. Feb. 10-17, 1990. Sun Valley, Idaho.

63. Patients' Complaints: A Neglected Aspect of Medical Education. J.M. Merrill, Z. Camacho, L.F.Laux, J.I. Thornby, and C. Vallbona. Presented at Clinical Research, Southern Section SGIM, New Orleans, LA, Jan. 30-Feb 1, 1991.

64. Adapting the Workplace for the Disabled Worker. Lila Laux and Dianna Puccetti, Presentation to the Houston Area Human Factors Society, April 8, 1991.

65. All Norms Are Not Created Equal: The Validity of Diagnostic Tests of Language Functioning in Indigent Minority Populations. Michael Bartha and Lila F. Laux, Report to The Department of Psychology, Rice University, April 19, 1991.

66. Cultural Differences in Patients' Mental Models of NIDDM and Their Effects on Patient Self-Management. Lila Laux, Susan Baker, Valorie Pavlik, John Thornby, J.M. Merrill, and Carlos Vallbona. Poster presentation: 14th International Diabetes Federation Congress. Washington, D.C. June 23-28, 1991.

67. Road Sign Comprehension: Age and Sex Effects (1991). Lila Laux and David Mayer. Paper presented to the 70th Annual Meeting of the Transportation Research Board of the National Research Council, Wshinton, D.C.

68. A Follow-up of the Mature Driver Study: Another Look at Age and Sex Effects. Lila Laux. The Proceedings of the 35th Annual Meeting of the Human Factors Society, San Francisco, CA., Sept. 2-6, 1991.

69. The Godfrey-Laux Alcohol Assessment Battery. Sandra Godfrey and Lila Laux. The Proceedings of the 35th Annual Meeting of the Human Factors Society, San Francisco, CA., Sept. 2-6, 1991.

70. Effects of Explicitness in Conveying Severity Information in Product Warnings. K.R. Laughery, Kent Vaubel, Anna Rowe-Halber, and Lila Laux. The Proceedings of the 35th Annual Meeting of the Human Factors Society, San Francisco, CA., Sept. 2-6, 1991.

71. In a National Health Program Who Will Provide Mental Health Services? J.M. Merrill, Z. Camacho, Lila Laux, John Thornby, and Carlos Vallbona.    119th Annual Meeting of the American Public Health Association, Nov. 9-14, 1991.

72. How Medical School Shapes Students' Orientation to Patients' Psychological Problems. J.M. Merrill, Z. Camacho, Lila Laux, J.I. Thornby, and Carlos Vallbona. Academic Medicine, 6(9), 53-56, 1991.

73.   Human Dualism: Medicine's dilemma and a solution.  J.M. Merrill, Lila F. Laux, and John I. Thornby, Texas Medicine, 87(3), p. 8 (Letter), 1991.

74.   Gender's Influence on Attributional Style Toward the Elderly.  J.M. Merrill, Lila Laux, J.I. Thornby, and Carlos Vallbona. Proceedings of the 44th Annual Meeting of the Gerontology Society of America (Abstract), San Francisco, CA.  Nov. 22-26,  1991.

75.   Measuring Affective Derivatives of Unfulfilled Success Expectancy.  J.M. Merrill, Lila Laux, J.I. Thornby, and Carlos Vallbona.  Family Medicine, 23 (5), 333-334  (Letter),  1991.

76.   A Study of Senior Medical Students' (SMS') Ability to Cope with Hypochondriacs and Alcoholics.  Ronald Lorimar, Lila Laux, John Thornby, Carlos Vallbona, and Joseph Merrill, Clinical Research, in press.

77.   Locating Vehicle Controls and Displays: Effects of Expectancy and Age.  Lila Laux and David Mayer, AAA Foundation for Traffic Safety, Nov. 1991.

78.   Visual Interpretation of Blood Glucose Strips.   Lila Laux.  Proceedings of Program: Abstracts, South Texas Symposium on Human Factors and Ergonomics, The University of Texas at San Antonio, San Antonio, Texas, Nov. 15, 1991.

79.   Narcotics for Pain Relief: A Paradox of Beliefs. S.M. Weinstein, C.S. Hill, L.F. Laux, D.M. Thorpe, J.I. Thornby, C. Vallbona, and J.M .Merrill.  Paper presented to the Southern Medical Association, Annual Meeting, New Orleans, LA; January, 1992.

80.   The Aging Driver, the Facts, the Myths, and the Texas Perspective. Lila Laux. Keynote address, Texas-based Older Driver Task Force Kickoff Meeting, Austin, Texas, April 13, 1992.

81.   Redesigning Medical Education for the 21st Century (1992).  J.M. Merrill, L.F. Laux, R. Lorimar, J. Thornby, and C. Vallbona.  In Chytil et al (Eds).  Health Systems- the Challenge of Change : Proceedings of the 5th International Conference on System Science in Health Care. June 29-July 3, 1992: Prague, Czechoslovakia: Omnipress, p 1419-1423.

82.   A Human Factors Approach to Developing Facilitators (Warnings and Instructions).  (1992) L.F. Laux and D.M. Mayer.  In Automotive Ergonomics, B. Peacock and W. Karwowski (Eds.), Taylor & Francis, Ltd.: Washington, DC.

83.   Evaluating Vehicle Displays for Older Drivers. (1992) David Mayer and Lila Laux. AAA Foundation for Traffic Safety, Washington, D.C.

84.   Expand Family Medicine Programs to Improve Geriatric Care. (1992) Anita Woods, D.K. Koester, Lila Laux, John Thornby, C. Vallbona, and Joseph Merrill. Proceedings of the 45th Annual Meeting of the American Gerontological Association, Washington, D.C.

85.   Re-Designing Medical Education for the 21st Century. (1992) J.M. Merrill,
      L.F. Laux, R. Lorimor, J.I. Thornby, and Carlos Vallbona. In The Health Systems-
      the Challenge of Change. M.K. Chytil, G. Duru, W. Van Eimeren, and C.D. Flagle
      (Eds.), pp. 1419-1423. Prague: Omnipress.

86.   Clinical Grisaille: Its Role in Medicine. J.M. Merrill, L.F. Laux, J.I. Thornby, R.
      Lorimor, C. Vallbona. Clinical Research; January, 1993.

87.   Chronic Pain Patients: Implications for Their Future Management. S.M.
      Weinstein, C.S. Hill, L.F. Laux, D.M. Thorpe, J.I. Thornby, and C. Vallbona.
      Clinical Research;   January, 1993.

88.   Future Pediatricians: Expanding the Nation's Primary Care Base. M. Tristan, L. F.
      Laux, R. Lorimor, J.I. Thornby, C. Vallbona and J.M. Merril. Clinical Research;
      January, 1993.

89.   Who Has the Lowest Threshold for Chronic Pain Patients? Clinical Research;
      January, 1993.

90.   Who's Attracted to Family Medicine? Anita Woods, D.K. Koester, Lila Laux, J.I.
      Thornby, C. Vallbona and J.M. Merrill. American Federation of Clinical
      Research, Carmel, CA, Feb. 20, 1993.

91.   Assessing Health Locus of Control Among Low Income Elderly Minority Patients.
      Cynthia Willis and Lila Laux. Southern Gerontological Society, Richmond, VA.
      April 29, 1993.

92.   Visual Interpretation of Blood Glucose Test Strips. Lila F. Laux. In press, The
      Diabetes Educator.

93.   Perceptual Demands of Reading Blood Glucose Strips. Lila F. Laux. Proceedings of
      the Interface '93 Conference, Raleigh, N.C., May 1993.

94.   Social Desirability and Medical Students' Perception of Success in Treating the
      Elderly. J.Merrill, L. Laux, R. Lorimor, J. Thornby, and C. Vallbona. Clinical
      Research, May, 1993.

95.   Aging and Mobility (1993). Lila Laux: Invited address to the Older
      Driver/Pedestrian Conference, NHTSA/FHWA sponsored conference, Phoenix, AZ.

96.   Machiavellianism in Medical Students (1993). J.M. Merrill, Z. Ca,acho, L. Laux,
      J.I. Thornby, and C. Vallbona. The America Journal of the Medical Sciences,
      305(5),   285-288.

                                    5/15/93

Publications from my work at Baylor College of Medicine 1994-Present
1994 Presentations
Opiods and Chronic Pain: Sources of Senior Medical Student's Maladaptive Beliefs. S.M.
Weinstein, C.S. Hill, L.F. Laux, D.M. Thorpe, J.I. Thornby, C. Vallbona and J.M. Merrill.
Clinical Research Meeting, April 29-May 2, 1994, Baltimore, MD.

An Attribution Theory (AT) Model Predicts and Improves Health Care Providers' (HCP)
Attitudes Toward the Elderly. J.M. Merrill, L.F. Laux, R.J. Lorimor, J.I. Thornby, and C.
Vallbona. 5th International Conference on Systems Science in Health-Social Services for the
Elderly and the Disabled. Geneva CICG, May 2-6, 1994.

Opiods and Chronic Pain: Sources of Senior Medical Student's Maladaptive Beliefs. S.M.
Weinstein, C.S. Hill, L.F. Laux, D.M. Thorpe, J.I. Thornby, C. Vallbona and J.M. Merrill.
Clinical Research Meeting, April 29-May 2, 1994, Baltimore, MD.

An Attribution Theory (AT) Model Predicts and Improves Health Care Providers' (HCP)
Attitudes Toward the Elderly. J.M. Merrill, L.F. Laux, R.J. Lorimor, J.I. Thornby, and C.
Vallbona. 5th International Conference on Systems Science in Health-Social Services for the
Elderly and the Disabled. Geneva CICG, May 2-6, 1994.

Social Desirability in Medical Students. J.M. Merrill, L.F. Laux, R.J. Lorimor, J.I. Thornby, and
C. Vallbona. AFCR Southern Section, February 3-5, 1994 New Orleans, LA.

Future Pediatricians Beliefs About Opioids and Chronic Pain. M. Tristan, S.M. Weinstein, C.S.
Hill, L.F. Laux, D.M. Thorpe, J.I. Thornby, C. Vallbona and J.M. Merrill, SSPR, February 3-5,
1994. New Orleans, LA

The Image of Aging: Its Role in Modeling the Services of Future Physicians. J.M. Merrill, L.F.
Laux, R.M. Lorimor, J.I. Thornby, and C. Vallbona. American Society on Aging, March 19-22,
San Francisco, CA.

Authoritarianism in Medicine. L.F. Laux, R.J. Lorimor, J.I. Thornby, C. Vallbona and J.M.
Merrill. 1994 Meeting of the Southern Society for philosophy and Psychology, March 31-April
2, 1994. Atlanta, GA.

1994 Publications
What Are the Future Pediatricians Like? J.M. Merrill, L.F. Laux, R.J. Lorimor, J.I. Thornby, and
C. Vallbona. Acta Paediatr 83:262-264;1994.

Who Derives Professional Satisfaction in Treating Hypochondriacs? J.M. Merrill, L.F. Laux,
R.J. Lorimor, J.I. Thornby, and C. Vallbona. Abstract. Journal of General Internal Medicine 9
(Supp.2):96;1994

Attribution Theory Predicts and Improves Attitudes Toward the Elderly. J.M. Merrill, L.F.
Laux, R.J. Lorimor, J.I. Thornby, C. Vallbona. In: Rey J.C., Tilquid C. (eds): Institut suisse de la
sante publique. Proceedings of the 5th International Conference on Systems Sciences in Health-

social Services for the Elderly and the Disabled. May 2-6 1994: Lausanne, Switzerland. Pp 857-861.

Measuring How Medical Students Cope with Uncertainties and Ambiguities. J.M. Merrill, Z. Camacho, L. F. Laux, R. Lorimor, J.I. Thornby and C. Vallbona. Medical Education 28:316-322;1994.

1995 PRESENTATIONS
Modeling Impression Management In Medical Practice. J. Merrill, L. Laux, R. Lorimor, J. Thornby, and C. Vallbona. SGIM. San Diego, CA. May 4-5, 1995.

Future Pediatrician's Beliefs About Therapeutic Uses of Opioids and Substance Abuse Patients. A. Mintz, J. Merrill, L. Laux, R. Lorimor, J. Thornby, and C. Vallbona. Ambulatory Pediatric Assoc. San Diego, CA. May 7-11, 1995.

Obesity as a Risk Factor: Roles of Attribution and Adaption Level Theory in its Detection and Management. J. Merrill, L. Laux, R. Lorimor, J. Thornby, and C. Vallbona. 2nd International Heart Health Conference. Barcelona, Spain. May 28 - June 1, 1995.

Using Attribution Theory Models to Predict Senior Medical Students' Perception of Patients and Career Choice. J. Merrill, L. Laux, R. Lorimor, J. Thornby, and C. Vallbona. R.I.M.E.—AAMC. Washington, D.C. October 27 - November 2, 1995.

1995 PUBLICATIONS
Modeling Impression Management In Medical Practice. J. Merrill, L. Laux, R. Lorimor, J. Thornby, and C. Vallbona. J. Gen Int Med 1995:43 (Supplement 1 4):112.

Using Applied Attribution Theory to Improve Caregivers' Attitudes Toward the Elderly. J.M. Merrill, L.F. Laux, R.J. Lorimor, J.I. Thornby, and C. Vallbona. J. Clin. Geropsychology. 1995:1:259-265.

Gender: Measuring Its Influence on Senior Medical Students' "Professional Personality" and Career Choice. J. Merrill, R. Lorimor, L. Laux, J. Thornby, C. Vallbona. Amer J Med 1995:98;598.

Authoritarianism's Role in Medicine. J.M. Merrill, L.F. Laux, R. J. Lorimor, J.I. Thornby, and C. Vallbona. Amer J Med Sci 1995;310:87-90.

Is Ob-Gyn a Primary Care Specialty? J. Merrill, R. Lorimor, L. Laux, J. Thornby, C. Vallbona. Texas Medicine. 1995:91;58-59.

Measuring Social Desirability Among Medical Students. J.M. Merrill, L.F. Laux, R. J. Lorimor, J.I. Thornby, and C. Vallbona. Psychol Reports 1995;77:859-864.

1996 PRESENTATIONS

High-Tech Medicine's Influence on Clinical Decisions. Merrill JM, Laux L, Lorimor R, Thornby J, Vallbona C. European Society for Medical Decision Making. Sixth Biennial Conference. Torino, Italy. June 16-18, 1996.

Medical Students as Prospective Consumers of Hi-tech Medicine. Lorimor R, Laux L, Thornby J, Vallbona C, Merrill JM. Int. Soc. Tech. Assessment Health Care, San Francisco, CA June 23-26, 1996.

1996 PUBLICATIONS
Using Attribution Theory Models to Predict Senior Medical Students' Perception of Patients and Career Choice. J. Merrill, L. Laux, R. Lorimor, J. Thornby, and C. Vallbona. Acad Med. 1996:71(1);Suppl:67-69.

1999 PUBLICATIONS
Measuring Medical Students' Reluctance To Prescribe Opioids For Cancer Pain. Joseph M. Merrill, C. Stratton Hill, Lila M. Laux, Ronald I. Lorimor, Jack I. Thornby, Deborah Thorpe, Sharon M.Weinstein. Psychological Reports, 1999, 84, 28-30.

2000 PUBLICATIONS
Medical Students' Attitudes Toward Pain and the Use of Opioid Analgesics: Implications for Changing Medical School Curriculum. Sharon M. Weinstein, Lila F., Jack I. Thornby, Ronald J. Lorimor, C.S. Hill, Jr., Debbie M. Thorpe, and Joseph M. Merrill. Southern Medical Journal. 93:[5] 472-478.2000

Physicians' Attitudes Toward Pain and the Use of Opioid Analgesics: Results of a Survey from the Texas Cancer Pain Initiative. Sharon M. Weinstein, Lila F. Laux, Jack I. Thornby, Ronald J. Lorimor, C.S. Hill, Jr., Debbie M. Thorpe, and Joseph M. Merrill. Southern Medical Journal. 93[5] 479-487. 2000.

**Lila F. Laux, PhD**
**Human Factors Consulting**
**417 Leyden St.**
**Denver, CO 80220**
**(303) 388 4659**

The following is a list of cases in which I have testified by deposition or at trial in the last five years.

**1996 to Present – extracted from billing records and other case materials prior to 2000**

| Attorney Name | Case information | type/year |
|---|---|---|
| Ray Marchan | Perez v Nueces Power Inc & Ingersoll Rand 357 Judicial District, Cameron Co, TX | depo 1999 |
| Tim Smith | Ruiz v White Consolidated et al 238 Judicial Dist, Midland Co., TX | depo 1999 |
| Webster Hart | Wooley v Powerscreen | depo 1999 |
| Mike Parker | Butchee v Allegheny Paper Shredders, Inc. | depo 1999 |
| Shari Wright | Navarro v Mississippi Pac RR DBA Union Pac RR and the Texas Mexican RR Co. | trial 1999 |
| Shari Wright | Cadena v Mississippi Pac RR DBA Union Pac RR and the Texas Mexican RR Co (?) | depo 1999 |
| Christopher Cowan | Brown et al v Voluntary Purchasing Group et al U S District court, N Dallas Div | depo 2000 |
| Kelly Puls | Callaway v Redmon Homes, Black & Decker, and Leviton | depo 1999 depo 2000 |
| Reed Morgan | Pate | depo 1999 |
| Stephenie Shapiro | McIntire v Motorola and Dames & Moore US District Court, District of Arizona | depo 2000 |
| Christopher Smith | Marcel v Seatac homes 260th Judicial District of Orange Co., TX | depo 1999 |
| Terry Hofer | Hensley v HD Electric Co, Elastimold Corp., Thomas & Betts, Cooper Power Systems, Inc., Cooper Industries, Inc. US Dist. Ct, Dist of SD, W Div | depo 2000 |
| Michael Stag | Branscum v Terry Catherine et al CDC No. 95-1542, "N-8" | depo 1999 |
| John Flood | Melba v Michaels Stores, Inc. and Plaid Enterprises, Inc District Court, 53rd Judicial Dist., Travis Co, TX | depo 2000 |
| John Flood | Tavarez et al v Exxon Corp. et all 61st District Ct, Cause No. B-101,723, Ector County, Texas | depo 2000 |
| Kelly Puls | Cause No. 98-00227 Sanders v TU Electric et al 162nd District Ct., Dallas County, TX | depo 2001 |
| Morris Ratner | MTBE Products Liability Litigation U. S. Dist. Ct., S. Dist. of N.Y. | depo 2001 |
| Thomas Londrigan | Yeaman et al v Shelby Electric Coop Christian Co. Illinois No. 2000-L-42 | depo 2001 |
| John Conway | Cause No. 00-03652; Straub v FMC Corp., et al 68th Judicial District, Dallas County, Texas | depo 2001 |
| Michael Stag | Vercher v Hub City et al Civil Dist. Ct. Parish of Orleans, State of LA | depo 2001 |
| John Flood | Thompson v Brown & Williamson Tobacco Corp, et al 105th Judicial District Court, Nueces Co, TX | depo 2001 |
| Carlene Lewis | Rebecek et al v The Ford Motor Company, Inc; | depo 2001 |

|  | Bridgestone/Firestone, Inc. et al. District Court of Williamson County, Texas, 368th Judicial District |  |
| --- | --- | --- |
| Marco Salinas | Fernandez et al v U-Haul et al | depo 2002 |
| Dan Rios | Martinez et al v ITT et al, Dist. Ct. Hidalgo Co., 370th Judicial Dist | depo 2002 |
| Greg Wilkins | Accardo v Grand Casino of Louisiana, Inc. | depo 2002 |
| Kevin Huddell | James Fox et al v Cheminova, Inc. et al USDC, EDNY, #CV 00-5145 | depo 2002 |
| Denys Clancy | Baden v Winters et al Dist. Court Nueces County | depo 2002 |
| Robert Binstock | Villareal v American Home Products | depo 2002 |
| John Hoffman | Calcaterra v Merck No. 02-142-GPM | depo 2003 |
| Steve Hastings | Figueroa et al v Home Depot et al No. 02-6242-E | Depo 2004 |

**Lila F. Laux, PhD**
SS# 465 62 0060
**Human Factors Consulting**
417 Leyden St.
Denver, CO 80220
(303) 388 4659

My fee schedule is as follows:

| | |
|---|---|
| For review of materials, report generation, consultation, etc. and deposition testimony in Denver | $100.00/hour |
| For travel days to give testimony at trial or to visit an Accident site, etc. | $600.00/day |
| All fees or charges incurred as a function of work on the case (air fare, long distance charges, hotels, copying, etc.) | as incurred |

I have no minimum fee and do not require a retainer.

# EXHIBIT "G"

**Lila F. Laux, PhD**
**Human Factors Consulting**
**417 Leyden St.**
**Denver, CO 80220**
**(303) 388 4659**

Brett S. Thomas
Bush, Lewis & Roebuck, PC
1240 Orleans
Beaumont, TX 77701

FAX: 409 835 4194

Oct.14, 2004

Re:   *Brian & Lisa Wright, Individually and as Representatives of the Estate of
Cade Wright v. Ford Motor Co. Cause No. 1:04CV0011. In the US
District Court for the Eastern Division of Texas, Beaumont Division*

Dear Mr. Thomas:

This letter provides a report of my human factors analysis of the accident that resulted in Cade
Wright's death on June 30, 2003. If I learn of additional discovery or am provided with reports
prepared by other experts retained by either side in this litigation, I may modify or expand these
findings and/or opinions.

I am a human factors practitioner. I have a Master of Science degree in Applied Psychology and
a Doctorate in Industrial Psychology with a specialization in Human Factors Engineering. I was
on the staff and faculty of Baylor College of Medicine in Houston, Texas, from 1981 through
1993, doing research in the Department of Community Medicine. A great deal of the work I did
at Baylor was related to conveying risk information. I am still an adjunct faculty member at
Baylor Medical College.

From 1986 until the end of 1993, I was on the Engineering Psychology faculty and research staff
at Rice University in Houston, Texas. I worked with others in the department to evaluate the
relationship between environments and product designs and human behavior. This research, and
other research performed in the Human Factors laboratory, examined the characteristics of user
populations, how people identify and respond to hazards, and how to design products and
environments to enhance safety. Our lab was funded for several years by General Motors to
examine the hazard communication systems in place in vehicles. I was one of the principal
investigators in this work.

I now work as a senior cognitive engineer for a firm in Boulder, Colorado that provides human
factors research and design/consultative services to the military, government, and business. I
continue to teach in a seminar on hazard communications (including on-product warnings and
product instructions) for industry in the school of Engineering Professional Development at the

1

University of Wisconsin, twice a year. I also teach annually in the Human Factors short course for professionals at the University of Michigan Ann Arbor. I have authored a number of publications related to designing and evaluating effective hazard communications and to the problems associated with effectively identifying hazards and communicating hazard and risk information. These papers and presentations are listed in my C.V., which is attached.

Brett S. Thomas of the law firm Bush, Lewis & Roebuck, PC, attorneys for the plaintiffs Brian and Lisa Wright, retained me in May 2004. I was asked to perform a human factors analysis of the design of the 2001 Ford Expedition owned by the McCutcheons with regard to the safety of the effective field of view when backing the vehicle. The vehicle was not equipped with a reverse sensing system or any other type of assist for drivers backing the vehicle. At the time of the accident that is the focus of this lawsuit, Robin McCutcheon was driving the 2001 Ford Expedition. Mrs. McCutcheon was reversing her Ford Expedition in the parking area at 5041 Twin City Highway, Groves, Texas, when her vehicle struck Cade, who was walking or standing directly behind the driver's side rear wheel. Mrs. McCutcheon did not, and could not, see Cade in the blind spot behind her Expedition.

I have reviewed the following material and information for the purposes of making my evaluation and formulating my opinions:

> Plaintiff's Original Complaint
> Defendant Ford Motor Company's Original Answer, Statement of Affirmative Defenses, and Reliance on Jury Demand
> Depositions of Darren McCutcheon and Robin McCutcheon with exhibits
> 2001 Expedition Owner Guide (Ford)
> Factory Invoice for VIN#1FMRU15WX1LB60820
> 2001 Ford-Mercury Cars & Lt. Trucks Warranty Guide
> Warranty Reimbursement Records for VIN#1FMRU15WX1LB60820
> Product Direction Letters (PDLs) 2000-20002 Expedition: GEN01039, 1060, 1078, 1081,1103, 1117, 1131, 1138, 1148, 1173, 1182, 1225, 1264, 1293,1329, 1358, 1363, 1400
> Death Certificate of Cade Wright
> Groves Police Department Accident Report
> Groves Police Department Investigation Report with photographs
> Portions of a May 4, 2004 study by the National Highway Traffic Safety Administration (NHTSA) regarding death and injuries resulting from non-traffic and non-crash events including those related to vehicle backing
> FMVSS/CMVSS Compliance Documentation 97-111, 98-111, 990111, 00-111, 01-111
> Ford Documents with Bates numbers 00001-01177, 01200-01215, 3720 13843-3720 14052
> SUV Blind Spots Lead to Back-over Accidents, May 24, 2004, http://www.wkyc.com/news/news_fullstory.asp?id=19284
> Low speed run-overs of young children in QLD. Queensland Injury Surveillance Unit Injury Bulletin, No. 76, March 2003
> NRMA Insurance Releases World First Reversing Visibility Index, 31 October, 2002, http://www.nrma/com/au/pub/nrma/about_us/media_releases/20021031a.shtml
> Car Safety. TheBabyProofer.com, http://mrsbabyproofer.store.yahoo.com/revisale.html

Driving Blind.  Consumer Reports.  Vehicle Backup aids 10/03.
   http://www.consumerreports.org/main/content/printable.jsp?WebLogicSession=QWciUByad
*Behind the Wheel*, January 15, 2002.  Caitlin Liu, LA Times
*Save a Child's Life*, http://www.rearlens.com, Rearview Safety Lens 2002-2004
*Backup Systems*.  Consumer Reports.Org, 10/04
Driveway Dangers.  Nov. 21, 2002.  CBS4boston.com
Drivers Backing Over Children on the Rise.  Dianne Whitacre, Charlotte News, June 9,
   2002.  http://www.charlotte.com/mld/charlotte/news/columnists/dr_traffic/
   3431912.htm?1c
Consumer Reports' 50th Anniversary Issue Puts a Premium on Safety.
   http://www.kidsncars.org/consumer_report_pr.htm
Consumers in Trucks Drive Demand for Backup Sensors.  USA Today, Oct. 14, 2002.
SUV Dangers.  Keepkidshealthy.com, http://www.keepkidshealthy.com/cgi-masterPFP.cgi
Guardian Alert Backup Sensor FAQ, http://www.reverselogic.us/faq.html
Looking Back in the Future, DELPHI Feature Story, Sept.2002.
   http://www.delphi.com/news/solutions/monthly/ms14552-09012002.
Park Assist Front & Rear Vehicle Parking Sensor Kits.
   http://www.sportsimportltd.com/paasvebase.html
Driving Aids - Sonar Wireless Backup Alert.  Assis-TECH, Inc.  http://www.assis-
   tech.com/driving_aids_sonar_backup_alert.htm
The Official Tailgauge[tm] Product Website - Ultrasonic Automotive Backup Warning,
   http://www.tailgauge.com
Danger on the Driveway, CBS 2 -New York News, cbsnewyork.com, A CBS Special
   Report, Nov. 21, 2002
Inside Edition Reports on Driveway Dangers, IE Investigative Reports, Original Airdate
   July 15, 2002.  http://www.insideedition.com/investigative/driveways.htm .
Engineered Auto Devices: parking sensors, backup sensors, parking safety, backup safety
   Engineered Auto Devices: How it works http://www.eautodevices.com
Video Assistance.  Speed-O-Tach, Inc. 2001,
   http://www.sotelectronics.com/videoback.php3

Based on information in these documents, I have the following understanding of the injury event:

   Brian Wright parked his Ford Lariat in the parking area at 5041 Twin City Highway,
   Groves, Texas.  His vehicle was to the left and rear of the parked 2001 Ford Expedition
   owned by Darren and Robin McCutcheon. Both vehicles faced the snow cone stand.  Mr.
   Wright went with his son, Cade, to the window of the snow cone stand.  He gave a snow
   cone to Cade, who asked to be allowed to return to the Lariat where his mother was
   waiting.  Mr. Wright turned to the window to complete the transaction.  As he was making
   his way back to the Lariat, Cade went behind the Expedition on the rear driver's side.
   Mrs. McCutcheon and her husband did not see Cade return from the snow cone stand
   window, as they were turned around and occupied with getting their two children belted
   into the back of the Expedition.  One of the children was fussy and they were busy
   settling him prior to starting for home.  Mrs. McCutcheon started the car, checked all
   three rear view mirrors, and put it into reverse, but the car backed up she and her husband
   almost immediately realized she had run over or hit something and she stopped and
   pulled forward.  Upon examination, it was revealed that the Expedition had driven over

Cade and killed him. Cade was three years old at the time of the accident.

Based on the information I have reviewed in the documents listed above and my training and experience as a human factors professional, I have the following preliminary opinions regarding the human factors issues associated with the safety of the reverse field of view when backing the 2001 Ford Expedition:

1. The design of the vehicle results in a large blind spot behind the Expedition. As designed, there is no way for a driver to detect a young child who goes behind the vehicle after the driver has entered the vehicle.

2. The large blind spot creates a significant safety hazard for young children.

3. There are a significant number of deaths and injuries to young children when drivers are backing, because of the blind spot in vehicles. SUVs are responsible for a disproportionate number of those deaths and injuries. The reverse field of view in an SUV is typically more restricted than it is for a sedan.

4. There is technology that reduces or eliminates the blind spot behind SUVs. Ford is aware of one type of such technology, the reverse sensing system, and made it available on some models such as the Navigator. It the reverse sensing system was an option available with the 2001 Expedition. In the PDLs the reverse sensor system is listed as a safety/security item.

5. There is no warning in the owner's manual about the fact that the reverse field of view in the Expedition is significantly restricted. There is no discussion of the safety hazards associated with this restriction. Purchasers of this vehicle are not made aware that Ford knows about this hazard and can provide a device that will significantly reduce or eliminate the hazard.

6. The Ford Expedition is a high-end vehicle in terms of price. The addition of the reverse sensing system would not significantly add to the production/manufacturing costs for this vehicle. The Expedition has more seating than a typical sedan. Families who purchase the Expedition often do so because they perceive it to be a safe car for transporting their families and they are likely to have children in their families. It is not likely that the additional cost of the reverse sensor system would deter them from purchasing it - on the contrary, if they understood the advantages of the reverse sensing system as a safety feature, it would likely attract additional buyers who have children.

7. It was absolutely foreseeable that a child would walk or stand in the blind spot behind the Expedition and get injured or killed. This happens with an unacceptable frequency due to the fact that children do not perceive or appreciate the hazard and drivers cannot see the children. Families with SUVs are also likely to be families with children, and they are also likely to be at locations where there are young children.

8. The hazard associated with backing vehicles, and the increased hazard associated with backing SUVs because of their reduced rearward field of view, was well known to Ford when this Expedition was planned, and Ford had the means to reduce or eliminate this hazard in the Expedition that caused the death of Cade Wright.

9. Ford could, and should, have provided a reverse sensor system on the Explorer driven by Robin McCutcheon. Failing to do so shows a callous disregard for the safety of children and adults and for the driver of an Expedition who causes a child's injury or

4

death.

10. Ford could, and should, have educated and warned purchasers of their vehicles about the need for and use of the reverse sensor system. There is nothing in the owner's manual that informs users whose vehicles are not equipped with this system that there are many after-market reverse sensor systems that they can have installed in their vehicles.

11. Failing to provide a reverse sensor system and failing to educate the purchasers of the Expedition about the availability and need for such a system shows a callous disregard for the safety of both children and adults.

The above represents my present opinions. If I receive more information, including reports from other experts, I may change or add to my opinions.

*Lila F. Laux*

Lila F. Laux, PhD

# EXHIBIT "H"

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     BEAUMONT DIVISION

 3   BRIAN AND LISA WRIGHT, :
     INDIVIDUALLY AND AS     :
 4   REPRESENTATIVES OF THE  :
     ESTATE OF CADE WRIGHT,  :
 5   DECEASED                :
                             :
 6   VS.                     :CIVIL ACTION NO. 1:04-CV-11(MAC)
                             :          JURY
 7   FORD MOTOR COMPANY      :

 8            ***********************************
                      ORAL DEPOSITION OF
 9                      LILA LAUX, PhD.

10                     November 22, 2004

11            ***********************************

12        ORAL DEPOSITION OF LILA LAUX, PhD., produced as a

13   witness at the instance of the Defendant, and duly

14   sworn, was taken in the above-styled and numbered cause

15   on the 22nd day of November, 2004, from 2:15 p.m. to

16   4:50 p.m., before CINDI L. BENCH, CSR, in and for the

17   State of Texas, reported by machine shorthand, at the

18   offices of Brown McCarroll, LLP, 1111 Bagby, Suite 4700,

19   Houston, Texas, pursuant to the Federal Rules of Civil

20   Procedure and the provisions stated on the record or

21   attached hereto.

22   _____

23              CINDI L. BENCH REPORTING
             101 Southwestern Blvd., Suite 145
24            Sugar Land, Texas   77478-3649
                      (281) 565-8222
25                 Fax (281) 565-8220
```

2

I N D E X

E-X-H-I-B-I-T-S

|  | Page | Line |
|---|---|---|
| Ex. No. 1 - List of Cases Ms. Laux testified in | 5 | 24 |
| Ex. No. 2 - Report | 12 | 16 |
| Ex. No. 3 - Invoices | 22 | 9 |
| Ex. No. 4 - CV | 23 | 6 |
| Ex. No. 5 - Amended Notice of Deposition | 32 | 1 |
| Ex. No. 6 - E-Mail trail and various related documents | 32 | 23 |
| Ex. No. 7 - Draft Report | 32 | 23 |

E-X-A-M-I-N-A-T-I-O-N

|  | Page | Line |
|---|---|---|
| Examination by Mr. Wamsted | 4 | 3 |

3

A-P-P-E-A-R-A-N-C-E-S


COUNSEL FOR PLAINTIFFS:

  Mr. Brett Thomas
  Bush, Lewis & Roebuck
  1240 Orleans St.
  Beaumont, Texas  77700


COUNSEL FOR DEFENDANT:

  Mr. Ron Wamsted (Appeared via telephone)
  Brown McCaroll, LLP
  111 Congress Ave., Suite 1400
  Austin, Texas  78701

  Mr. William Moye
  Brown McCarroll, LLP
  1111 Bagby, Suite 4700
  Houston, Texas  77002

4

1          LILA LAUX, PhD.,

2     having been first duly sworn, testified as follows:

3               E-X-A-M-I-N-A-T-I-O-N

4     BY MR. WAMSTED:

5          Q     Give me your full name, please.

6          A     Lila Carol Fitzgerald Laux.

7          Q     Dr. Laux, give me your business address,

8     please.

9          A     147 L-E-Y-D-E-N Street, Denver, Colorado,

10    80220.

11         Q     All right, ma'am.  My name's Ron Wamsted, and I

12    represent Ford Motor Company, and I don't believe you

13    and I have ever spoken before; is that correct?

14         A     Well, since I can't see you, I don't know.  I

15    don't recognize your voice and your name doesn't sound

16    familiar, but I wouldn't swear to it.

17         Q     There you go.  You've given a fair number of

18    depositions over these last few years, have you not,

19    ma'am?

20         A     Since 1986, yes.

21         Q     All right.  I won't spend much time on

22    preliminaries, but telephone depositions are a little

23    bit difficult, so please let me finish my question

24    before you begin your answer, and I'll try to extend

25    the same courtesy to you on your answer.  Okay?

5

1     A     Sure.

2     Q     If you need a break -- and we will take some

3   breaks here -- let me know, and if you would just allow

4   me to finish my line of questioning, we'll take a break

5   anytime you want.  All right?

6     A     That's fine.

7     Q     Are there any time constraints I need to know

8   about?  Are you trying to get out today?

9     A     My airplane leaves at 9:00 tonight, so I don't

10  think we have any constraints.

11    Q     I don't know, I might be long-winded.

12    A     Oh, gee, that's not good news.

13    Q     We'll make -- we'll make your airplane.  I

14  suspect you probably need to leave there by 7:00,

15  though, is that -- is that --

16    A     Probably by 6:30, I would say.

17    Q     Okay.  I don't see any problem with any of

18  that.  Let's do this:  Start out, if you would, and

19  let's mark your deposition list, your trial and

20  deposition list as Exhibit No. 1.

21    A     I think they've already marked something else.

22          MR. MOYE:  We have scratched through that.

23          THE WITNESS:  Oh, you did.  Okay.

24          (Exhibit No. 1 was marked.)

25    Q     (By Ms. Wamsted)  All right, ma'am.  I'm

6

1    assuming it's the same one that I have, but mine ends

2    with a Jim Cole case called Prukop; is that what's been

3    marked there?

4        A    It is.  You know, and there might be a case

5    that has -- that I've testified in since then.  I'll

6    have to go back and look, but it wouldn't be more than

7    one.

8        Q    That's fine.  With that possible addition, does

9    this then contain your deposition and trial testimony

10   for -- or since 1999?

11       A    I hope so.  I tried.

12       Q    All right.  And it looks like you've got them

13   set up by the name of the attorney that retained you on

14   the left margin, case name in the middle, and then the

15   year and -- the year of the deposition or trial

16   testimony, correct?

17       A    That's correct.

18       Q    And if I read this correctly, mine only

19   indicates one -- one trial in this four to five-year

20   period; is that correct?

21       A    That's what it looks like.

22       Q    Does that sound about right?

23       A    Sounds right.

24       Q    Okay.  As you look at this list, ma'am, are

25   there any cases like the case we're here about today,

7

1    which I will call a rear-sensing system case?

2        A    No.

3        Q    Are any of them similar to the right -- case

4    we're here about today in any form or fashion?

5        A    Well, yes, in that they're human beings who got

6    involved in an accident and something bad occurred.  I

7    mean, you know, it's that sort of case.

8        Q    Okay.

9        A    If you're asking me if it's anything specific

10    to back-up sensors, no.

11        Q    All right.  As I look at this list, how many of

12    these cases here are plaintiff's cases, where you were

13    retained by the human being that was injured or killed?

14        A    Well, in all instances, I was retained by an

15    attorney, and I think these are all plaintiffs' cases.

16        Q    As I look down at this list, I count about 36,

17    and there's quite a number of corporations involved.

18    Was your testimony in this list, Exhibit No. 1, all

19    against these various corporations listed?

20        A    Well, that's not the way I think of it.  I

21    don't feel like I'm testifying against anybody.  I

22    think what I'm trying to do is explain from a human

23    factors perspective what happened and why it happened,

24    and how it could have been avoided, I guess.

25        Q    Okay.  But in that regards, you found fault or

8

1    problems with each and every one of these corporations,

2    in the way they had done something specific to that

3    case, correct?

4         A    I suppose you could say that.  I don't --

5    without having -- going back and looking at all of

6    them, I really can't say -- you know, make a blanket

7    statement that that's true, but typically that's --

8    when I'm asked to give a deposition, that's been my

9    conclusion, yes.

10        Q    Well, as we run through here, can you find a

11   single corporation of this list of cases on Exhibit No.

12   1 where you came into the deposition and said this

13   corporation did everything just fine, and whoever was

14   suing that corporation was wrong?

15        A    Well, I don't suppose an attorney who hired me

16   to do a human factors analysis for the plaintiff would

17   probably have asked me to give a deposition if that had

18   been my opinion.

19        Q    My next question is:  Are these attorneys all

20   plaintiffs' attorneys?

21        A    Some of them may work for third parties like

22   insurance companies and things like that, but, of

23   course, they are all -- I mean, I don't know exactly

24   how to answer your question, I guess is my answer.

25        Q    Well, I'm trying to find out, ma'am, if this

9

1    list of cases where you've given a deposition you ever

2    came in and found the corporation having done the right

3    thing?

4        A    I don't know that I've ever been asked that

5    question, and, you know, I'm having a little difficulty

6    with -- you know, in these cases that are on here, I've

7    been hired by a plaintiff's attorney to give an opinion

8    about the human factors associated with some injury or

9    some accident, and by the fact that these plaintiffs'

10   attorneys have asked me to give a deposition, it's

11   pretty clear that I'm not going to be saying that the

12   people that they're suing did the right thing.  So,

13   that's why I'm not really understanding where you're

14   going with this.

15       Q    I just want to make clear that you find -- you

16   find fault with what these corporations have done, at

17   least in the cases we're looking at here on Exhibit No.

18   1?

19       A    Yeah.  I don't -- you know, I don't -- in my

20   human factors analysis, I have found that they have

21   been lacking, yes.

22       Q    On the bottom of the first page of Exhibit No.

23   1, I have a case called Rebecek versus Ford Motor

24   Company.

25       A    Yes.

1      Q    Do you recall what you were retained to look at

2    in that case?

3      A    Not really, no.  I remember it's something to

4    do with tires, but that's about all I recall.

5      Q    Going up a little bit, I see a case called

6    Straub versus Ford Motor Company.  Do you remember what

7    you were retained to look at in that case?

8      A    Who was the attorney that retained me, do you

9    know?

10      Q    John Conway.

11      A    No, I don't have a clue.  Straub vs. FMC

12    Corporation?

13      Q    Right.

14      A    No.  My best guess is that it had something to

15    do with some large piece of equipment, but that's all I

16    can recall, I mean, and I'm not sure of that.

17      Q    Of your open files, ma'am, that have not been

18    reduced to a deposition or trial testimony, do you have

19    any open cases at the present time that deal with

20    reverse sensing issues?

21      A    No.

22      Q    Is this Wright case the only case you've ever

23    looked at that dealt with reverse sensing issues?

24      A    I think so.

25      Q    I understand you were retained in May of this

11

1    year, according to your report.  Is that correct?

2        A    If that's what my report says, that's probably

3    correct.

4        Q    All right, ma'am.  As we go through this

5    deposition, please feel free to look at any part of

6    your file.  All right?

7        A    Sure.

8        Q    Who first contacted you?  I assume Mr. Thomas?

9        A    Yes.

10       Q    What did he ask you to do?

11       A    He asked me to review these materials and give

12   him an opinion about whether there was a human factors

13   issue, or if there was a human factors issue, what the

14   issue was.

15       Q    Do you use any kind of intake form or anything

16   of that nature?

17       A    No.

18       Q    Do you have any notes of that initial contact

19   from Mr. Thomas?

20       A    No.  I never do take notes on those initial

21   contacts.

22       Q    What was -- when was your first I'm going to

23   say hard copy contact?

24       A    Well, it must followed shortly after that that

25   he sent me the file, at least the first ones.  We could

12

1    probably look at some of the letters that are in my
2    file and determine the dates at which the materials
3    came to me, but I don't know exactly.  I would say
4    sometime within the next week or 10 days after our
5    initial telephone conversation.
6         Q    If you would, ma'am, would you please pick out
7    the first letter from Mr. Thomas' office to you?
8         A    Okay.  That may take a little time.
9         Q    Is there a big stack of materials there?
10        A    Yes.  Here's some and there's some in there,
11   too.
12        Q    Let me ask it a different way.  Let's pull out
13   your report and mark that as Exhibit 2, would you
14   please?
15        A    All righty.
16              (Exhibit No. 2 was marked.)
17        Q    (By Mr. Wamsted)  All right, ma'am.  Looking at
18   your report, Exhibit No. 2, am I to understand that the
19   totality of the documents you reviewed for this case
20   are contained in your listing on page 2 and 3?
21        A    To the best of my knowledge, yes, they are.
22        Q    Is it possible for you to look at this list of
23   documents on page -- items or documents on page 2 and 3
24   and tell me which ones were provided to you by
25   Mr. Thomas and which ones you pulled together for this

13

1    case?

2        A    All right.  Three -- four documents with Bate's

3    numbers 1 to 1,177, et cetera, et cetera, those

4    documents were all provided by the attorneys.

5        Q    Okay.

6        A    And the rest of them are all materials that I

7    got myself.

8        Q    So, starting with "SUV Blind Spots," down to

9    the end of the list are materials you gathered?

10       A    Should be.  I'm not saying that there isn't a

11   possibility that somehow something got mixed up in

12   there, but I tried to keep them separate.

13       Q    Have you ever been retained by Mr. Thomas or

14   his firm before?

15       A    Yes, I have.

16       Q    On how many different occasions, please?

17       A    I'm not sure.  A couple, probably, but I really

18   don't know, over -- you know, since 1986 it's been a

19   long time.

20       Q    Ma'am, have you worked on any other type of

21   automobile sensing case -- for instance, seatbelt

22   sensors or blinders or flashers, or anything like that?

23       A    I've done a number of seatbelt cases, but I

24   don't recall anything about -- I'm not sure what you're

25   asking me about seatbelt sensors.  I don't recall doing

14

1  any cases where there was a question about the seatbelt

2  ding, ding ding, if that's what you're talking about,

3  failing.  So, I guess my answer to that question would

4  be no.

5      Q    All right.  The seatbelt cases you worked on,

6  what was your role?  Had to do something with warning

7  or education, or what?

8      A    Both.  It had to do with public knowledge, what

9  people know and the kinds of risks people are exposed

10  to and how they educate people about how to use a

11  seatbelt properly, and the warnings and instructions.

12  Yes, all of those things.

13     Q    Did you pull any file materials for those

14  seatbelt cases for use in this case?

15     A    No.  I throw all materials from every case away

16  when my work on the case is terminated, it either goes

17  to trial or settled or, you know, whatever notice I get

18  from the attorney that my work is over.

19     Q    Does that mean the documents compiled by you in

20  this case were compiled specifically for this case?

21     A    That's correct.

22     Q    Did any of these materials come from your

23  personal or business library, or did they all come from

24  the Internet?

25     A    Let me see.  They probably all came from the

15

1    Internet.  There might have been something -- I was

2    looking to see if I had something from the National --

3    National Safety Council, but I don't see anything.

4    So. . .

5        Q    What sort of Internet search did you do, ma'am?

6    What were you looking for?

7        A    Well, I was looking for sensors and rear

8    sensors and back-up sensors.  You know, I had read the

9    case materials, so I was looking for materials that

10   were relevant to the case.  It's hard to say.  I mean,

11   you know, you start with one set of search words, and

12   you continue to change them and refine them as you go

13   through the searching.  So, I don't really have a

14   record of all the terms I used to search.

15       Q    Other than traveling from Denver to Houston

16   today, ma'am, what else did you do to prepare for your

17   deposition today?

18       A    I reviewed all the materials that were provided

19   to me, and I drew on my knowledge of human factors in

20   these kinds of situations, where people make

21   inadvertent errors, and did a human factors analysis of

22   how this accident occurred.

23       Q    How long did you spend reviewing materials?

24       A    Oh, I probably spent 18 hours.

25       Q    In preparation for this depo?

CINDI L. BENCH REPORTING (281) 565-8222

16

1      A     Oh, no.   In preparation for my -- writing my

2    report.   Did you mean for this deposition today?

3      Q     Yes, ma'am.

4      A     Oh, I guess I spent 3 hours.

5      Q     Did you have time to meet with Mr. Thomas about

6    this depo?

7      A     Well, he picked me up at the airport, so we had

8    that 30-minute drive into Houston from the airport, 35,

9    40-minute drive.   That's the only time we met.   And we

10   had lunch in there, talked about running.

11     Q     What time did your flight arrive?

12     A     My flight arrived about 12:40, I think.   And

13   then I had to call him on his cell, and he had to come

14   and pick me up.   So, it was about -- it was after 1:00

15   o'clock, I think, when we left the passenger pick-up,

16   probably about 1:15.

17     Q     Is that the only time you've met with

18   Mr. Thomas face-to-face on this case?

19     A     Yes, it is.

20     Q     In the short time you had together, did you

21   review any particular documents that you might have

22   pulled together for this case?

23     A     No, we didn't.   He was driving, and we were --

24   it was pouring rain, and we're trying to find out how

25   to get into the building, which we never did find.   So,

LILA LAUX, PhD.   11-22-04

17

1    we barely made it here on time.

2        Q    Talk about any particular issues that I might

3    raise with you today?

4        A    Nothing that I can recall.

5        Q    Since preparing your report a month and a half

6    ago or a month and a week ago, ma'am, have you looked

7    at any other materials on this case?

8        A    No.  Until yesterday, or the day before, when I

9    started pulling my file together, I looked at some of

10   the materials, but nothing new, if that's what you're

11   asking me.

12       Q    That is what I'm asking you.  Nothing new has

13   been provided or gathered by you, other than what's

14   listed in your report, No. 2?

15       A    There might be, actually, a document or two

16   that was sent to me after that report.  Maybe we'd

17   better look and see.

18       Q    Would you do that for me, please?

19       A    I recall there were some things, but I don't

20   know what they were right offhand.  Have I got 1,200 to

21   1,215 listed on there?  No.  That's it, then.  Yes,

22   it's on there, so that's not it.  I remember recalling

23   something that I thought came in after I sent my

24   report, but I don't know what it was.  Was it this

25   "Field Measurement of Naturalistic Backing Behavior"?

18

1    Is that listed on here?  That's probably -- that's

2    probably it, "Field Measurement of Naturalistic Backing

3    Behavior and IVHS Counter-Measures for Rear End

4    Collisions Task III."  I think those are not on there.

5        Q    Was that sent by you or sent to you?

6        A    Sent to me.  I have not gathered any materials,

7    you know, in answer to that question, since I submitted

8    my report, but these two documents I believe were sent

9    to me after I submitted my report.  One is called

10   "Field Measurement of Naturalistic Backing Behavior"

11   from NHTSA.  The other is called "IVHS," all caps,

12   "Counter-Measures for Rear End Collisions Task III Test

13   Results."

14       Q    You reviewed those documents, ma'am?

15       A    I'm sure I did when they came to me, and I

16   looked at them -- I looked at the one, the "Field

17   Measurement of Naturalistic Backing Behavior" again

18   yesterday.  I did -- I don't recall reviewing the "IVHS

19   Counter-Measures for Rear End Collisions" in any

20   detail.  I probably looked at the summary, and that's

21   about it.

22       Q    Do the documents change or alter your opinions

23   in any form or fashion?

24       A    Not at all.

25       Q    Talk a minute about your consulting business.

1    Let me ask you a few questions.  What is Human Factors
2    Consulting?
3         A    That's me.
4         Q    That's you individually?
5         A    Yes.  What is it called for tax purposes?  Sole
6    proprietorship or something like that.
7         Q    And how long have you done business as Human
8    Factors Consulting?
9         A    I've been doing this since 1986.  I don't know
10   how long I've been calling myself Human Factors
11   Consulting.  There may have been a time when I just did
12   it under my own name and didn't say anything about
13   Human Factors Consulting, so I can't really answer that
14   question.
15        Q    Do you have any other professionals working
16   with you in this business?
17        A    No.
18        Q    Do you have any -- anybody working with you in
19   this business?
20        A    No.
21        Q    Is 417 Leyden Street the address of this
22   business?
23        A    That's my home office, yes.
24        Q    And I see that you are also working with Micro
25   Analysis and Design at the present time?

1    A    That's correct.

2    Q    What is that business, ma'am?

3    A    Micro Analysis and Design is a human factors

4    and industrial engineering company that does mostly

5    contract work for the military and agencies like the

6    Nuclear Regulatory Commission and the Stock -- New York

7    Stock Exchange and public hospitals, things like that.

8    Q    Is that a full-time position for you there?

9    A    Well, I'm supposed to only be working 75

10   percent, but it turns out to be mostly full-time, yes.

11   Q    With Micro Analysis and Design, have you ever

12   done any automobile-type human factors work?

13   A    No.

14   Q    Does Human Factors Consulting advertise?

15   A    No.

16   Q    Have you ever advertised?

17   A    No.

18   Q    Is all of Human Factors Consulting work

19   litigation related?

20   A    No.

21   Q    What else do you do?  You're a sole

22   proprietorship, ma'am.

23   A    Well, I teach class, or several classes, and I

24   also consult to industry on -- I give classes or

25   consult with their labeling and tech writing people on

21

1    how to write good instructions, how to develop good

2    warnings, how to test warnings.

3        Q    Where do you teach these classes, please?

4        A    I teach twice a year at the University of

5    Wisconsin in the School of Professional Engineering

6    Development.  That's for -- not for college students,

7    but for professional folks.  And I teach once a year at

8    the University of Michigan in their human factors

9    summer short course.  It's a two-week course.  I don't

10   teach it for two weeks, I teach one afternoon, but I do

11   that every year.

12       Q    In the times a year in Wisconsin, how long a

13   program is that that is your portion of it?

14       A    It's a three-day program, and I teach one

15   afternoon of that as well.

16       Q    Any of the classes you've taught ever dealt

17   with rear-sensing issues?

18       A    No.

19       Q    And who puts on the Wisconsin seminar, ma'am?

20       A    The University of Wisconsin School of

21   Engineering Professional Development.

22       Q    Okay.  I assume they pay you for your time?

23       A    Yes, they do.

24       Q    And the same is true at Michigan?

25       A    Yes.  I teach the odd course and other -- you

CINDI L. BENCH REPORTING (281) 565-8222

1   know, if something comes up like at the University of

2   Colorado in Denver -- I taught a course there one

3   summer for them.  So, when things fall into place,

4   sometimes I do teach.

5       Q    Let's get your field notes marked very quickly,

6   if we could.

7       A    All right.  I think there's only one.

8       Q    I guess we're up to Exhibit No. 3 one.

9            (Exhibit No. 3 was marked.)

10      Q    (By Mr. Wamsted)  All right, ma'am.  Up to the

11  time of your report, October 14th, it looks like you

12  had 22 hours in this file?

13      A    That's correct.

14      Q    And I understand, because of your business,

15  this is all of your time?

16      A    Yes.

17      Q    And your rate is a hundred dollars an hour,

18  correct?

19      A    That's correct.

20      Q    When you travel such as today, is it a hundred

21  dollars an hour plus 600?  I don't quite understand

22  your --

23      A    No.  It's $600.  It's a flat rate.

24      Q    Okay.  And expenses just billed as incurred?

25      A    That's correct.

23

1     Q     All right, ma'am.  Please take out your CV now,

2     and let's mark that as Exhibit No. 4.

3            THE WITNESS:  You can change that easily.

4     It's got a sticker on there.  You can just change it

5     from a 1 to a 4.

6            (Exhibit No. 4 was marked.)

7     Q     (By Mr. Wamsted)  Again, I have copy up here.

8     I assume it's the one you're looking at.  Mine starts

9     out with your education, and the last thing on it says

10    "Physicians' Attitudes Towards Pain."  Is that the one

11    you're looking at?

12    A     I don't know about that.  Oh, you're looking --

13    the last thing on it has to do with my pubs, right?

14    Q     Yes, ma'am.

15    A     Okay.  Let's see if it's the same one.  It

16    probably is.  Yes.

17    Q     Is this up-to-date and accurate, please?

18    A     Pretty close, probably.  I think I did it a

19    month or two ago, I looked at it again, but I think it

20    ought to be pretty close.

21    Q     Let's start out, I guess, on you publication --

22    publications and papers presented.  Are there any in

23    this list -- I show 96 publications -- that have to do

24    specifically with rear-sensing issues?

25    A     No.

24

1    Q    I see a number of these have to do with the

2  medical field, is that correct?

3    A    That's correct.  I was on the faculty at Baylor

4  College of Medicine from, oh, about '81 through '94.

5  I'm still an adjunct faculty member there.

6    Q    And I see a number have to do with, it looks

7  like, the "older driver."  Is that also a fair

8  statement?

9    A    Yes.  I did quite a bit of work for -- on the

10  Older Driver Task Force for the State of Texas and for

11  the AAA Foundation at one point.

12    Q    Do any of your papers or presentations have to

13  do with rear-sensing devices or rear-sensing issues?

14    A    I don't think so.  Certainly not directly.

15    Q    It looks like you published only in '93, is

16  that accurate?

17    A    No.  And you see this -- when you read me that

18  last title, there's a whole bunch of publications since

19  then.  You read me the last title, "Physicians'

20  Attitudes Toward Pain."  That was a 2000 publication,

21  and those on the last few pages are stuff that I did

22  while I was at Baylor.  And you'll see on my resume

23  there are a few others that I've added which doesn't

24  represent all of them, but some of the ones I've done

25  since I've been at Micro Analysis and Design, and there

1    are a lot of publications that I don't have on there

2    because I don't -- didn't keep track of them.  They had

3    mostly to do with telecommunications.  I was on the

4    Federal -- I've forgotten what it's called -- Task

5    Force for Cell Phones and things like that for a while,

6    so -- and I just didn't keep track of my pubs during

7    that period of time.

8        Q    Let me ask you how you've set this up, then.

9    You've got publications listed 1 through 96, correct?

10       A    Well, at the end of my CV, you should find two

11   pages called "Selected Publications."

12       Q    I'm just trying to figure out how this --

13       A    Right.  Well, I'm trying to help you.  So,

14   after my CV, which ends with references, then there's

15   two pages of selected publications, and then there is a

16   list of 96 publications, of the pubs that I was keeping

17   track of during the time I was at Rice, because when I

18   was there, it was important.

19               Then there is another list of publications

20   that came out of the work I did at Baylor, and that's

21   another three pages of publications that were done

22   based on the work that I did at Baylor and was

23   co-author on most -- on those papers.  There are, as I

24   said, some other papers that I published during the

25   time I worked with the telecom industry and since I've

1    worked at Micro Analysis and Design which are not on

2    any of these lists.  I just didn't keep track of them,

3    and, you know, most of them have to do either with

4    Recon systems or telephone -- telephone, things like

5    that that I don't think are relevant to this trial.  I

6    could try to track them down for you if you want me to,

7    but it would take some time and effort.

8        Q    No, that's fine, ma'am.  I just want to make

9    sure that they don't have anything specifically to do

10   with rear-sensing devices.

11       A    No.  I've never published a paper, that I know

12   of, that has specifically to do with rear-sensing

13   devices.  Boy, we're seeing a lot of lightning out

14   here.

15       Q    We're clearing up here.

16       A    I don't like flying with all this lightning.  I

17   hope it clears up here.

18       Q    Looking at some of the articles about the older

19   driver, I did not read these papers, but you advocate

20   increased testing for the older driver?

21       A    No, I don't.  We were -- part of what the task

22   force was doing was trying to determine if more testing

23   would be useful, and I think the general consensus was

24   that the capabilities of not just older drivers but all

25   of us vary from day to day, and to do any kind of

1    adequate testing of older drivers, we really don't have

2    a way to do that now without incurring enormous

3    expense.  So, at the end of that work I did with the

4    older driver task force, we pretty much concluded that,

5    unless there was some cause to do more and more

6    extensive testing of older people, some clue that they

7    needed it, it wasn't a very useful thing to suggest

8    that all older drivers needed to have a whole lot of

9    additional testing.

10       Q     Did you advocate in any of your papers that

11   there ought to be a bright line test for older drivers

12   whereby they can no longer drive?

13       A     No, I don't think so.  I don't know what a

14   bright line test is, but -- so, I doubt that I

15   recommended that.  I don't think I ever recommended

16   that there should be any test which would determine

17   whether an older person should no longer drive.  I

18   think there are many other ways -- I mean, not just a

19   test.  I think we have a lot of other kinds of clues

20   and indications we have to look for.

21       Q     What would those clues be, ma'am?

22       A     Well, for instance, if your -- if your

23   physician finds that you have lost your ability to

24   maintain attention, for one thing, that's one thing; or

25   if you have suffered a stroke or something that has

28

1    impaired you significantly, or if you're experiencing

2    significant visual problems, cognitive issues -- there

3    are all kinds of things that your physician might

4    determine or your family might see them, even if your

5    physician doesn't, and become aware that you have some

6    deficiencies that might cause a problem with driving.

7    It's a very, very complex and very sticky issue,

8    because, you know, if you take a driver's license away

9    from people in the United States, they're pretty much

10   immobilized.

11       Q    So, do you advocate anything such as just

12   voluntary giving up the driver's license at a time that

13   the physician or family members think you should?

14       A    Well, certainly if you -- if your physician

15   recommends that you should and your family members

16   think you should, you should definitely consider it,

17   but there are so many other factors, you know, that we

18   don't think about or don't always consider, like how is

19   this person going to maintain their social contacts,

20   which are very healthy, very important for them to

21   maintain their mental health.  So, how are they going

22   to get back -- I mean, there are parts of west Texas,

23   for instance, where there's no public transportation.

24   How are they going to get to their doctors

25   appointments?  These are really not such simple issues

LILA LAUX, PhD.

29

1    that you can say, well, if this person is showing signs

2    of whatever we might call it, reduced capabilities,

3    they should immediately give up their driver's license.

4    You know, it turns out that the older drivers are

5    really only dangerous to themselves, for the most part.

6        Q    And not to the motoring public or the walking

7    public?

8        A    Not so much.  I mean, they're not -- we do have

9    the sensational cases like out in California, where the

10   man ran into the -- all the pedestrians, but those get

11   a lot of publicity.  But typically older people are

12   very slow drivers and very cautious drivers, and they

13   stay in their neighborhoods where they know what

14   they're doing and where they're going, and they don't

15   drive after dark, and they don't drive in heavy

16   traffic.  So, you know, they are pretty much

17   self-regulating and self-monitoring.  And maybe they do

18   recognize when it would be better if they didn't drive

19   anymore from a safety perspective, but a lot of times

20   they don't see any other alternative.  And that's our

21   problem, our societal problem to solve.

22       Q    You talk then about your professional

23   experience, there's about three pages of items over a

24   chronological time.  Were any of your professional

25   experience -- did any of your professional experience

30

1    deal specifically with reverse sensing issues?

2        A    No, I don't think so.

3        Q    Before I move on from your CV, I want to make

4    sure I know all of your education, experience in the

5    area of rear-sensing issues.  I think you've given me

6    that.  You don't have any education in this area,

7    correct?

8        A    Well, I'm -- you know, except for my education

9    about human beings.  Specifically about rear-sensing

10   devices and their mechanical or engineering

11   characteristics, no.

12       Q    You haven't had any experience in the way of

13   jobs specifically dealing with reverse sensing issues,

14   correct?

15       A    No, I haven't.

16       Q    I don't believe you've listed seminars or

17   classes you've attended, but have you attended any

18   seminars or classes in the area of rear-sensing issues?

19       A    No, I don't think so.

20       Q    We've talked about your papers and

21   publications, and there's none that deal specifically

22   with rear-sensing issues; correct?

23       A    That's correct.

24       Q    Have you done any developmental work on

25   rear-sensing issues?

CINDI L. BENCH REPORTING (281) 565-8222

31

1     A     I don't think so.  Years ago, I did some work

2     on the IVHS with some folks out in California, and I'm

3     sure that was part of the things, you know, some part

4     of what we considered, but specifically, no.

5          Q     I'm not sure I know what IVHS is.

6          A     The Integrated Vehicle Highway System.  You all

7     sent me some papers on it, "IVHS Counter-Measures for

8     Rear End Collisions."

9          Q     Okay.  Have you done any specific testing in

10    the area of rear-sensing devices?

11         A     No.

12         Q     Have you ever done any durability testing on

13    rear-sensing devices?

14         A     No.

15         Q     Have you ever done any human factors work on

16    rear-sensing devices?

17         A     No.

18         Q     This is the first case in which you've had this

19    issue in your forensic work, correct?

20         A     I believe so.

21         Q     If we could now, ma'am, if you would mark your

22    -- or the duces -- the deposition notice with the duces

23    tecum.

24         A     You have your copy.  This is a copy I got, too.

25    Are we sure it's exactly the same?  Guess so.

32

1                      (Exhibit No. 5 was marked.)

2          Q    (By Mr. Wamsted)  All right, ma'am.  Have you

3     brought your entire file to this deposition?

4          A    Yes, I have.

5          Q    Anything been removed from your file?

6          A    Has anything been removed from my file, is that

7     what you're asking me?

8          Q    Yes, ma'am.

9          A    No, nothing.

10         Q    Do you have any computers files, such as

11    e-mails, between you and Mr. Thomas?

12         A    I do and I brought copies of those.

13         Q    All right.  Did you prepare a draft of your

14    report before going final with it?

15         A    I did, and I have copy of it in here somewhere.

16         Q    Ma'am, I don't want to mark your whole file,

17    there's no sense in doing that.  I think what I'd like

18    to do is if we could take just a five-minute break here

19    and let me work with Will to find out what I need to

20    mark, and we'll get those marked and then move on.

21         A    Works for me.

22                     (Short Break 3:00 to 3:05.)

23                     (Exhibits Nos. 6 and 7 were marked.)

24         Q    (By Mr. Wamsted)  All right, ma'am.  If you

25    would, identify what's been marked as Exhibit No. 6 to

33

1    your deposition.

2        A    Let's see.  It appears to be an e-mail trail

3    that is from them to me and back maybe, several of

4    those, regarding setting up this deposition.  And then

5    there's a letter confirming my oral deposition and my

6    E-ticket receipt.  And then there's the amended notice

7    which was on there, plus here's one that just -- let's

8    see what this is.  Then there's one that just says

9    attachments, and it has Chapter 41 from the Civil

10   Practice and Remedies Code, some of it anyway.  Let's

11   see.  Page 152, 153, 54, 55, 269, 271, 272, and then

12   there are some pages with definitions on them.  And

13   then there's a fax transmission page.  When he was

14   trying to fax me the depo notice, I kept getting the

15   fax transmission page and nothing else.  I got that

16   about 7 or 8 times, so I didn't bring all those cover

17   pages, I threw them away.  And then I finally did get

18   the whole thing.  So, I think this must be the cover

19   page that goes with it.  That's what's in that file.

20       Q    Okay.  Exhibit 7 is what, ma'am?

21       A    Exhibit No. 7 is my draft report.

22       Q    Does your business have a Web site?

23       A    No.

24       Q    With the documents that have now been marked as

25   part of your deposition here today and the documents

LILA LAUX, PhD.

34

1    listed in your report, Exhibit No. 2, have we covered

2    the totality of information you have reviewed to enable

3    you to express your opinions in this matter?

4        A    Well, the things I reviewed specifically,

5    except for those two documents that I named earlier?

6        Q    Right.

7        A    The IVHS countermeasures and the field

8    measurement of naturalistic backing behavior that are

9    not listed on my report and they're not -- don't have a

10   sticker on them, the -- what do you call it?

11       Q    Exhibit number?

12       A    Exhibit number, right.

13       Q    With that exception, we've now discussed the

14   totality of information you reviewed to express your

15   opinions here today?

16       A    Yes.  The totality of specific information to

17   this case, yes.

18       Q    Have you visited with any person involved with

19   this case?

20       A    No.

21       Q    By that I mean any of the parties, the

22   investigators, police officers, EMTs, any of those

23   people.

24       A    No, no one.

25       Q    Have you visited -- and when I say visit, I

35

1    mean either by phone, in person, computer or letter,

2    have you visited with any of the other experts that

3    have been retained by Mr. Thomas in this case?

4        A    I've not had any of that kind of contact, and I

5    don't recall reading any reports.  There might have

6    been some, but I just don't recall at this moment.  I

7    mean, if I did, they're on my list.

8        Q    You've read the depositions of the individuals

9    in the McCutcheon vehicle, correct?

10       A    I have.

11       Q    The parents, I mean?

12       A    Yes, I have.

13       Q    Have you made any notes of those depositions?

14       A    I'll have a look.  I doubt it.  I don't

15   typically do that, but let me have a look just to be

16   sure I'm not lying.  Once in a while, I'll make a check

17   mark or something.  I don't see anything.  That's not

18   to say that I didn't make a pencil mark in there

19   somewhere, but nothing that I could ever find again if

20   I did, because I didn't indicate it.

21       Q    You have not been to the scene of this event,

22   have you?

23       A    No, I have not.

24       Q    You have not examined the accident vehicle,

25   have you?

36

1     A    No, I have not.

2     Q    Have you been provided any photographs or

3  videotapes, other than the photos taken by the

4  investigating officers?

5     A    Well, I don't know, because I don't know

6  which -- I have photos, but I don't know who took them.

7  I have these that were attached to the depositions,

8  and -- of one of the McCutcheons or both of them, and

9  there were some other photos that were attached to the

10 officer's report.

11    Q    Any others?

12    A    I don't recall any others at this moment.

13    Q    Have you done any surrogate or exemplar vehicle

14 work in this matter?

15    A    No, I have not.

16    Q    Ma'am, is there a single vehicle that you know

17 of that doesn't have a blind spot of some magnitude?

18    A    No.  I haven't surveyed every single vehicle,

19 but I don't know of any, right.

20    Q    They all have a blind spot of some magnitude;

21 is that a fair statement?

22    A    That's probably a fair statement.

23    Q    Since vehicles all have a blind spot of some

24 magnitude, we could come up with a scenario with any

25 vehicle whereby a tragedy similar to this one could

37

1    occur, can we not?

2        A    Yes.

3        Q    It might be a smaller child, it might be

4    someone closer to the vehicle, but we could come up

5    with a scenario where this event would occur, right?

6        A    Well, it wouldn't be this event if it was, you

7    know, different circumstances, but we can certainly

8    come up with a scenario where this kind of event

9    occurs.

10       Q    Thank you for correcting me.  Thus, ma'am, is

11   it your opinion that all vehicles in 2001 would be

12   defective unless they have some sort of rear-sensing

13   detection device?

14       A    Well, I guess my opinion would be that either

15   they should have some sort of rear-sensing device or

16   they should be advising people about the availability

17   of rear-sensing devices and why they're needed.

18       Q    They either ought to have rear-sensing devices

19   or advise people of a need for rear-sensing devices;

20   otherwise, they're defective; correct?

21       A    Yes, I think so.  Not -- not only just advise

22   them of the need for rear-sensing devices, but explain

23   -- you know, give them the rational why they need them

24   and make them aware of how to get them.

25       Q    What if someone chose not to get them after

38

1    being advised of the need for them?

2        A    Well, if you advise people adequately and made

3    them -- made them aware of these devices and how to

4    assure that they had the appropriate device on their

5    own vehicle, then you have discharged your

6    responsibility, as far as I'm concerned.

7        Q    Do you know what Ford did insofar as advising

8    the McCutcheons of the availability of a rear-sensing

9    device?

10       A    As far as I could tell, they didn't do

11   anything.

12       Q    What did you look at to come up with that

13   opinion?

14       A    Well, you know, you can tell by looking at my

15   report what I looked at.

16       Q    Why do you think they didn't advise them of

17   anything?

18       A    Well, I don't think that they adequately

19   informed the McCutcheons about the likelihood of a

20   back-over injury and the need for -- the size of the

21   blind spot and the kinds of statistics we know are out

22   there about the kinds of back-over accidents that occur

23   and explain to them how they could get a rear sensor

24   and why they should do it, and et cetera.  I didn't see

25   any evidence that those things occurred.

39

1      Q    What did you look at to determine that?

2      A    I looked at their depositions and all the other

3  information that's in my file.

4      Q    Did you look at any of the advertisements or

5  marketing materials that were available to the

6  McCutcheons when they purchased this vehicle?

7      A    Yes, I did.

8      Q    Is that part of your file?

9      A    Some of it is, I think.  I'm sure it's not all,

10  but some is.

11      Q    Pull that out for me, please.

12      A    This may take a while.  There's two

13  depositions.  I don't think it's in that stack.  It's

14  probably in those things.  Okay.  Is this it?  This is

15  the -- this is the owner's manual, I believe.  No, this

16  is the advertising for the various -- I'm looking at

17  Ford 00960, through Ford 0121021.  It's called Escape,

18  Explorer Sport Track, Explorer Sport, 2002 Explorer,

19  Expedition and Excursion, No Boundaries, Ford

20  Outfitters, I guess was the sticker.  Or maybe it's

21  part of it.

22          So, I did look through this, and, as I

23  recall, there was nothing that I considered to be any

24  kind of adequate in terms of alerting the purchasers of

25  the need for a rear-sensing device and how to get one.

1    Q    Is the option noted as being available?

2    A    I imagine, although I couldn't say for sure

3    right now.  I'd have to look through all these

4    documents to say on which ones it's noted as being

5    available.

6    Q    Why should it be a choice if it's a safety

7    device.

8    A    I'm sorry?

9    Q    Why should it be a choice if it's a safety

10   issue?

11   A    I'm sorry, I still didn't understand your first

12   word.

13   Q    Why should it be a choice if it's a safety

14   issue?

15   A    Well, that's a good question, and, you know, my

16   personal opinion would be that it should be included on

17   at least SUVs and other kinds of vehicles that have

18   such large blind spots behind them.  But if that's

19   impossible to do, for whatever reason, then at least,

20   the very least that could be done is that the purchases

21   could be alerted to the fact that their vehicle doesn't

22   have one, that there's a need for one and why there's a

23   need, and that there are many after-market sensor

24   devices that are available.

25   Q    But it's your preference that all vehicles

41

1   should have this rear-sensing device, correct?

2       A    Well, that would be my personal preference.   Do

3   I think that that's a realistic mandate?  Well, we

4   certainly have gotten seatbelts through.   It took a

5   struggle, but we did it over a number of years.  So, I

6   think that we should certainly start working in that

7   direction.

8       Q    Well, it's my understanding the McCutcheons

9   couldn't get this option even after this accident.   Is

10  that your understanding from reading their depositions?

11      A    I don't recall that.

12      Q    Well, what guidance would you give the auto

13  manufacturers as to what vehicles must have

14  rear-sensing devices?

15      A    Well, I haven't done a study to determine which

16  vehicles have extremely large areas behind them which

17  are -- which create a special hazard, particularly for

18  vehicles like SUVs which are likely to be owned by

19  people who have children and which would be being used

20  in environments where there are many children.   That's

21  a study that certainly should be done.  But as I said,

22  my personal preference would be that every car owner

23  would be educated about the need for the back-up

24  sensing device and would be given the option to either

25  buy it on their car, come as a standard part of the

42

1  vehicle, which would be my preference, of course, as a

2  safety-conscientious human factors person, or made

3  available of other options that are out there, of which

4  there are many.  If for some reason they can't afford

5  to have the option put on the car that they buy or the

6  car that they buy doesn't have it, they need to be

7  informed about those options that are available to

8  them.

9      Q    What options would they be?

10     A    Well, you can get many after-market kinds of

11 rear-sensing devices.  I mean, that's -- if you look in

12 my file, you'll see that I -- just by doing a few hours

13 of research on the Web, I identified any number of

14 those devices that are being marketed, which indicates

15 that there is an awareness of the need for these kinds

16 of devices.

17     Q    And you're putting the responsibility for

18 making that awareness on the auto manufacturers?

19     A    Well, I am.  What I'm saying is that if you

20 sell a car that you know has a hazard associated with

21 it, which you do, then you have the responsibility to

22 either provide some way to mitigate the risk or to

23 inform the person who's buying the car how they can go

24 about mitigating the risk.  If you've made the decision

25 that you're not putting that on that car or on that

43

1   vehicle, for whatever reason, either because it's too

2   expensive or you don't have the technology or whatever,

3   then you have the responsibility to educate that

4   purchaser and say, "Look, you just bought a car that

5   has this significant hazard associated with it, and

6   here are the things you can do to mitigate that hazard

7   and to mitigate the risk to the people around you and

8   to yourself."  I mean, it's a horrible trauma to the

9   driver to have this kind of accident.

10      Q    Is it now your opinion that you intend to

11  express that this ought to be provided on every vehicle

12  manufactured by every manufacturer?

13      A    I didn't say that, I don't think.  I said my

14  personal preference would be that.  Do I think that I

15  would at this point be able to say to every

16  manufacturer, "From now going forward, every vehicle

17  that produce" -- well, I know that's not realistic,

18  because that's not -- you know, it takes a while to get

19  legislation passed or whatever it is that you need to

20  do in the Federal Motor Vehicle Safety Standards and so

21  forth to get this to happen.  But do I think it would

22  be the right thing?  Yes, I do.

23      Q    So, you're advising and going to opine that

24  every manufacturer of every type of vehicle ought to

25  provide rear-sensing devices of some nature or give

44

1    full and complete and open and -- disclosure as to the

2    dangers of not having rear-sensing devices?

3        A    Yes.

4        Q    And that's from a Mini Cooper on up to the

5    biggest vehicle I can come up with, right?

6        A    Well, I don't know about the biggest vehicle

7    you can come up with, I don't know what that would be,

8    but certainly for all vehicles that are driven by

9    nonprofessional -- I mean, I'm not talking about

10   over-the road vehicles, trucks and so forth.  They have

11   their own standards.  But any kind of vehicle that's

12   sold to consumers, yes.

13       Q    And have you done any sort of surveys to see if

14   any auto manufacturer would pass your muster?

15       A    Well, I know there's no auto manufacturer that

16   does that currently, if that's what you're asking me.

17       Q    Yes, ma'am, that's what I'm asking you.  So,

18   none do, right?

19       A    That's -- as far as I know, none do, or does.

20   What is it?  Not one does -- does.

21       Q    Unless there is actually a rear-sensing device

22   on an automobile, it is your opinion that that

23   automobile, whether it's a car or an SUV or a van or a

24   truck, is unreasonably dangerous and defective, at

25   least from 2001 on, correct?

45

1    A    Well, I don't know about to the 2001. I mean,

2    I am not -- I'm not sure I understand why you picked

3    2001. But do I think that any vehicle is unreasonably

4    dangerous if it doesn't have some kind of back-up

5    device, warning device? Yes, it is, unless there is a

6    vehicle that has no blind spot large enough to conceal

7    a small child.

8    Q    And to your knowledge, there is no vehicle

9    without a blind spot such that a small child wouldn't

10   be concealed at some place behind the vehicle, correct?

11   A    I don't know of any. I haven't done any

12   research in that area, but I don't know of any.

13   Q    Have you done any work in your forensic

14   practice to try to get legislation requiring all

15   vehicles to have rear-sensing devices?

16   A    No, I haven't.

17   Q    You're aware that private citizens such as

18   yourself can do that, right?

19   A    Yes, I am.

20        It was here, we were in it, and now it's

21   moving westerly. Sorry, we're having a meteorological

22   moment.

23   Q    I understand that. Let's pull out some of the

24   reference materials you pulled together. The -- I have

25   at my end, it's called "NRMA Insurance Releases World

46

1    First Reversing Visibility Index."

2        A    That's from the Australians or New Zealanders,

3    I think.  Is that the one you're talking about?

4        Q    Yes.

5        A    Let's see.  Is this the one -- what's the name

6    of it again?

7        Q    It's NRMA.

8        A    Yeah, I've got it.

9        Q    Did you review this as part of your work in

10   this file?

11       A    Yes.

12       Q    One of the head topics there is about these

13   children that have been killed, and it is overseas.

14   I'm sorry, I can't remember where it was.

15       A    It was either Australia or New Zealand, I can't

16   recall either, but one of those.

17       Q    Okay.  And it says a key finding of the study

18   is that the reversing visibility of four" -- it says 4

19   WD, so I'm assuming four-wheel drive --

20       A    Yes.

21       Q    -- "no worse than many other cars on

22   Australia's roads."  You see that?

23       A    I do.

24       Q    And you agree with that, right?

25       A    Yeah, with the caveat that you have to remember

47

1   it says many other cars.  It doesn't say all other

2   cars.

3       Q    Well, you're not here to parse out what are the

4   good cars and what are the bad cars, are you?

5       A    I don't think I understand that question.

6       Q    Well, are you here to tell me that certain

7   vehicles don't need rear-sensing devices, but other

8   vehicles do need rear-sensing devices?

9       A    No.  I'm here to tell you that there are some

10  four-wheel drives -- some cars that are as bad as

11  four-wheel drives, but other cars that aren't.  That's

12  what that means to me.

13      Q    All right.  What is your safer alternative

14  design, ma'am?

15      A    Well, my safer alternative design would be a

16  rear-sensing device.

17      Q    Well, there's a number of different kinds of

18  rear-sensing devices, are there not?

19      A    Yes, there are, and I think, you know, it

20  doesn't matter which kind of sensing device you use, as

21  long as it's been shown to be effective.

22      Q    Well, in this case, in front of this Beaumont

23  jury, what are you going to tell us should be the safer

24  alternative -- safer alternative design for this 2001

25  Expedition?

48

1    A    Well, I think the one that Ford actually used

2    on their next largest SUVs, whose name I can't -- is it

3    Navigator?

4              MR. THOMAS:  Excursion.

5    A    Oh, Excursion, right.  That certainly would be

6    one place where I would look for a piece of effective

7    technology.

8    Q    (By Mr. Wamsted)  Did you do any specific

9    looking at that technology?

10   A    No.

11   Q    Did you look at an Excursion and do any testing

12   of that Excursion?

13   A    No, I didn't.

14   Q    Do you know what type of technology was used on

15   that Excursion?

16   A    Well, I'm not sure what you mean by what type

17   of technology.  It's not a camera.  It's a sensor, and

18   I don't remember all that I read about it, but my

19   recollection is that it would sense objects the size of

20   a small child within a few centimeters of the rear

21   bumper and give a warning signal.

22   Q    Do you know what type of sensor?

23   A    Probably infrared but I'm not sure right

24   offhand.  I'd have to go back and look at the

25   materials.

49

1    Q    Would that be an adequate fix for the problem

2    you see here?

3    A    I'm not sure what "that" would be.

4    Q    Well, the sensor that you think is infrared

5    that was put on the Excursion.

6    A    Well, I don't know.  I mean, those things would

7    have to be tested out, and -- for each vehicle, so I

8    can't say that you could take whatever the one is from

9    the Excursion and put it on this one and say that

10   that's all you need to do.  There would have to be

11   engineering analysis done to determine if that would be

12   the appropriate one.  But there are any number of

13   sensor technologies out there.  I've done quite a bit

14   of sensor technology work for the military, and I know

15   that we have many kinds of sensors, and I think that

16   there are sensors that could be used, if not this one,

17   something that Ford has access to that could have been

18   used.  And there -- if you see what's on the Internet,

19   there are just so many kinds of sensors available, of

20   course, you would have to do an engineering evaluation

21   which is the appropriate one for each vehicle.

22   Q    You haven't done this engineering evaluation,

23   have you?

24   A    No, I haven't.

25   Q    Do you know if Mr. Mann has done this

50

1    engineering evaluation?

2        A    I don't know Mr. Mann, I don't know that name.

3        Q    Going back to the article I had you look at

4    there, the NRMA.

5        A    Right.

6        Q    Partway down it says, on -- it looks like two

7    paragraphs up from the bottom, says, at the last

8    sentence, "Even the best sensors and video cameras will

9    not be effective once the car is going faster than 5

10   kilometers an hour."  Do you see that?

11       A    Yes, uh-huh.

12       Q    Do you agree with that?

13       A    Well, I don't have any basis for agreeing or

14   disagreeing with it.

15       Q    Next paragraph says, "No matter how good the

16   car design and technology might be, there is always

17   going to be an area behind a car that is not visible to

18   the driver.  Even the very best car in the study has a

19   blind area of around 3 meters that can easily hide a

20   child."  Do you agree with that?

21       A    Well, again, as I said, I have no basis for

22   agreeing or disagreeing.  I take it as -- you know, as

23   I read it.

24       Q    What vehicle do you drive, ma'am?

25       A    I drive a Buick Century, 2001, I think.

51

1    Q    It has rear-sensing devices, correct?

2    A    No, it doesn't, sadly.

3    Q    I'm sorry?

4    A    Sadly, no.

5    Q    So, even with your work in this area, you

6    haven't saw fit to go out and purchase an after-market

7    rear-sensing device?

8    A    That's correct.

9    Q    Why is that?

10   A    Well, in the environment in which I drive,

11   there aren't children at all, and I'm very careful to

12   always go behind my car and make sure there's nothing

13   there.  But, yes, it's a risk.

14   Q    That's a risk you're willing to take?

15   A    Seems like it, doesn't it?

16   Q    You say there are no children in your

17   environment?

18   A    No.

19   Q    What does that mean?

20   A    I'm sorry?

21   Q    What does that mean?

22   A    Well, that means I live in a neighborhood where

23   there aren't any children, and it means that in my work

24   place there is no children, and on the expressways

25   there's no children.  I suppose in shopping malls there

52

1    might be children, but I haven't seen any lately, and I

2    rarely go to shopping malls.

3        Q    So, there's no place you drive that vehicle

4    where it could come in contact with a child; is that

5    what you're telling me?

6        A    Well, no, that's obviously not true, because

7    when I go to the grocery store, that could happen.  But

8    it certainly is very rare that I am around a child.

9        Q    What does your husband drive?

10       A    He drives a Ford Explorer.

11       Q    What year, please?

12       A    I think it's a '92.

13       Q    Obviously, there's no rear-sensing device on

14   that vehicle, correct?

15       A    No.  It's fairly new.  He just bought it in the

16   last couple of months, and he has actually been looking

17   into that.

18       Q    But he hasn't put one on there?

19       A    Not yet.

20       Q    What Ford vehicles had rear-sensing devices of

21   any kind into 2001?

22       A    The Navigator is the one that I know about.

23   There may have been others where it was available as an

24   option.

25       Q    What rear-sensing devices were available in the

CINDI L. BENCH REPORTING (281) 565-8222

53

1    automotive industry community in 2001?

2         A    Well, at least that one that was in the

3    Navigator was available in the automotive industry in

4    2001, and I haven't done a survey to see what other

5    ones were available.

6         Q    Do you know if General Motors put rear-sensing

7    devices in any of their vehicles?

8         A    I don't know for sure.

9         Q    Chrysler?

10        A    Don't know for sure.

11        Q    The foreign automobile manufacturers, do you

12   know if they had rear-sensing devices?

13        A    There were some that I think that did, but I

14   couldn't tell you which ones.

15        Q    The Europeans, do they have rear-sensing

16   devices?

17        A    I'm sorry, what did you ask me there?

18        Q    Did the Europeans manufacturers have

19   rear-sensing devices in their vehicles in 2001?

20        A    I said I think there are some that did, but I'm

21   not sure which ones.

22        Q    When did Ford first develop the system you

23   believe should have been placed in this vehicle?

24        A    Was that a question?  I didn't get it.

25   Either the thing is cutting out or my hearing is not

54

1   good or --

2       Q    I said when did Ford first develop the system

3   that you believe should have been placed in the 2001

4   Expedition?

5       A    I don't know.  I think I saw evidence that it

6   existed back into the '90s, but I'm not sure when it --

7   when it was first developed.

8       Q    So, would all vehicles, after they have their

9   engineering analysis performed, be defective back down

10  to the early '90s if they didn't have this rear-sensing

11  system in it?

12      A    Well, I don't know.  I'd have to think about

13  that some more.  I mean, it would depend on when the

14  technology became mature enough and they were able to

15  understand how to install these devices so they

16  wouldn't get damaged and wouldn't be giving false

17  alarms all the time.  I mean, there's a long process

18  that evolves as the product gets developed.  So, I

19  can't say from the very earliest days when Ford had

20  this, that if they didn't use it, it would be

21  defective.  I mean, that would be an engineering

22  analysis that I have not seen yet.

23      Q    Do you know, if not the earliest days, what

24  year you would opine vehicles are defective for not

25  having this?

1      A     No, I don't.  I'd have to do some additional

2    analysis before I could tell you that.

3      Q     Are you going to look at whether or not these

4    systems still give false positives or --

5      A     Well, I know they do.  All systems give false

6    positives, and all systems give false negatives.  So, I

7    mean -- but if we went -- if we said we are never going

8    to use a warning system that never makes an error, we

9    would never have any warning systems.  I mean, we have

10   to accept some level of error.

11     Q     And have you looked at what level of error

12   would be acceptable for these types of devices?

13     A     No, I haven't, and it would vary according to

14   the hazard that -- that you're looking at.  I mean,

15   when you're developing a system and you're trying to

16   determine how sensitive to make a warning device, you

17   have to do a cost-benefit analysis on what's the cost.

18   I mean, one of the things we worry about is if you warn

19   people all the time when there's nothing there, pretty

20   soon they'll stop paying attention to it.  So, if you

21   have too many false alarms, that's not a very good

22   thing, because human beings being what they are, will

23   become immune to the warning.  So, those kinds of

24   analyses would remain to be done.  I -- you know, I

25   think being oversensitive is better than being

56

1   undersensitive certainly in this case.

2       Q     That's really a human factor analysis, is it

3   not?

4       A     Yes, it is a kind of human factors analysis,

5   that's right.  That's one kind of analysis we would do.

6       Q     Haven't done it for this case, have you?

7       A     No, I haven't had access to the equipment, but

8   I wasn't asked to do it anyway.

9       Q     Do vehicles have front blind spots?

10      A     Yes.

11      Q     Have you ever looked at this issue?

12      A     No, not -- I mean, I don't know what looked at

13  mean.  Have I never analyzed it?  No, I haven't.  It's

14  a -- it's a different kind of situation typically.

15      Q     Do you believe vehicles ought to have

16  frontward-looking sensors to prevent any sort of

17  injuries or deaths to small children in a going-

18  forward mode?

19      A     Well, typically people are looking forward and

20  they typically I think look at the -- in front of their

21  vehicle before they get in, and they would see

22  something approaching from the side, which might not be

23  -- or from the front which wouldn't be the case

24  necessarily from the rear.  So, it's a different

25  situation altogether.

57

1    Q    To answer my question, you don't think we need

2    frontward-looking sensors because people are looking?

3    A    Well, that's a very simplistic analysis or

4    summary of what I said.  I think that, again, you'd

5    have to do an analysis, but I think you would find that

6    the situation is different enough.  Would I recommend

7    it if it were cheap and effective?  Sure, I would.  But

8    do I think it's as important as the rear-sensing?  No,

9    I don't.

10   Q    But again, we can come up with hypotheticals

11   where if a small child was either placed in front,

12   perhaps with the mom thinking the father was going to

13   back up and the father went forward, or a small child

14   crawling under the front wheel after the father got in

15   the vehicle, causing injuries and death going forward,

16   too, correct?

17   A    Well, we can certainly think of those, yes.

18   Q    And have you looked at the data in this area to

19   see whether those, in fact, happen?

20   A    I haven't seen any indication of that in any

21   databases I've looked at, which is not to say I don't

22   think it occurs.  I just don't think it occurs at the

23   same rate as the rear back-over problem, which is a

24   recognized problem.  It's been written about and talked

25   about and solutions have been developed to solve it

58

1    over a number of years now.

2       Q    Is there a certain amount of injuries and

3    deaths that you require before you consider something a

4    problem?

5       A    Well, when it comes to vehicles, we are

6    certainly willing to accept lots of injuries and

7    deaths.  I mean, that's as our -- our society has said

8    we will accept 40,000 deaths and several million

9    significant injuries every year in the use of motor

10   vehicles.  So, you know, is there any level of injury

11   that, if it were preventable, I would say we shouldn't

12   prevent it?  No.  Does that mean that I think that we

13   have to address through an engineering solution every

14   kind of accident that occurs?  Probably not feasible.

15      Q    And tying that back into the front sensing, do

16   you believe that that is not feasible at this point in

17   time?

18      A    Oh, I believe it's feasible.

19      Q    Then do you believe or do you opine that, if

20   the proper engineering analysis was done and if it's

21   economically and technologically feasible, that all

22   vehicles should have front sensing devices as well?

23      A    Well, I certainly think it would be a good

24   thing from a safety perspective, but, as I said, I

25   don't think the problem with people being run over from

59

1 the front is as significant as the rear backing-up kind

2 of injury.

3  Q And what data are you relying to give me that

4 opinion?

5  A Well, I get all kinds of data every year on

6 injury events, and I don't think I've ever seen any

7 analysis that said that this kind -- I mean, there are

8 plenty of front-end collisions, don't get me wrong, and

9 plenty of pedestrians being hit at intersections and

10 all of these kinds of accidents, but you don't -- I

11 don't see discussions of children being inadvertently

12 run over by forward-moving vehicles to the same --

13 anywhere near the same extent.  In fact, I don't know

14 that I've ever seen an analysis of that, compared to

15 the fact that you frequently see analyses of the rear,

16 backing-over injury for children in particular.  I was

17 interested to see that it also happens to older people,

18 but from my perspective, children are the most

19 significant hazard because they are short.

20  Q Let's explore that a minute.  Why is it

21 happening to older people when clearly when one is

22 paying attention, the older people shouldn't be a blind

23 spot because they're going to be above that blind spot?

24  A My -- my take on that is, which I haven't

25 verified, is that older people are walking into the

60

1    path of moving -- of rearward-moving vehicles.

2        Q    And thus not be detected by what you believe

3    ought to be a safer alternative design for this

4    Expedition?

5        A    Well, I'm not sure that I understood what you

6    meant.  Did you mean a sensor, a rear sensor?

7        Q    Yes, ma'am.

8        A    Well, I think they would be detected by a rear

9    sensor.  I think the problem with most of those

10   incidents -- accidents is that they occur so suddenly

11   that people's reaction time is -- is not adequate to

12   cope with it.

13       Q    You haven't done any studies about rear-sensing

14   devices and humans' reaction time to same?

15       A    Humans' reaction time to what?

16       Q    Any alert that a rear-sensing device may

17   provide.

18       A    Well, I've done quite a bit of research of

19   people's reaction times to warning buzzers and bells

20   and sounds and so forth, though not specifically with

21   the warning bell or buzzer for this device, no.

22       Q    Why would this safer alternative design even

23   worry about reaction time?  Why don't we take that out

24   of the system and make the vehicle stop completely?

25       A    Well, there are probably a lot of reasons.  We

1    could talk about the fact that sometimes they're not

2    correct, they give false alarms.  We could talk about

3    the fact that sometimes whatever is back there, the

4    person doesn't care if they hit it, I suppose, or

5    drives over it.  But you're asking me if I think there

6    ought to be some kind of a cut-off or shut-off, that if

7    the device senses something behind it, the car won't

8    go?

9       Q    Sure.

10      A    Well, until -- until people are willing to

11   accept that, I suppose that's not a very reasonable

12   suggestion, because people would then try to figure out

13   ways to work around the device, I assume.  But in and

14   of itself, that's not a bad suggestion, actually.

15      Q    That would take out someone's slow reaction or

16   ignoring the sensor altogether, correct?

17      A    Well, I don't really think it's probably a

18   function too much of slow reactions, although I suppose

19   there are circumstances in which it could, and, yes,

20   sometimes people might ignore it altogether, and that

21   would solve that.  But, as I said, there's always the

22   issue of user acceptance.

23      Q    Have you done any looking or studies about

24   whether it's acceptable to users?

25      A    No, I haven't.

1    Q    Do you know if the young child in this case was

2    standing or walking at the time he was first struck?

3    A    No.

4    Q    Do you know if even there -- let me start over

5    again.  Do you know if Ms. McCutcheon would have been

6    able to stop in time, even if she had had a

7    rear-sensing device on this vehicle?

8    A    Well, I don't think Mrs. McCutcheon would have

9    been going, so she wouldn't have needed to stop.  She

10   would have put the car into reverse, and she would have

11   immediately gotten the signal that there was something

12   back there, based on my analysis of the things I read

13   about the sensing devices and the location of the child

14   and the car.

15   Q    The child walking from the side, would she have

16   had time to stop?

17   A    If she had already started moving, would she

18   have had time to stop, if he moved -- if he walked in

19   from the side?

20   Q    Yeah.

21   A    Don't know.

22   Q    You don't know if Cade was walking or standing,

23   right?

24   A    No, we don't know.  I think it seems as though

25   he probably was standing or was not moving very rapidly

1    anyway.

2        Q    No one saw Cade's movement, to the best of your

3    knowledge, immediately before this accident, correct?

4        A    No.  I think policeman said they tried to find

5    witnesses and there was no one who actually saw that

6    part of the accident.

7        Q    So, are you able to, as you sit here today,

8    tell us whether he was standing still or walking?

9        A    No.  I'm going to have to take a health break

10   here in a second.

11       Q    Good time.

12       A    I wanted to let you know so if you were going

13   through a line of questions, you asked me not to stop

14   you.

15              MR. WAMSTED:  Let's take 5 minutes.

16              THE WITNESS:  Okay.

17              (Short break held 3:50 to 4:00)

18       Q    (By Mr. Wamsted)   Go to the part from the

19   Consumer Report's Automobile '93 article.

20       A    Says "Driving Blind"?

21       Q    Yeah, that's it.

22       A    Okay.

23       Q    This, too, is part of your file, correct?

24       A    Yes, it is.

25       Q    And this is part of the materials you reviewed

64

1    in this case to express your opinions?

2        A    Yes.

3        Q    And it says one, two, three -- four paragraphs

4    down, we're talking about "cameras are marketed as

5    safety devices, sensors as parking assists."  Do you

6    see that?

7        A    I do.

8        Q    Do you agree with that?

9        A    Do I agree that's that how this was marketed in

10   this case?  Yes.

11       Q    All right.  And do you agree that cameras are

12   marketed -- well, let me go on down further.  The

13   little Consumer Report "Quick "Take" on the side?

14       A    Yes, I see it.

15       Q    It's got a little -- four little quick takes

16   there.  Do you agree with each and every one of those?

17       A    I agree that they're there.  I mean, do you

18   mean do I verify that they're all true?  I don't know.

19       Q    Do they comport with your opinions in this

20   matter?

21       A    Well, let's see.  Certainly, I agree with No.

22   1.  I guess No. 2 won't hurt.

23       Q    Okay.

24       A    No. 3 seems to be accurate.

25       Q    Okay.

65

1    A    No. 4 seems to be their opinion about it, yes.

2    Q    Is that your opinion as well?

3    A    That rear sensor systems can help you park but

4    they aren't reliable safety devices?

5    Q    Yes, ma'am.

6    A    Well, I don't think so, based on the things

7    that I've read.  I mean, I don't know what they mean by

8    a reliable safety device.

9    Q    Well, you read this, right?

10   A    I did read it.  They're talking about for

11   detecting blind spots.

12   Q    Let's go to the next page.

13   A    All right.

14   Q    Where it goes through each and every one of

15   these, says "Your choices"?

16   A    That's correct.

17   Q    Camera systems, wide-angle lenses and then

18   sensor systems?

19   A    Correct.

20   Q    Tell you what they're best utilized for.  Do

21   you see that?

22   A    I do.

23   Q    And really, what it's saying, if I can distill

24   this, is that camera systems are really the safety

25   system to be able to see small children or objects, and

66

1   sensor systems are best for parking.

2       A    Well, they say that they are best for detecting

3   large, stationary objects, but it also says it picked

4   up a three-inch wide pole when it was 3 to 4 feet away

5   from the vehicle.  So, as a parking assist, it

6   certainly is going to be a big help.  You know, and I

7   don't believe I've ever said that that was the only

8   kind of safety device that could be used to prevent the

9   kind of accident that this case is about.

10      Q    Question to you, ma'am, is:  Was this 2001

11  Expedition, in your opinion, unreasonably dangerous and

12  defective because it didn't have a camera system, the

13  preferred system by Consumer Report to detect a small

14  child such as the one involved in this case?

15      A    Well, I don't know that I would say it's

16  defective.  Would I say that if you wanted to have the

17  best system according to Consumer Reports, that would

18  be the best one.  That doesn't mean that -- as I said,

19  I haven't done the engineering analysis, so I can't

20  tell you which is the best or which are the -- all the

21  options that could be used, but based on the data that

22  I have reviewed, there are options, and there are rear

23  sensor systems that would have prevented this accident

24  from occurring.

25      Q    Well, you go further than that.  You fault Ford

67

1   Motor Company for not putting that safety system on

2   this vehicle, do you not?

3      A   Yes, I do, because that kind of technology was

4   available, and I think a sensor, a rear sensor system,

5   as was available on the Navigator, would have done what

6   needed to be done in this accident, would have

7   prevented this accident.

8      Q   But you're saying the parking aid was an

9   adequate safety system for this accident?

10      A   Well, I'm not saying it's a parking aid.  I'm

11   saying it's a rear sensor system, and I think it would

12   have prevented this accident.

13      Q   Without having ever looked at anything other

14   than the materials we've talked about, correct?

15      A   The materials that are in my file, that's

16   correct.

17      Q   Without having done any tests, right?

18      A   That's correct.

19      Q   Without having done an engineering analysis or

20   having an engineering analysis provided to you,

21   correct?

22      A   Correct.

23      Q   And you disagree with Consumer Reports

24   suggesting that the camera system is a far better

25   system for safety reasons than the sensor system you're

1  talking about, correct?

2      A    Well, I don't know where you came to that

3  conclusion.  I don't ever think that I -- I don't --

4  would you read back what he said?  I don't think I ever

5  said those things.

6              THE REPORTER:  Read back --

7              THE WITNESS:  Could you read back to me

8  the last question that he asked me?

9              (The requested excerpt was read back.)

10     A    Did I ever say that?  I don't think I ever said

11  that.

12     Q    (By Mr. Wamsted)  Let me ask you that.  Do you

13  believe that?

14     A    Do I believe that the rear sensor system that

15  was available on the Navigator, which could have been

16  on this Expedition, was as good or better than the

17  camera system?  Probably not.  Would it have been

18  adequate in this instance?  I believe it would have

19  been.

20     Q    Would it have been adequate in every instance?

21     A    Well, I don't know about every instance.  Every

22  instance is a mighty big term.  But would it have been

23  adequate in many instances of rear back-over accidents?

24  I believe it would have been.

25     Q    Would a camera system be better for safety

1    reasons than the sensor system?

2        A    Would it be more sensitive and more accurate?

3    Probably.

4        Q    And how do you then make the determination that

5    Ford has got a defective vehicle out there in this 2001

6    Expedition for not having the sensor system in there

7    but it didn't need the camera system?

8        A    Well, I don't know that I ever said it didn't

9    need it.  I said that, in terms of what's available,

10   the technology that's readily available, I think the

11   sensor system would have been adequate.  Now, if I had

12   my druthers, would I put a camera system on there if it

13   could be done at a reasonable cost and without

14   affecting the usability of the vehicle?  Probably.  I

15   haven't done those analyses.

16       Q    You haven't done either one of those analyses,

17   have you?

18       A    Which -- either meaning what?

19       Q    Either the sensor system analysis or the camera

20   system?

21       A    What kind of analysis?  I haven't done the

22   analysis to see if the -- if the camera system could be

23   installed in these vehicles without interfering with

24   the usability of the vehicle.  I know that's true for

25   the sensor system because it's out there on the

70

1   Navigator and other automobiles and it doesn't

2   interfere with the usability of the vehicle.

3       Q    How is the camera system going to interfere

4   with the usability of vehicle?

5       A    Well, you don't know.  I mean, if it has to

6   display a screen, is that screen going to be a

7   distraction to people driving?  There is a lot of

8   analysis that has to be done.  Is the camera going to

9   be taking up space and create some problem, that has to

10  be -- or has to be mounted in a location where it might

11  itself obscure rear vision?  I mean, there are all

12  kinds of questions that would have to be answered.

13      Q    Okay.  And you haven't done that -- you're

14  saying usability analysis, correct?

15      A    No, I haven't.

16      Q    You also haven't done the sensor system on this

17  2001 Expedition usability analysis either, have you?

18      A    Well, it's been done.

19      Q    My question, ma'am, is you haven't done it?

20      A    No.  I haven't had access to do it.  I don't

21  have access to Ford's manufacturing plants to do these

22  kind of analyses.

23      Q    Well, the fact of the matter is, and you said

24  it in your report, the 2001 Expedition had this as an

25  option they could have put on it, correct?

71

```
 1      A      That's correct.

 2      Q      You haven't even gone out and gotten an

 3   exemplar vehicle with that option and done any testing,

 4   have you?

 5      A      No, I haven't.

 6      Q      You don't have to get to Ford's manufacturing

 7   plant to do this usability analysis, do you?

 8      A      Well, it would depend on what kind of usability

 9   analysis you were doing.  Could I go out and do an

10   evaluation of the usability of that particular device

11   on that particular Expedition, assuming I could find an

12   exemplar?  Probably I could do an analysis and see --

13   but those analyses have been done.  I mean, they're in

14   the data that were provided to me.

15      Q      That data said what?  That it's useful as a

16   rear parking aid, correct?

17      A      Yes, but it also says that it detects things

18   that are fairly close and the kinds of things that this

19   little boy would have -- he would have reflected to the

20   sensor.

21      Q      Have you done any study of the effectiveness of

22   rear-sensing devices?

23      A      I'm not sure what you mean.

24      Q      Have you looked at whether there's been any

25   accidents, injuries or fatalities on vehicles with
```

72

1    rear-sensing devices?

2        A    No, I haven't.

3        Q    Should auto manufacturers put side air bags on

4    all their vehicles?

5        A    Yes.

6        Q    Have they put side air bags on all their

7    vehicles?

8        A    I don't know enough about side curtain air bags

9    to know what you're talking about.

10       Q    They put fog lights on all their vehicles?

11       A    No, probably not.  I don't know.  I mean, I

12   haven't researched any of these issues, so I can't

13   answer really.

14       Q    Should they put OnStar on all their vehicles?

15       A    It sure would be nice.  Are you asking me if I

16   think from a safety perspective it must be mandated?

17   Probably not.

18       Q    Why?

19       A    Why not?  Because it's quite expensive.  I

20   suppose when the technology gets to a reasonable price,

21   we'll be able to afford it, but we have to do -- we

22   have to do a cost-benefit analysis, and I don't know

23   what the cost -- I can pretty much guess what the cost

24   might be, but I don't know what the benefits would be.

25   I mean, in terms of safety, I just don't know, so I



73

1   can't give you an opinion on that.

2      Q   Have you done a cost-benefit analysis in this

3   case?

4      A   Not a formal one, but based on what I've seen,

5   the cost of these systems, these rear-sensing systems

6   is not out of reach for the manufacturer, given the --

7   especially for this vehicle, the cost of the vehicle,

8   it would not have added significantly to the

9   manufacturing cost.  That's just my estimate.  That's

10   not -- I'm not an expert in that area.

11      Q   What about a Ford Focus?

12      A   Well, again, I don't know.  I mean, I saw a lot

13   of devices out there that were not very expensive that

14   could be installed as after-market devices.  So, I'm

15   not sure what the cost to the manufacturer of putting

16   these devices into all vehicles of all makes and costs

17   would be.

18      Q   The only really inexpensive device after-market

19   is that magnifying window, correct?

20      A   Well, that is the least expensive and whether

21   or not that would be adequate for some small cars or

22   not, I don't know.  I mean, I just don't know the

23   answer to these questions.

24      Q   Let's go to your report, Exhibit 2.

25      A   Okay.

74

1    Q    March through some of your opinions here.  No.

2    1, "The design of the vehicle results in a large blind

3    spot behind the Expedition."  I read that correctly,

4    correct?

5    A    Yes.

6    Q    Can you quantify that blind spot?

7    A    Well, no, but I could if I went back through

8    the documents.  It's spelled out in size, width and

9    depth in the documents.

10   Q    Did you quantify it in relation to any other

11   vehicle?

12   A    No, I didn't.  My assumption is that for other

13   vehicles of its size and shape, it's going to be the

14   same, and as vehicles have different sizes and shapes,

15   it's going to vary.

16   Q    And you didn't do any of that by looking,

17   correct?

18   A    It doesn't look relevant to me in this case, so

19   I didn't do it.

20   Q    Well, we could also write the design of all

21   vehicles results in a blind spot, correct?

22   A    We could say blind spot, yes, but I said in

23   this case large blind spot.

24   Q    Well, I said we could write all vehicles have a

25   blind spot, correct?

75

```
 1      A     Yes, they do.

 2      Q     We could further say, as designed, there is no

 3   way for a driver to detect a young child who goes

 4   behind the vehicle after the driver has entered the

 5   vehicle, correct?

 6      A     Well, for many vehicles, that's true.  It may

 7   not be true for all.

 8      Q     Well, give me a single vehicle it's not true

 9   for.

10      A     Well, I don't know.  I haven't done that

11   analysis, but I don't like to make blanket statements,

12   since I don't have those data.  I mean, there may be

13   small vehicles with adequate rear windows where you

14   could detect them.  I just don't know the answer to

15   that at this point.  It's irrelevant to me anyway in

16   the context of this case.

17      Q     No. 2, you say, "The large blind spot creates a

18   significant safety hazard for young children."

19      A     I do say that.

20      Q     I can take out large and I could put blind

21   spots create a significant safety hazard for young

22   children, correct?

23      A     You could say that, but I think the large is

24   important, because I think the larger the blind spot,

25   the greater the hazard and the more likely it is that a
```

76

1    child will enter that blind spot and be at risk.

2       Q    But that's again something you haven't

3    quantified, have you?

4       A    Well, I have seen data in these reports that,

5    you know, different vehicles have different size blind

6    spots, and this one happens to have a large -- what I

7    consider a large blind spot.

8       Q    Well, let's pull out some more data then.

9    Pull out the data collection study.  Do you see that,

10   from the Texas -- or the Department of Transportation?

11      A    I don't know what you're talking about, no.

12      Q    The May, 2004 --

13      A    Is that the -- not that one.  I don't know.

14   Does it have a Bate's number?

15              MR. WAMSTED:  Bill, is this something --

16              MR. MOYE:  Ron, that's something that Jeff

17   Mann relied upon, mentioned in his expert report.

18   Dr. Laux doesn't have that particular NHTSA document

19   mentioned.

20              THE WITNESS:  Well, thanks.

21      Q    (By Ms. Wamsted)  My question, ma'am, is there

22   any reason you don't have this document?

23      A    No.

24      Q    Says "Data Collection Study, Deaths and

25   Injuries Resulting from Certain Non-Traffic and

CINDI L. BENCH REPORTING (281) 565-8222

77

1   Non-Crash Events," May, 2004.

2       A    No, there is no reason I don't have it.

3       Q    There are four topics:  Vehicle-generated

4   carbon monoxide --

5       A    I do have that.  I do have that.  I remember

6   seeing it.  And one of them is back-over accidents,

7   right?

8       Q    Right.

9       A    Yeah, I've seen that.  Here it is right here,

10  only it's call "Field Measurement of Naturalistic

11  Backing Behavior"?  Maybe that's not -- no, that's not

12  the one.  But I've seen the one you're talking about.

13  I do have it somewhere, or I've seen a reference to it.

14  Because I remember looking at it again, because it had

15  four kinds of accidents, and only one of them was back-

16  overs.  I just don't know where it is right now.

17      Q    Is it referenced in your report?

18      A    Is it mentioned in my report?  Portions of a

19  May 4th, 2004 study by NHTSA.  Yeah, it's there.

20           MR. MOYE:  I apologize.

21      A    I just can't find my -- put my hands on it, but

22  I know it's in this stack of stuff, because I've seen

23  it recently when I was putting things together.  So,

24  we'll just take the time to find it, unless you can ask

25  me questions that I can answer without looking at it.

1     Q     (By Mr. Wamsted)  No, you need to look at it.

2     A     Okay.  Well, it's not in this stack of stuff.

3    I know I've looked at it recently, so it's got to be in

4    here somewhere, unless I inadvertently left it at home.

5    "Data Collection Study, Deaths and Injuries Resulting"

6    -- yeah, there it is.  Okay.  Vehicle backing, right?

7     Q     Yes, ma'am.

8     A     All right.

9     Q     We need to go to the '98 data from the death

10   certificates which is on page 38 of that report.

11    A     I'm looking at 18, which has 1998 death

12   certificates.

13    Q     Go to Appendix 3.

14    A     Okay.  All righty.

15    Q     And the very first one is a 14-month-old child

16   apparently?

17    A     Yes.

18    Q     Was killed by a parent and the parent was

19   driving a car, correct?

20    A     Parent was parking car, backing up, that's

21   correct.

22    Q     Okay.  That's a -- the car created a

23   significant safety hazard for that young child,

24   correct?

25    A     Well, I think that's a given, isn't it?

79

1    Q    Yes, ma'am, it's a given.  Do you know what the

2    size of the blind sport of that vehicle?

3    A    No.  We don't even know what the vehicle was.

4    Q    Except we know it's a car, correct?

5    A    That's correct.

6    Q    Then we've got a 7-year-old that's killed by a

7    car crossing a street, right?

8    A    That's correct.

9    Q    Do you know if that one was caused by a blind

10   spot on that vehicle?

11   A    Don't know.

12   Q    Have you done any look, other than what's

13   written in this document, at any of these individual

14   incidents?

15   A    No, I don't have access to the death

16   certificates, and I don't have access to Nexus; so no.

17   Q    Where do you get the information in Paragraph 3

18   of your opinions that SUVs are responsible for a

19   disproportionate number of those deaths and injuries?

20   A    Well, it's in -- somewhere in the documentation

21   that I read that, proportionate to the numbers of SUVs

22   that there are in the -- in the total population of

23   vehicles, the number of back-over incidents is higher.

24   Q    Now, what does this study suggest, at least in

25   1998?

80

1    A    Which study?  The one we've just been looking

2    at?

3    Q    Yes.

4    A    I don't think it suggests anything.

5    Q    Well, look at page 18, now, if you would.

6    A    As you know, this is not exhaustive, by any

7    means.  This is just a sample of accidents that they

8    had access to.  This is no -- not an exhaustive study

9    of accidents that occurred that has them all

10   quantified.

11   Q    I understand that.  Please tell me the

12   exhaustive study you looked at such that you're able to

13   opine that SUVs are responsible for a disproportionate

14   number of those deaths and injuries.

15   A    Well, I didn't opine it.  I was reporting it,

16   and I will go through the documentation and find it, if

17   you want me to, but if you want me to, I would like to

18   do it not here today, because it might take me a

19   considerable amount of time.  But I did draw that from

20   some of the documentation that I looked at.

21   Q    Okay.  This documentation would suggest that's

22   not the case, correct?

23   A    No, I don't think it does.  I don't think it

24   suggests one way or the other.

25   Q    Well, we can at least look at, on page 18,

81

1    "Backing Deaths Identified in 1998 Death Certificates

2    by Vehicle Type."  Do you see that title?

3        A    I do.

4        Q    Tell me, if you would, how many they find from

5    SUVs.

6        A    Well, we don't know.

7        Q    Tell me how much they've written down.

8        A    Well, they've written down three.

9        Q    Well, tell me how many they found from

10   passenger car?

11       A    Let's see.  25.

12       Q    Okay.  Now, tell me how many that are unclear?

13       A    19.

14       Q    All right.  So, if we take their data source,

15   and how good is this data source?

16       A    Well, I didn't say more SUVs.  I said

17   disproportionate, as a proportion of the population

18   of vehicles.  There's a big difference between what

19   you're -- the inference you're drawing here and what I

20   said.  I think these data might actually support that

21   position if we -- if we count the unclears as SUVs, and

22   we don't know.

23       Q    Well, that wouldn't be very reliable to do

24   that, now, would it?

25       A    No, it wouldn't but then you're wanting to use

1    it as -- you're wanting to use this study as some kind

2    of proof that I've made some kind of wrong assumption.

3    And my assumption is, based on data that I've read in

4    some other study in here -- and I don't know where it

5    is, but, as I said, I'll be glad to find it for you and

6    communicate that to you.  But this study doesn't have

7    anything to do with proportionate.  This is a study of

8    things that they just happened to have access to and

9    were looking at.  This is in no way any kind of

10   statistically significant sample.  They say so

11   themselves.  I mean, they're just looking at some of

12   these accidents to try and figure out how they happen.

13        Q    And a lot of them happened with cars, correct?

14        A    Yes, a lot of them happened with cars, because

15   there are a hell of a lot of cars out there on the

16   road.

17        Q    Well, we ought to put these devices, whatever

18   it is, once you do the engineering analysis, on all

19   these cars, too, right?

20        A    That would be my choice, I said, as we -- as we

21   went through for 20 or 30 minutes earlier in this

22   deposition.

23        Q    If you looked up on Table 4, it shows that the

24   backing deaths are really pretty evenly divided between

25   children and adults.  Doesn't it show that?

83

1    A    Well, I'd say that 41 between the ages of 0 and

2    4 is a pretty high number, because that's only a four-

3    year period, and all these other periods are much

4    longer.

5    Q    That's not my question.

6    A    Well, your question was almost half of the

7    accidents occurred to children under -- 4 and under.

8    Q    Almost half of the accidents occurred to

9    adults, correct?

10   A    Let's see.  Well, elderly adults, as we pointed

11   out earlier, but the able-bodied adults, it's only 17

12   of the 91.

13   Q    My question:  I said half of them occurred with

14   adults, correct?

15   A    Yeah, sure.

16   Q    In No. 5, you say, ""There is no warning in the

17   owner's manual about the fact that the reverse field of

18   view in the Expedition is significantly restricted."

19   Is that correct?

20   A    Yes.

21   Q    Have you ever seen an owner's manual about

22   warning of -- in reverse field of view?

23   A    No.

24   Q    Is it your view that every owner's manual on a

25   vehicle ought to have a warning about a reverse field

84

1    of view restriction?

2        A    For vehicles that have a significantly enhanced

3    impaired -- or inhibited field of -- reverse field of

4    view, I think it is an important thing to say.  I think

5    a lot of people, the first time they drive an SUV or

6    buy an SUV, don't realize that it's different from an

7    automobile.

8        Q    And we've already determined that an automobile

9    has a blind spot, correct?

10       A    Yes, it does.  Most people have experience with

11   driving cars, they've been doing it for quite some

12   time.

13       Q    But your belief is that people driving cars

14   know they have a blind spot.  When you get in a big

15   vehicle, they don't know they have a blind spot?

16       A    They may not realize the size of that blind

17   spot.  In, you know, car SUV, they may not realize --

18   probably don't realize that there are devices available

19   to help them avoid the consequences of that blind spot.

20       Q    My question:  What size of blind spot in cubic

21   feet, let's say, would one need to warn an owner about?

22       A    Is that it, the question?

23       Q    That's the question.

24       A    I don't know.  I think if there is a blind spot

25   that could cause -- that's large enough that a child

1    could be in it, then probably we need to warn them

2    about it.

3        Q    Okay.  And we've already determined basically

4    that a child can be in a blind spot in every vehicle

5    manufactured?

6        A    No, I don't think we determined that, because

7    we don't know that.  We don't know about every single

8    vehicle that's been manufactured.  Am I willing to

9    accept that that's true for most vehicles?  Sure.

10       Q    And you're willing to accept that owner's

11   manuals in almost every single vehicle needs this

12   warning, correct?

13       A    Yes, I am.

14       Q    And in all your work on warning in owner's

15   manuals, have you ever seen -- have you ever seen such

16   a warning?

17       A    No.  I think I told you earlier, I have not.

18   You asked me that before, and I said no, I haven't.

19       Q    You've done some work on warnings in owner's

20   manuals and such.  Has any of your work suggested or

21   required or recommended such a warning?

22       A    No, I don't think so.  I don't think we've ever

23   recommended warnings of any -- of any kind.

24       Q    Do you have a specific warning you're

25   recommending here?

86

```
 1        A    I have no specific one, but I have ideas about

 2   what I would do.  I don't ever come up with a warning

 3   in a deposition, because warnings have to be formulated

 4   based on the information you have and tested, and you

 5   have to check them against standards and so forth.  So,

 6   I could come -- I could tell you what I think it ought

 7   to be like.

 8        Q    But you haven't done any of that?

 9        A    No, I haven't.

10        Q    No. 6, you say, "The Ford Expedition is a

11   high-end vehicle in terms of price," correct?

12        A    I do.

13        Q    And you say, "The addition of the reverse

14   sensing system would not significantly add to the

15   production, manufacturing cost for the vehicle,"

16   correct?

17        A    That's what I said.

18        Q    As a proportional basis, right?

19        A    No, not necessarily.  I just -- I think that

20   there's probably a price above which it's

21   insignificant.  Below that price, it's probably more

22   significant in terms of affecting the total cost of

23   manufacturing.  (Coughing.)  Excuse me.

24        Q    But it's still your opinion that all vehicles

25   should have this reverse sensing system, right?
```

87

1    A    I think it would be good for safety, yes, if

2    all of them had the reverse sensing system.

3    Q    That's all vehicles and vehicles alike,

4    correct?

5    A    Yes.

6    Q    No. 8, at the very end of No. 8, "Ford had the

7    means to reduce or eliminate this hazard in the

8    Expedition" correct?

9    A    Yes.

10   Q    How would they eliminate this hazard?

11   A    By providing the rear-sensing system.

12   Q    That would absolutely eliminate this hazard,

13   correct?

14   A    Let's see, what did I say?  Yes, it would

15   reduce or eliminate it.  That's what I said.

16   Q    My question to you, ma'am, is how would Ford

17   eliminate this hazard?

18   A    Well, no one can ever eliminate any hazard all

19   the time everywhere, in every circumstance.  The goal

20   is to get the hazard down to as low as possible within

21   reasonable design requirements.  And that's what I'm

22   saying.  This would reduce the hazard, reduce the risk

23   to Cade, and I think it would have prevented his being

24   run over.

25   Q    But there's no way you can opine that it would

88

1    eliminate the hazard, can you?

2         A    Well, I would -- I can opine that it would

3    probably have eliminated the hazard in this instance.

4    Now, not maybe in every instance, but in this instance,

5    I think it would have, because she was stopped.  When

6    she put it into reverse, if the sensor had alerted her

7    that the child was there, she would never have moved.

8         Q    Or before the child could have been moving out

9    of the field of the sensor view and into the field of

10   the sensor view after she started the vehicle

11   backwards, correct?

12        A    Well, as I said, I'm not the accident

13   reconstructionist, but that's not my reading of what

14   happened based on the reports I read.  The reports I

15   read indicated to me that he was stationary or almost

16   stationary at the time of the accident.

17        Q    Your report doesn't even say that.  Your report

18   says he was standing or walking.  You now need to

19   change your report?

20        A    No.

21        Q    All right.

22        A    If he was walking, he was walking -- but, you

23   know, what I've said throughout is that if he was

24   walking, he wasn't walking -- he wasn't running, he

25   wasn't walking rapidly.  He was behind the vehicle.  If

CINDI L. BENCH REPORTING (281) 565-8222

89

1    he had been out to the side of the vehicle, the driver

2    would have seen him when she looked in the rearview

3    mirror, which she testified she did, and that she

4    testified she always did.  So, if he had been coming

5    from the side and going slowly behind this vehicle, she

6    would have seen him, because he would have been there

7    just an instant before she put the car into reverse.

8        Q    Where did she look in her mirrors?

9        A    She said she looked left, center and then right

10   -- or right, center and then left, I think.  I don't

11   remember which.  But she looked in all the rearview

12   mirrors, and it doesn't take even a millisec -- it

13   doesn't take 500 milliseconds to look in the rearview

14   mirror, to glance in one.

15       Q    But you can't remember, as you sit here today,

16   what order she looked in her mirrors?

17       A    No, I can't.

18       Q    But she looked in left mirror first, and then

19   her rear mirror -- rearview mirror, and then her right

20   mirror.  There is a possibility that Mr. Cade, right,

21   could have started in from the left while she was

22   scanning those other mirrors, correct?

23       A    Not really, because he would have had to have

24   been coming down the side of her vehicle.

25       Q    Was Ms. McCutcheon distracted in any form or

CINDI L. BENCH REPORTING (281) 565-8222

91

automotive industry.

Q    Was this hazard only known by the automotive industry, or was it known by the government?

A    Yes, it was known by the government.

Q    Does the government have any standards when it comes to rear-sensing devices?

A    Not that I know of.  (Coughing.)  Excuse me.

Q    Did you look if Ford was in violation of any standards in preparing your report?

A    Well, I didn't look at all the Federal Motor Vehicle Safety Standards, but I was not aware that they were in violation of any safety standard related to rear sensor systems, if that's what you're asking me.

Q    That is what I'm asking.  They are in compliance with the governmental standards as they existed in 2001, correct?

A    To my knowledge, yes, although, as I said, I haven't looked at all of them, and there are lots and lots and lots of them.  So, I'm not giving a blanket statement about that.

Q    The government could implement and cause Ford and the other auto manufacturers to place some sort of rear-sensing device in their vehicles, could they not?

A    Yes.

Q    They hadn't done so in 2001, correct?

92

1      A     That's correct.

2      Q     They haven't done so here in November of 2004,

3   correct?

4      A     That's correct.  There's that cloud back again.

5      Q     No. 9, you say, "Ford could and should have

6   provided a reverse sensor system on the Explorer" --

7   "Explorer driven by Robin McCutcheon."  Correct?

8      A     Yes.

9      Q     You don't mean Explorer, you mean Expedition,

10  right?

11     A     Oh, I sure do.

12     Q     However, had Ms. McCutcheon been driving an

13  Explorer, your opinions would be the same, would they

14  not?

15     A     They would.

16     Q     Had Ms. McCutcheon been driving an F150, your

17  opinions would be the same, right?

18     A     I don't know what an F150 is.

19     Q     A truck?

20     A     A truck?

21     Q     Yes.

22     A     Probably.  You know, I haven't analyzed a truck

23  and I don't know anything about its blind spots or

24  anything, but probably, yes.

25     Q     Had Mrs. McCutcheon been driving a Taurus, a

93

1    car, and she had run over Cade, your opinions would

2    have been the same, right?

3        A    To some extent.  Although I think the

4    likelihood that she would have been aware of a child

5    back there certainly increases when she's driving a

6    Taurus.

7        Q    But if the accident would have happened, your

8    opinions would be the same, correct?

9        A    If the accident had happened like this one in a

10   Taurus, probably.

11       Q    And it would be the same with General Motors

12   vehicles and Chryslers and Toyotas and European

13   vehicles, correct?

14       A    Well, you don't think I'm just saying that

15   Ford's responsible, do you?  Of course, that's correct.

16       Q    Okay.  You say, "Failing to do so shows a

17   callous disregard for the safety of children and

18   adults, also for the driver of the Expedition who

19   causes a child injury or death," correct?

20       A    I do.

21       Q    How do you define callous?

22       A    Callous means that -- to me, that they had the

23   option to provide appropriate warning devices, and they

24   made a cost-benefit analysis of some sort, I don't know

25   what, and decided not to put it on these vehicles and

90

1   fashion?

2       A    Yes, she was, but just before she started her

3   car, she said she looked in the rearview mirrors.  If

4   she had looked in the rearview mirror as he was coming

5   down the side of her vehicle, she would have seen him

6   either in front of the rearview mirror or behind it, in

7   the rearview mirror.  So, that doesn't -- that scenario

8   doesn't play very well with me.

9       Q    In your work, you found -- your human factors

10  work, have you found that distracted people sometimes

11  do things wrong?

12      A    Yes.  And certainly before she began to put the

13  car in reverse, she was distracted, but, from her

14  description and her husband's description, at the time

15  she began to back up, all of the distraction had been

16  resolved, they were -- the kids were strapped into

17  their seats.  She was turned around, she was looking in

18  her rearview mirror, she was driving normally at that

19  point.  She doesn't say that she was still distracted,

20  checking on the kids or anything at that point.

21              MR. WAMSTED:  Object to the

22  responsiveness.

23      Q    (By Mr. Wamsted)  Was this hazard only known by

24  Ford or was it known by the entire automotive industry?

25      A    Well, it was certainly known by the entire

94

1   to accept the consequences of that.

2       Q    What person or persons at Ford were actually

3   callous?

4       A    Anybody who had any part in the decision not to

5   put this rear-sensing system on this Expedition.

6       Q    Name one of those people, please.

7       A    Well, I can't.  I don't know them.  I've not

8   had privy to those folks.

9       Q    Okay.  So, your opinion is that Ford, through

10  some unknown persons, more or less intentionally caused

11  the death of Cade, right?

12      A    I don't think I said that.  What I said was

13  that Ford employees made the decision, based on some

14  cost-benefit analysis that I don't have access to --

15  all I can see is the result of it -- that it was -- the

16  benefits did not outweigh the cost of putting the

17  sensor on this vehicle.

18      Q    Well, they actually make money on the sensor,

19  right?

20      A    I don't know.

21      Q    You don't know one way or another?

22      A    No.  I don't know whether putting one on this

23  car would have increased their profit margin on the car

24  or not.

25      Q    Let's assume it would have increased the profit

95

1    margin.

2       A    All right.

3       Q    You're saying they're callous because they

4    didn't make Mrs. McCutcheon buy a reverse sensing

5    device that would have made Ford more money?

6       A    Well, you're actually twisting everything

7    around, aren't you?  I'm saying that they had the

8    choice to put a reverse sensing system on here.  They

9    made the analysis -- if you're telling me it wasn't for

10   costs in terms of dollars, for some other reason, they

11   made the decision that the costs were greater to them

12   than the benefits.  That's what a cost-benefit analysis

13   is.  Doesn't have to be monetary cost.  If they didn't

14   do that, then it was just random that they decided to

15   put this on there.  I mean, maybe they don't do cost-

16   benefit analyses or any kind of rational analysis in

17   the design of their vehicles.  Maybe they just do

18   random decision-making, say this one gets it, this one

19   doesn't, this one gets it, this one doesn't.  I don't

20   have.  I mean, I don't have any documents to tell me.

21   Logically, my assumption is, knowing how manufacturing

22   works, that somebody along the line did some kind of

23   cost-benefit analysis and said, "No, we won't put it on

24   there."

25              MR. WAMSTED:  Object to the nonresponsive.

96

1    Q    (By Mr. Wamsted)  And this cost-benefit

2    analysis that you're talking about Ford should have

3    done, is not anything you've done in this case?

4    A    No, I haven't.

5    Q    Other than the ten opinions you've provided --

6    eleven opinions you've provided in your report, do you

7    have any other opinions in this matter, ma'am?

8    A    Not that come readily to mind.

9    Q    Have you done enough work on this file to be

10   comfortable with each and every one of your opinions?

11   A    Yes.

12   Q    Do you intend to do any more work on this

13   matter?

14   A    If I'm asked to, I will.

15   Q    Have you prepared any exhibits or demonstrative

16   aids?

17   A    No, I have not.

18   Q    Do you intend to do so?

19   A    If I'm asked to, I will, but I doubt that I'll

20   be asked to.

21              MR. WAMSTED:  Let's take a 5-minute break.

22              MR. THOMAS:  Sure.

23              (Short break held 4:45 to 4:50)

24   Q    (By Mr. Wamsted)  Ma'am, just a few more

25   questions.

CINDI L. BENCH REPORTING (281) 565-8222

97

1      A     Okay.

2      Q     Did you have any data support for 2003 backing

3   test?

4      A     2003 backing test?  No.  Well, I mean, I

5   probably do have some data sources.  I haven't looked

6   at them.

7      Q     Are these types of deaths in any of the usual

8   data sources utilized by folks such as yourself, such

9   as FARS?

10     A     Sometimes they are.  I mean, it just depends on

11  the data source and how the data were collected and how

12  the data are designated.  I mean, that's, you know,

13  always a problem.

14     Q     Have you looked at or studied any substantially

15  similar cases such as this?

16     A     No.

17           MR. WAMSTED:  That's all I have, ma'am.  I

18  hope you make your plane.

19           THE WITNESS:  Me, too.  I'm not worried

20  about me making it, I'm worried about it making it.

21  I'm worried about it going.

22           MR. THOMAS:  Reserve ours.

23           MR. WAMSTED:  I'll pass the witness.

24           THE WITNESS:  Thank you.

25           MR. THOMAS:  Reserve ours.

CINDI L. BENCH REPORTING (281) 565-8222

98

1          THE REPORTER:  Read and sign?

2          THE WITNESS:  Yes, I like to sign.

3               * * * * * * * * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

99

1                CHANGES AND SIGNATURE BY LILA LAUX, PhD.

2    PAGE      LINE      CHANGE            REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

100

I, **LILA LAUX, PhD.**, have read the foregoing
deposition and hereby affix my signature that same is
true and correct, except as noted above.


_____
LILA LAUX, PhD.

THE STATE OF COLORADO:

COUNTY OF _____:


Before me, _____, on this day personally

appeared, witness name, known to me (or proved to me

under oath or through _____) (description of

identity card or other document)) to be the person whose

name is subscribed to the foregoing instrument and

acknowledged to me that they executed the same for the

purposes and consideration therein expressed.

Given under my hand and seal of office this

_____ day of _____, _____.



_____
NOTARY PUBLIC IN AND FOR
THE STATE OF COLORADO
COMMISSION EXPIRES:

101

1 | THE STATE OF TEXAS        :

2 |        I, CINDI L. BENCH, the undersigned Certified
Shorthand Reporter, in the State of Texas, do hereby
3 | certify that the facts as stated by me in the caption
hereto are true; that the above and foregoing answers of
4 | the witness,
                LILA LAUX, PhD.,
5 | stated in the caption hereto, to the deposition as
indicated, were made before me by the said witness after
6 | being duly cautioned and sworn to testify the truth, the
whole truth and nothing but the truth, and the same were
7 | thereafter reduced to typewriting under my direction;
that the above and foregoing deposition as set forth is
8 | a full, true, and correct transcript of the proceedings
had at the time of taking said deposition.
9 |        I further certify that I was neither attorney
nor counsel for, nor related to, nor employed by any of
10 | the parties to the action in which this deposition is
taken, and further that I am not a relative or employee
11 | of any counsel employed by the parties hereto, or
financially interested in this action.
12 |        GIVEN UNDER MY HAND AND SEAL OF OFFICE this
_____ day of _____, 2004.

13

14

15 | _____
                CINDI L. BENCH, CSR
16 |                Certificate No.:      752
                Expiration Date:    12-31-06
17 |                Firm Registration No.: 56

18 | CINDI L. BENCH REPORTING
101 Southwestern Blvd., Suite 145
19 | Sugar Land, Texas    77478-3649
(281) 565-8222
20 | Fax (281) 565-8220

21

22

23

24

25

CINDI L. BENCH REPORTING (281) 565-8222